Hart *v.* Burnett.

## HART *v.* BURNETT *et al.*

SAN FRANCISCO was at the date of the conquest and cession of California, and long prior to that time, a pueblo, entitled to and possessing all the rights which the law conferred upon such municipal organizations.

Such pueblo had a certain right or title to the lands within its general limits; and the portions of such lands which had not been set apart, or dedicated to common use, or to special purposes, could be granted in lots by its municipal officers to private persons in full ownership.

The authority to grant such lands was vested in the Ayuntamiento, and in the Alcaldes or other officers who at the time represented it, or had succeeded to its "powers and obligations."

The official acts of such officers in the course of their ordinary and accustomed duties, and within the general scope of their powers, as here defined and explained, will be presumed to have been done by lawful authority.

These municipal lands to which the city of San Francisco succeeded, were held in trust for the public use of that city, and were not, either under the old government or new, the subject of seizure and sale under execution.

This property and these trusts were public and municipal in their nature, and were within the control and supervision of the State sovereignty, and the Federal Government had no such control or supervision.

The Act of the State Legislature of March, 1858, confirming the so-called Van Ness Ordinance, was a legal and proper exercise of this sovereign power; and this act gave full effect to the provisions of that ordinance, and vests in the possessors therein described, as against said city and State, a title to the lands in said ordinance mentioned.

The city of San Francisco holds the municipal lands of the pueblo, not legally disposed of as hereinbefore explained; and her title is wholly unaffected by Sheriff's sales under execution against her, so far as those sales touch or affect the aforesaid pueblo lands.

A defendant in ejectment, holding such lands merely by possession, may set up the invalidity of such sales, or the plaintiff's title derived therefrom, to defeat the plaintiff's action.

It is not clear, that the order of the Board of Supervisors of the city and county of San Francisco, repealing the Van Ness Ordinance, before the passage of the Act of 1858, confirming it, destroyed the power of the Legislature to give due effect to the provisions of that ordinance.

Assuming that this repealing order was effectual to defeat the rights claimed to have vested under the ordinance, then the property claimed would belong to the city, and plaintiff here could not recover.

APPEAL from the Fourth District.

Ejectment for a number of fifty-vara lots in the city of San Francisco. Plaintiff claims under a Sheriff's sale upon an execution issued Nov. 1851, upon a judgment rendered in September of that

Hart *v.* Burnett.

year, in favor of Jesse D. Carr, against the city of San Francisco, and a Sheriff's deed based on such sale. The deed was executed in June, 1852, to one Thorne, from whom, by mesne conveyances, the title passed to plaintiff. Plaintiff had judgment below, defendants appeal.

It is unnecessary to state particularly the facts, or the precise form in which the questions presented by the record arose. The case was argued in this Court as properly raising the question as to the existence and extent of a pueblo at San Francisco, and as to the rights of such pueblo, if any, to the lands within its limits; and also as to the validity of execution sales of such lands.

The case was elaborately argued at the bar, and there are filed in the record a large number of briefs, containing, some of them, over one hundred and fifty printed pages. Most of this matter is as to the existence or non-existence of a pueblo, and the character of its title, if any, to the municipal lands. To insert a reasonable portion of the argument of counsel upon this point, would not present it fully and fairly, and to do more, would require too much space. The opinion of the Court discusses this question and others at great length, and the Reporter has determined to omit the argument of counsel upon all the points in the case, except as to the leviable character of the city's interest in the land, and also excepting respondent's positions as to the inability of defendants to raise this question, and as to the rule of *stare decisis.* The elaborate arguments of Messrs. Randolph, Thornton, Williams & Thornton and Shaw, for appellants, upon this rule, are omitted, for the reason that the Court discusses the rule at length, and reaches the conclusions for which the counsel contended.

*Thornton, Williams & Thornton, Edmund Randolph, Wm. J. Shaw, R. Aug. Thompson, Horace Hawes, John Nugent, F. J. Lippitt, McDougall & Sharp and F. M. Haight,* for Appellants.

The mere points, with the authorities of appellants, as given in a brief signed by most of the counsel, are as follows :

I.    Neither the municipal incorporation of Yerba Buena (if such ever existed, which we deny) or the city of San Francisco, as its successor, ever had any title to the lands within their respective limits. But the title to them prior to the seventh of July, 1846, was in the Mexican Government, and since, by conquest and treaty, in the Government of the United States. (*Vide* opinion of Land Commissioners, under act of Congress, approved March 3rd, 1851, in the case of the

*City of San Francisco* v. *The United States,* and authorities therein cited ; Febrero Mexicano Libro Segundo, chap. 1, arts. 13 to 16 inclusive ; Ordenanzas de Tierras y Aguas, 102–3–4; Decree of Spanish Cortes, January 4th, 1813; Land Laws in California, &c. (White) 2 vol. 46–161 ; Law of March 20th, 1837—entitled " Reglamento provisional para el Gobierno Interior de los Departamentos," and authorities (additional) under point No. III ; Mexican Executive Regulations of 1828 ; Escriche Dic. de Leg. y Juris, 571–3 ; Elizondo's Practica Universal Forens. vol. 3, 109 ; Id. vol. 5, 226 ; 5 La. 103 ; 10 Pet. 723; 2 White, 46–55 ; Id. 76, 111–125 ; Escriche, Verbum Baldio.)

II.   The act of Congress approved March 3rd, 1851—entitled "An Act to ascertain and settle Private Land Claims in the State of California "—is not a grant to the city of San Francisco of the lands, or of any portion of them, embraced within the limits of the city. ( *Vide* Debates in the Senate of U. S. on the fourteenth section of said Act of Congress, approved March 3rd, 1851 ; *Bryant* v. *Forsyth,* 15 How. 335 ; *Kissell* v. *St. Louis Public Schools,* 18 How. 19.)

III.   Conceding, for the sake of argument, that the city of San Francisco was invested with title to the lands within the corporate limits of the city ; then such lands were held for public purposes, and were not subject to levy and sale under execution.   (See authorities under point I ; 15 How. 367 ; *Edgerton* v. *Third Municipality of New Orleans,* 1 La. Ann. 435 ; *La. State Bank* v. *Orleans Nav. Co.* 3 La. Ann. 294; *Municipality No.* 3 v. *Hart,* 6 La. Ann. R. 570 ; *Mayor et al.* v. *Hopkins et al.* 13 La. R. (O. S.) 208 ; *Gilman* v. *County of Contra Costa,* 8 Cal. 52 ; *Emeric* v. *Gilman,* 10 Cal. 404 ; 10 How. 534 ; *Police Jury of Baton Rouge* v. *Michel,* 4 Ann. 84 ; *Heirs of Villars* v. *Kennedy,* 5 Ann. 725–729 ; 4 Wheat. 660–1 ; 13 Wend. 337 ; 10 How. 534 ; 6 Id. 534; 1 Tucker's Com. 454; 5 Cal. 216 ; 9 Watts & Serg. 28 ; 3 How. 550.)

IV.   There is no proof in the record that the land in controversy is within the limits of the place called Yerba Buena, nor within the limits of any grant to such a municipal corporation as Yerba Buena ; the plaintiff therefore cannot recover in this case.

*Hoge & Wilson and J. B. Townsend,* for Respondent.

The points and authorities of Hoge & Wilson, for respondent, upon the leviable character of the city's interest in the municipal lands, as to defendants' right to set up the want of leviable title in the city, and upon the rule of *stare decisis* were :

I.  Defendants claim under the city, relying upon a title under her ordinances, and are estopped to dispute her title. (*Trahan* v. *McManus*, 2 La. 209–214; 8 Id. 237; *Jackson* v. *Shutee*, 5 Cow. 182; *Lessee of Cooper* v. *Galbraith*, 3 Wash. C. C. R. 546; *Hughes* v. *Barrow*, 4 La. Ann. 250, and cases cited.)

II.  As to *stare decisis*. (1 Blac. Com. 70, 71 and notes; 3 Johns. 562; Ram on Legal Judgment, 9 vol. Law Lib. 20, 21, 74–6; *Curtis* v. *Leavitt*, 15 N. Y. 187–8; *Towle* v. *Forney*, 14 Id. 423; *Oakley* v. *Aspinwall*, 3 Kern. 500; *Welch* v. *Sullivan*, 8 Cal.)

To sustain the defense in this case, the Court must first reverse the current of decisions in relation to San Francisco land titles. These are some of the cases: 1st. As to the title of the city to her pueblo lands. (*Cohas* v. *Raisin*, 3 Cal. 443; *Seale* v. *Mitchell & Wardwell*, 5 Id. 401; *Dewey* v. *Lambier*, 7 Id. 347; *Welsh* v. *Sullivan*, 8 Cal. 165, 511; *Norton* v. *Hyatt*, Id. 539; *Touchard* v. *Touchard*, 5 Id. 307.)

2nd. As to the right to sell the lands of the city under execution. (*Smith* v. *Morse*, 2 Cal. 524; *Thorne* v. *City of San Francisco*, 4 Id. 127; *Seale* v. *Mitchell*, 5 Id. 401; 8 Id. 165, 511; *Wood* v. *The City*, 4 Id. 193.)

The counsel on the other side contend that the decision of *Cohas* v. *Raisin et al.* may be sustained, so far as involves alcalde titles, and yet lend no sanction to the positions of the plaintiff in this case.

Alcalde titles can only be maintained upon the principle of ownership in the pueblo. Unless this be established, an American alcalde grant is not worth the paper it is written on. If the lands did not belong to the pueblo, then they were the property of the Mexican nation, and passed under the treaty to the United States. If so, by what authority did an American alcalde or magistrate, appointed under the authority of the United States, undertake to grant away the public lands? That such an officer had no such power, no one denies. This was the very basis of the decision in *Woodworth* v. *Fulton*. The whole case proceeds upon the assumption, that there was no right of property existing in the pueblo. The very first step, therefore, in the case of *Cohas* v. *Raisin et al.* was to establish the title of the pueblo to her lands. Upon this rests the whole case. The argument of the Court is addressed to it. The principle once ascertained, the consequences necessarily follow. The property belonging to the municipality, her officers, under the regulations of the law, have authority to grant, not the lands of the Mexican nation, or of the United States, but of the

Hart *v.* Burnett.

pueblo or incorporated body. We think it may be successfully maintained, that the authority exercised by the Mexican Government over the pueblos and their property was political entirely, and not proprietary. It was the same power, now exercised by our Legislature over incorporated municipal bodies. It would be difficult to maintain the validity of a Mexican alcalde grant upon the theory of our opponents.

III.   The right of the pueblo to the lands within its limits is, at least, that of a perpetual usufruct of the property; and this the civil law construes into a gift of the property itself. (*Arnauld* v. *Delachaise*, 4 La. Ann. 119; 2 Prudhon, 6–9; *New Orleans* v. *Bermudez*, 3 Martin, 309; *Lane* v. *U. S.* 10 Pet. 728–35–6; 2 Bay. 195; 1 Ired. 194; 1 Dougl. 546.) The doctrine of the common law upon the subject of dedication leads to the same result. Such a dedication passes the absolute title to the town. (6 Pet. 481, 438, and case before cited from 10 Id.)

IV.   These lands could be levied on and sold under judgments rendered against the city.

In this State all property, whether real or personal, of the judgment debtor, not exempt by law, is liable to execution. (Statutes of 1850, 443; 1851, 83, tit. 7, ch. 1; 1854, 89; 1850, 94, secs. 8, 9, 10; 1851, 390, sec. 11; 1859, 76, sec. 2; 1858, 196, sec. 10; 1855, 266, sec. 66; 1858, 267, sec. 1; *McKeon* v. *Bisbee*, 9 Cal. 137.) The Legislature cannot exempt municipal corporations from the ordinary process of the law. (Const. art. 4, sec. 33; 1 Duer, 494, 496.) A municipal corporation, as to her private property, as to her contracts, and as to her torts, occupies the same, and no other position, and is liable in the same way, and to the same extent with an individual or private corporation, as is abundantly clear from the following authorities: (*Touchard* v. *Touchard*, 5 Cal. 306; *Bailey* v. *Mayor of New York*, 3 Hill, 538–541; S. C. 2 Denio, 438; 1 Brown's Ch. 469; *Milhau* v. *Sharp*, 15 Barb. 211–12, 237–8; 9 Cal. 469; 7 Id. 376–7; 10 Barb. 233–244; *Lacour* v. *Mayor of New York*, 3 Duer, 415; 15 B. Monroe, 672–5, 642; 24 Barb. 482–3; 2 Rob. La. 211; 4 Id. 244; 1 Duer, 495–6; 1 Seld. 374; 12 Ill. 8; 3 Barb. 257; 25 Miss. 434; 5 Ired. 297; 1 Adol. & Ellis, 700; 41 E. C. L. 736; 15 Mees & Wel. 571; 3 McLean, 580; 2 Vern. 379).

The points and authorities of *Mr. Townsend*, for respondent, upon the leviable character of the city's interest were:

By reservation and dedication to the uses of a town and its inhab-

itants of the lands within its limits, such lands became, under the Spanish law, so absolutely the right and property of the town, that even the grant of the King himself could not alienate them.   (2 White Recop. 100; Novis. Recop. lib. 7, tit. 16, Laws 1 and 2; Partida 3, tit. 28, Laws 9 and 10; Mexican Colonization Law of August 18th, 1824, sec. 2; 1 Febrero Mexicano, lib. 2, tit. 1, ch. 1, secs. 7, 13, 14, 15, 20, 25, 26.)

Such land was said to be granted to it " *en clase de dote,*" that is, as its dower or legal endowment.   (See Ord. de Tier. y Ag. 102–3, 14, 19, 20, 21, 22, 23.)

That such dedication passes the absolute title, at least to the perpetual use of the land, to the town, is as well the doctrine of the common law as of the civil.   (See *Devisees of Hawkins* v. *Arthur,* 2 Bay So. Ca. R. 195; *Deu* v. *Boyd,* 1 Ired. N. C. R. 194; *Cincinnati* v. *White,* 6 Pet. 431; *Barclay* v. *Howell's Lessee,* 6 Id. 498; *McConnell* v. *Trustees of Town of Lexington,* 12 Wheat. 582.)

Such grant, when made by the sovereign or legislative authority, *ipso facto,* creates the inhabitants of such town a corporation, with capacity to take and hold.   (*Deu* v. *Boyd,* 1 Ired. 194.)

The extent of the land granted being equidistant north, south, east and west from the Presidio, or town square, its location was certain; and where, as in the case of San Francisco, the town was located at the extremity of a peninsular, so that this mode of measurement could not obtain, it was no less certain, as its extent must necessarily be measured southward for quantity.   Even were its location less certain than it is, under the decision of the Supreme Court of the United States, in the case of *United States* v. *Fremont,* and of this Court in the case of *Ferris* v. *Coover,* the title would none the less have passed and been a vested legal title.   (See 17 How. 542; 10 Cal. 589.)

At common law, a municipal corporation, as the proprietor of lands and other property held for general corporate purposes, is regarded but as a private owner.   (*Barclay* v. *The Mayor, etc., of N. Y.* 3 Hill, 539–541; *Milhau* v. *Sharp,* 15 Barb. 212, 213; *Dartmouth College* v. *Woodward,* 4 U. S. Cond. Rep. 577; *Touchard and Sullivan* v. *Touchard,* 5 Cal. Rep. 306; 1 Kyd on Corp. 108, 317, 318.)

The corporation of the city of San Francisco, at the time of the Sheriff's sale under which the plaintiff claims, had the free and unrestricted power of disposition of the lands which it held, for its general corporate purposes.   (Cal. Sts. 1851, 357; sec. 1, Id. 360; sec. 13.)

And where such corporation has itself the power of selling and disposing of such property for the payment of its corporate debts, no good reason can be assigned why, if it neglects to do so, such sale and payment should not be enforced by execution.

Until the passage of the recent " Municipal Corporations Act " in England, (5 and 6 William IV) it was always held there that such corporations were liable to the same process for the enforcement of judgments and decrees against them as other parties to suits, except process *in personam*. (*Arnold* v. *Ridge*, 24 Eng. L. and Eq. R. 242 ; *Attorney General* v. *Mayor*, etc., *of Newark-upon-Trent*, 23 Eng. Ch. Rep. 399 ; *Attorney General* v. *Bailiffs of East Retford*, 14 Eng. Ch. Rep. 484 ; *Mayor*, etc., *of Colchester* v. *Lowton*, 1 Ves. & Beames, 226 ; *Harvey* v. *East India Co.* 2 Vern. 396 ; *Doe* v. *Roe*, 41 Eng. C. L. Rep. 736 ; 1 Kyd on Corp. 185, 276, 277 ; Grant on Corp. 341, 365, 366, 487, 489 ; 1 Bl. Com. 242.)

The same principle has been recognized, it is believed, in all the Courts of the United States, wherever the question has arisen. (*Homer, Adm'x*, v. *Coffey*, 25 Miss. Rep. 434; 6 La. Ann. Rep. 570 ; 1 Duer, 495.)

So little reason has been found against it, in the fact of such corporations exercising limited political power, that in most of the New England States executions are issued upon judgments even against unincorporated towns, school districts, and parishes, and the property of the inhabitants sold under them. (*Beardsley* v. *Smith*, 16 Conn. 368 ; *Chase* v. *Merrimack Bank*, 19 Pick. 564; *McLoud* v. *Selby*, 10 Conn. 390 ; *Adams* v. *Wiscasset Bank*, 1 Greenl. 329.)

The salability of such property has been considered the settled law of this State ever since the decision of this Court in the case of *Smith* v. *Morse*, decided in the year 1852, and it has been recognized or expressly reäffirmed in the subsequent cases of *Thorne* v. *The City of San Francisco*, 4 Cal. 127; *Seale* v. *Mitchell*, 5 Cal. 401; and *Welch* v. *Sullivan*, 8 Cal. 165 and 511.

As to the salability on execution of the property in dispute, even should this Court arrive at the conclusion that the title of the city thereto at the time of such sale was inchoate, and not a perfect legal title, see *Goodlet* v. *Smithson*, 5 Port. Ala. 245 ; *Land* v. *Hopkins*, 7 Ala. 115 ; 9 Cal. 137 ; *State* v. *Moore*, 12 Id.

BALDWIN, J. delivered the opinion of the Court—FIELD, C. J. concurring.

The immense interests involved in the decision of this case have drawn to it a laborious and careful examination by numerous and able counsel, of the various points and considerations connected with the controversy.   Probably no cause ever submitted to this Court has been more thoroughly and learnedly discussed, both at the bar and in written and printed arguments.   We have postponed the decision from time to time for further examination and argument; for we were unwilling to pass upon the question until all attainable sources of correct and reliable information had been exhausted.   To that end, we have extended a latitude to the debates which we have not allowed in any other case; and we have postponed attention to much important and pressing business, that we might fully consider this record, unembarrassed by other engagements.

This is an appeal from the late Superior Court of the city of San Francisco.   It involves the title to a number of fifty vara lots, levied upon and sold by the Sheriff of San Francisco county, under judgment and execution in a suit of *Jesse D. Carr* v. *The City.*   Although the property actually involved in this case is not very large, the question really to be decided affects property of immense value, and the right and title of the city of San Francisco to what is termed its municipal lands, the construction of the Act of Congress, approved March 3rd, 1851, and the liability of such lands to forced sale under execution.

I.   In discussing this case, the first question to which we shall direct our attention is this: Was there any law authorizing the establishment of a *pueblo* at San Francisco, and was any such *pueblo* ever established?

It appears from the history of Spanish jurisprudence, that special attention was given in very early times to the establishment of cities, (*ciudades*) towns, (*pueblos*) and villages, (*villas*) and that particular laws were enacted for their foundation and government.   Title seven, book four, of the Recopilacion de Indies, refers especially to this subject, and contains numerous laws and provisions relating to the different classes of land belonging to such municipalities.   Some of these laws will be more particularly referred to hereafter.   Title five of the same book, relates especially to the formation of settlements of a municipal character, and their subsequent organization into municipal bodies.   Law six of this title authorizes contracts to be made for the founding of towns, and prescribes the conditions to be imposed upon the contractors.   Law ten authorizes the founding of towns by

35

the voluntary union of families, without contract with any *poblador particular*. These laws constitute a part of the system of Spain for the settlement of Spanish America. They contemplate two modes of founding towns or municipal settlements: one by contract with a particular individual or *poblador*, who undertook to bring together a certain number of families or settlers, and build a town; the other by the voluntary union of a certain number of families or settlers, who were to act in concert for the same object.

We find among the printed Mexican laws and orders, and the numerous documents made evidence in this case, and referred to in the briefs of counsel, various official documents relating to this same system, and illustrative of the policy of the Spanish Government with respect to the establishment of such municipal settlements in California. We refer more particularly to the " Regulations of Presidios," of September 10, 1772; the "Instructions " of August 17, 1773; the " Regulations " of June 1, 1779; the " Opinion " of October 27, 1785; and the " Order" of June 21, 1786. (Cong. Doc. thirty-first Cong. first Sess.; H. of R. Ex. Doc. No. 17, 133 *et seq.;* Arrillaga's Recopilacion de Leyes,· 1828, 121; Limantour Land Com. Ex. " O."

The opinion of the Fiscal, dated October 27, 1785, and the order of the Commandant General, dated June 21, 1786, fully recognize the right of the Governor of California to form and mark out pueblos, and the right of such pueblos to four leagues of land. (Lim. Land Com. Ex. " O," 60.) In 1789, November 14th, a plan was formed for the town of Pitic, in Sonora, which, by the direction of the King, was to be taken as a model for all other towns formed in that commandancy, which commandancy then included California. This plan is of record in the archives of California, now under the charge of the United States Surveyor General. It dedicates four square leagues to the town for various municipal purposes, and directs that if they cannot be had in a square, they may be taken in some other form. This plan will be again referred to hereafter.

In an order from the Commandant General of this commandancy to the Governor of California, dated October 22, 1791, authority is given to form pueblos out of the existing presidios, and an extent of four square leagues of land is designated for each of such new pueblos. (Ex. Doc. No. 17, 139; Lim. Land Com. Ex. "O," 66 *et seq.)*

A decree of the Spanish Cortes, May 23, 1812, provides for the municipal organization of pueblos, and the election of Ayuntamientos,

consisting of Alcaldes, Regidores and Syndicos. Another decree, of August 9th of the same year, confers upon the Alcaldes of pueblos certain political and judicial powers. These decrees continued in force in Mexico after its separation from Spain. (Leyes Vigentes, 28, 50.)

Such is a brief outline of the laws relating to pueblos in California prior to the Colonization Law of 1824, and the Executive Ordinance or Regulation of 1828.)

The first of these—the law of August 18, 1824—makes no new provisions for pueblos, but in section two it recognizes the fact that pueblos have a right of property in land. The Executive Regulation of November 21st, 1828, section ten, provides for the formation of new pueblos of at least twelve families each, by *capitulantes* or contractors.

No change, however, is made in the laws respecting pueblos formed in the usual way, by the union of families or settlers for that purpose, or by the conversion of presidios into pueblos.

It was also stated in these Regulations that the Missions of California were not " for the present " to be colonized. Although the Spanish Cortes, by decree of September 13th, 1813, had claimed the Catholic Missions as Government property, and exercised the right to secularize them and convert them into secular and municipal organizations under the name of pueblos, the Executive of Mexico, in forming the Regulations of 1828, seemed to prefer reserving this subject for the further action of the Mexican Congress. That body, on the seventeenth of August, 1833, passed a law secularizing all the Missions of Upper and Lower California, thus bringing them within the general operation of the laws, and especially of the Colonization Law of 1824, and the Regulation of 1828. A number of departmental laws and regulations were subsequently issued by the Governor and Legislature of California, for converting these Missions into pueblos, for the government of such pueblos, and for the use and disposition of the lands and other property pertaining to them. (Ex. Doc. No. 17, 138 *et seq.*; Gov. Figueroa's Manifesto; U. S. Printed Mission Exhibit; Leyes Vigentes, 106.)

This brings us to the period when it is claimed that the *pueblo of San Francisco* was first founded. We will now consider the evidence adduced to show the *fact* of the establishment of a pueblo, without reference to its boundaries or to its title or right to any lands. We shall make no reference to the Zamorano document, or to what is called

the Vallejo line, but only to documents whose genuineness is entirely undisputed.

On the third of November, 1834, the Territorial Deputation authorized the election of an Ayuntamiento to reside at the presidio of San Francisco, to be composed of an Alcalde, two Regidores or Councilmen, and a Sindico-Procurador. This Ayuntamiento, when organized, was to exercise the political functions pertaining to such office, and the Alcalde was also to perform the judicial functions which the laws conferred upon him. This decree was communicated to the Military Commandant by the Governor, on the fourth of November, 1834. An election was accordingly held on the seventh of December, 1834, at the presidio of San Francisco, and the Ayuntamiento duly installed. A similar election was held on the thirteenth of December of the following year, (1835) at the same place, which was then officially designated as the pueblo of San Francisco. Other elections of the same character were subsequently held; and there are numerous official documents of undisputed authenticity, which refer to the "Ayuntamiento of San Francisco," the "Alcalde of San Francisco," and to the "Pueblo of San Francisco," proving, as we think, beyond a doubt, that there was at that place, in 1834, 1835, 1836, and subsequently, a pueblo of some kind, with an Ayuntamiento composed of Alcaldes, Regidores and other municipal officers. What were the rights of this municipality, and what the powers of its officers, and the extent of its territory and jurisdiction, we shall not now inquire. We here refer merely to the *fact* of the existence, at that time, and at that place, of such an organization, whether corporate or incorporate. And that fact is proved by the official returns of elections, by the official acts of the Governor and of the Territorial or Departmental Legislature, by the official correspondence of Government officers, and by the acts, proceedings, records, and correspondence of the officers of the pueblo itself. As a part of the evidence of this *fact*, we refer to the election returns of December 7th, 1834, December 13th, 1835, December 3d, 1837, and December 8th, 1838; to the Governor's letters of January 31st, 1835, October 26th, 1835, January 19th, 1836, January 17th, 1839, and November 14th, 1843; to the expediente of proceedings between May and November, 1835, with respect to certain persons obliged to serve as municipal officers of that pueblo; and to the official correspondence between the Alcaldes of that pueblo and the various officers of the Territorial or Departmental Government of California.

II.   Had this pueblo a right or title to any lands? and if so, to what lands?

In examining these questions, it will be necessary to recur to the laws and authorities already referred to.   All the old Spanish laws relating to the foundation and government of pueblos in the Indies, seem to admit the fact that such municipal organizations possess *some* right to, and some control over the lands upon which they are established, and which are included within their limits.   In this respect there does not seem to be any essential difference between pueblos founded by an individual *poblador* or *capitulante*, and those founded by the actual settlement of a number of families, voluntarily uniting together without any contract or capitulation.   A pueblo, when once established, (no matter how or by whom composed) and officially and legally recognized as such, came immediately within the provisions of the general laws relating to pueblos, and was entitled to all the rights and privileges, whether political, municipal, or of property, which the laws conferred upon such organizations or corporations.   Sometimes, however, special laws and regulations were made for particular places. Such seems to have been done in very early times, with respect to the infant establishments of Monterey and San Diego, and the pueblos of San José and Los Angeles, and the villa of Branceforte in California. (Recop. de Indies, book 4, tits. 5 and 7; Regulations of Presidios of 1772; Bucareli's Instructions of 1773; Neve's Regulations of 1779, etc.; Ex. Doc. No. 17, 134 *et seq.*; Navarro's Opinion, October 27th, 1785; Ugarte y Loyola's Order, June 21st, 1786; Nava's Order, October 22d, 1791; Limantour Land Com. Ex. "O.")

By law six, title five, of book four, of the Recopilacion, a new town, containing at least thirty inhabitants and the other requisites for a municipal organization, was entitled to four square leagues of land, to be laid off in a square or prolonged form, as the nature or circumstances of the land might require.   This right of a town, when duly organized, to this extent of land, is particularly referred to and repeated in the Royal Instruction of 1789 for the plan of Pitic, which plan was made applicable to all new towns that should thereafter be established in California, as a part of that General Commandancia.   The particular municipal organization of such new towns was to depend, under the laws, upon the name or title given to them, as ciudad, pueblo, villa, etc.   It will be noticed that the town of Pitic was organized out of the Presidio of San Miguel, which was removed to that locality for the

purpose of forming, guarding and protecting the new settlément.   In the order of 1791, by the Commandant General to the Governor of California, for the formation of pueblos out of presidios, it is also specially directed that the extent of land for each of these pueblos should be four common leagues, measured from the center of the presidio plaza, or square, viz: two leagues in each direction.

Of course, under the law and royal instruction above referred to, and upon which this order was based, this form and these dimensions were to be changed according to the nature and circumstances of the land; as when the presidio was adjacent to the sea, or on a bay, or where any portion of the land within such general limits had become private property, or had been devoted to some other special object.

It does not appear that any formal grants of land were made to the new pueblos in such cases; but their right or title, whatever it was, to land, to the extent of four square leagues or less, as the case might be, seems to have vested, *ipso facto,* on the formation or official recognition of such town, and that the powers of the municipal officers over such land resulted from the general laws, immediately on the municipal organization, and their election and entry upon the duties of their respective offices, and that these powers might be restricted or enlarged by the political authority of the State.

It is true, that in the case of Pitic, and in some other towns, an officer was appointed to mark off the boundaries of the four square leagues, and to designate the particular kinds of land, and the uses to which they were to be applied, within such limits; but the right or title, whatever that might be, " to the land so marked out," could not result from the act of measurement or survey.   And as no subsequent grant was made, or seems to have been contemplated, the title, if any passed at all, must have vested *ipso facto* upon the organization of the pueblo. Such seems to have been the intention of the laws themselves, and the construction put upon them by the officers by whom they were administered.

It follows, from what has been already stated, that when near the close of 1834 a municipality was erected at the presidio of San Francisco, by the orders of the Governor and Territorial Deputation of California, and that place was officially recognized as a pueblo, and its organization completed by the election of the municipal officers provided for by law, such pueblo became, *ipso facto,* vested with some right or title to four square leagues of land, measured either in a

square or prolonged form, from the presidio square as a general central point; excepting so much of the space within such general limits as might not be susceptible of grant, on account of its being water, the private property of individuals or corporations, or lands dedicated to or reserved for other purposes.

Before proceeding to investigate the character of this right or title, we will premise a few remarks upon the character of the land embraced within the limits described, in order to give a general idea of the claim of the new pueblo and its boundaries.

It appears from official maps made under the direction of the United States Surveyor General and the Superintendent of the United States Coast Survey, that the old presidio of San Francisco was situated near the middle of the northern extremity of the peninsula formed by the ocean and the bay of that name; that the width of this peninsula, as far south as the Mission creek, is less than two leagues, and that still further south, to the Buri-Buri or Sanchez Rancho, the average width is just about two leagues; although two or three points, as Lobos and Avisadero, project somewhat beyond these points very nearly corresponding with indentations, as Mission bay and Merced lake, on the opposite sides. Of course, the pueblo could acquire no right or title to the ocean or bay; and consequently, according to the law of its foundation, the four square or common leagues would be taken in a prolonged instead of a square form.

Again, it appears from the documentary evidence and from other authentic sources, that at the time of the formation of this pueblo, there was a fort or battery, with its buildings and appendages, at the entrance of the bay of San Francisco; it would seem that the fort and the land pertaining thereto and necessary for its service, would be excepted out of the pueblo claim, for it is understood that such establishments were not, under the Spanish laws, susceptible of acquisition by town settlements or by colonization. (*Mitchell et al.* v. *The United States*, 15 Pet. 86 *et seq.*)

Again, it also appears that long prior to the organization of this pueblo, there existed within the limits of the four square leagues, an establishment called the "Mission of San Francisco" or "of Dolores," with some sort of claim or right to the lands in that immediate vicinity. Perhaps some of these lands were also so dedicated or reserved as to exempt them from any right or title which the pueblo acquired by its organization. If so, what was the extent of the land so reserved or

excepted? It appears that, in very early times, some disputes arose with respect to the lands which the inhabitants of the presidio and Mission were respectively entitled to occupy and use, and that some line of division was established between them corresponding to, or near to Mission creek, and to what is now called the Vallejo line. The lands north of that line, wherever it may have been, were generally called "presidio lands," and those on the south, as far as San Mateo creek or the northern boundary of the Pulgas rancho, were called "Mission lands." It also appears that the ordinance or regulation of 1828 exempted the lands actually occupied by the Mission from colonization "at present," and until it was determined what right the Mission establishments had in these lands. The secularization law passed in 1833, and various measures were subsequently taken by the authorities of California to organize the Missions into pueblos, and to reduce their lands to colonization. It further appears that, on the 3d of November, 1834, a curacy was authorized for the Mission of Dolores, which was one step in the operation of secularization; but that, at a later period, it still retained some of the characteristics of a "Mission," although portions of the land which it had formerly occupied, in the direction of San Mateo and across the bay, had already been disposed of by grants to private individuals. The Land Commission and the United States Supreme Court have decided that these titles were valid, and that the lands previously occupied by the Mission establishments were subject to grant in colonization. Moreover, the Commissioners and the law officers of the Government have decided that the Mission church, cemetery, buildings occupied by the priest, and a small piece of land pertaining to these as curtileges, were dedicated to the use of the Catholic church, and consequently were not susceptible of grant in private ownership.

It would seem, from these facts, that in December, 1834, when the pueblo was organized, this pueblo could not acquire any title to these "church lands," which were occupied by that establishment, although lying within the general limits of the four square leagues designated by the laws. Perhaps, however, when the occupation by the Mission ceased, such of these lands as had not been granted in private ownership, or dedicated to pious uses, became subject to the general right of the pueblo as pueblo lands. There are certain facts shown by the evidence in this case which confirm this view. At first, the municipal authorities of the pueblo made no grants at the Mission, but subse-

quently, under the orders of the Governor, the same Alcalde granted *solares* alike at the place called "Yerba Buena," and at the old "establishment of Dolores," the latter being limited to fifty varas square.

But it is unnecessary to investigate or decide this question here, for it is admitted that the land now in dispute is north of Mission creek and within the tract confirmed to the city of San Francisco under the Act of March 3, 1851.

We have thus far considered the question of the establishment of the pueblo of San Francisco, and its limits, without any reference to what is commonly called the "Zamorano document," the genuineness of which has been strongly contested in the arguments of counsel. The only tribunal which has judicially investigated the character of that document, seems to have considered its genuineness sufficiently established. But, even admitting its genuineness to be beyond all doubt, we attach to it very little importance for the purpose of this investigation. The more important facts mentioned in it—the order of the Governor and Territorial Deputation of 1834, for the election, at the presidio of San Francisco, of an Ayuntamiento, and the official recognition of the change of that presidio into the pueblo of San Francisco—are also abundantly proved by other documentary evidence, the genuineness of which has never been called in question. The only effect of the Zamorano document would be to restrict at that particular time the possession of the pueblo to a space less than the four square leagues to which it was entitled under the law. And there is much evidence outside of the document to show that such was the fact. But, as already stated, it is unnecessary, for the purposes of this case, to determine that question, and we therefore have left that document entirely out of consideration.

Nor do we deem it necessary to follow counsel through their elaborate discussion respecting the history of the Missions, and the numerous acts and regulations of the Governors and the Legislatures of California under the law of 1833, respecting the secularization and conversion of the establishments themselves into pueblos, and the colonization of the land which they had previously occupied. According to our view, the pueblo of San Francisco was first formed out of the Presidio of that name, and not out of the Mission; and consequently, the question of its original formation was in no way dependent upon the law of secularization. There are, however, some things connected with the execution of that law, which serve to explain certain facts in the sub-

sequent history of this pueblo. It would be very natural, upon the partial or entire secularization of the Mission, considering its advantageous position, and the superior quality of the land at that establishment, the location of the church, the residence of the parish curate, etc., that a portion of the pueblo settlers and of its municipal officers would establish themselves in that place. We accordingly find that, in the infancy of the pueblo, or in 1837, according to the testimony of Sanchez, the Secretary of the Ayuntamiento, most of the inhabitants, not engaged in commerce, did reside there, and also that several of such residents at the old Mission were, at different times, members of the Ayuntamiento. There is, too, some evidence to show that in 1837 or 1838, permission was asked of the Governor to hold the sessions of that body at the old Mission, and as they were so held, it is to be presumed that the request was granted. A few of the inhabitants who were engaged in commerce located themselves at the place called "Yerba Buena," on account of the advantageous anchorage for shipping in the cove of that name. And, as commerce increased, that little settlement, notwithstanding the nature of the soil, but with the larger element of foreign population which is shown to have been introduced there, very soon outstripped the settlement at the old Mission, which was mostly composed of a less enterprising population of Mexicans. Moreover, it was natural that foreigners, who were mostly engaged in trade, should call that place the "pueblo of Yerba Buena," while the old inhabitants of the country should apply to it, and to the old Mission, the general terms "pueblo of San Francisco," or "pueblo of Dolores," as is testified to by various witnesses. It was also very natural that, in the course of time, the names "pueblo of San Francisco," "Yerba Buena," "port of San Francisco," "Mission of Dolores," "pueblo of Dolores," etc., should by different persons be applied indiscriminately, either to the entire northern portion of the peninsula, or to particular parts thereof. This, it seems to us, fully explains and reconciles some apparent contradictions in the parol and documentary evidence. Again, it should be observed that the term "de Assis," which is sometimes affixed to the name "San Francisco," although, perhaps, more usually applied to the Mission, was a part of the appellation of the saint whose name was given to the bay when it was first discovered, which appellation belonged alike to the bay, the fort, the presidio, the Mission, and the pueblo—all of which took their name from the same saint. That these words should be more often added

in speaking of the Mission is very natural, because there were other Missions in California called after other saints by the name of Francis, as the Mission of Sonoma, which took its name from "San Francisco de Solano;" the Mission below San Diego, which took its name from "San Francisco de Borja," and the Mission further south, which took its name from "San Francisco Xavier." (Butler's Lives of the Saints, *verbo* Saint Francis; Life of Padre Ugarte; Vanega's History of California; Life of Padre Junipero Serra; Garcia y Cubas' Carta de Baja California.)

It may be proper in this connection to allude to some of the objections made by counsel to the view we have taken respecting the organization and character of the pueblo of San Francisco.

It is said that the first order calling for the election of an Ayuntamiento at the presidio, was for the "partido of San Francisco;" that many of the voters and some of the persons elected to office, in 1834 and subsequently, did not then reside at that place; that the military commandant of San Francisco, who was superseded in authority by the Ayuntamiento so elected, exercised jurisdiction as far south as the Pulgas rancho; that the Ayuntamientos and Alcaldes of San Francisco exercised authority, both political and judicial, not only over the four leagues claimed as constituting the pueblo, but also south to San Mateo or Francisquito creek, and across the bay to the north and east—in fine, over the whole "partido" of that name.

It was very natural that in founding the new pueblo, the inhabitants of the adjacent country should be called upon to assist in commencing the new settlement, and forming its municipal organization. Where else were settlers to be looked for or obtained? We hear of no recent arrival of emigrants or colonists who were to build up the new town. Nor was it for such persons, or for the purpose of colonization, that this pueblo was established. It was rather for the purpose of carrying out the general policy which had been pursued by Spain in her American dominions, and which is often alluded to in the instructions issued to the Governors of California, of inducing the scattered inhabitants of the country to unite and build up towns, as being more conducive to civilization, and as forming a better protection against the incursions of hostile Indians. Moreover, the persons entitled to elect Ayuntamientos of pueblos, were not merely those who actually resided within the limits of the lands which pertained to such pueblos. The Alcaldes, who were the principal officers of the Ayuntamientos of pueblos, some-

times exercised political and judicial authority over much larger geographical districts, and the inhabitants of such districts were entitled to vote at the primary elections which were held to fill such offices. It is shown in official documents, that the Alcaldes of San Jose at one time exercised political and judicial jurisdiction upon the Contra Costa, and over the whole extent of country from the Pulgas Rancho to San Juan Bautista, and that the officers of the pueblo of Los Angeles at one time exercised such jurisdiction from the Conejo Rancho to San Juan Capistrano. Are we to infer from these circumstances that no pueblos had been founded at either of the above named places? Such an inference would not only be unauthorized, but would be entirely contradicted by well established and indisputable facts.

Again, it is said that the Governors of California made grants of land to private persons within the limits of the four square leagues of the so-called pueblo of San Francisco, which fact precludes the idea that this pueblo had any title to the land within such limits. Admitting the fact to be as stated, we do not think the inference logical. Suppose the municipal officers of the pueblo had been precluded from exercising any authority whatever over such lands, and that the right to distribute or grant them to the settlers had been retained by the Governor in his own hands, or had been conferred upon a commissioner, or some other officer in no way connected with the Ayuntamiento; would that fact constitute any argument against the supposition that the pueblo or its inhabitants had a vested right or interest in such lands? We think not. As will be more particularly stated hereafter, the inhabitants of the pueblo may have had a vested right, interest, or use in such lands, and they may have been set apart and dedicated to some special object and purpose, and yet the legal title, subject to such purposes and uses, may have been vested for the purpose of grant in some one else, and the trust may have been executed by the Governor himself, or by some other person duly appointed for that purpose. The ownership of property may be in the sovereign, and the use private or public; or the ownership may be public and the use private. This depends upon the character of the ownership and dedication, and the circumstances of the use. (Bouvier, Law Dictionary, *verb* Dedication; *Town of Pawlet* v. *Clark*, 9 Cranch. 292; *McConnell* v. *Town of Lexington*, 12 Wheat. 582; *Hawkins* v. *Arthur*, 2 Bay, 195; *Barclay* v *Howell*, 6 Pet. 498; *City of Cincinnati* v. *White*, 6 Id. 431; *New Orleans* v. *The United States*, 10 Id. 712.)

If Governors of California have granted lands within the general limits of pueblos, it will be presumed, unless the contrary be shown, that such grants were made in accordance with the objects and uses for which such lands had been assigned and dedicated by the laws to the pueblos. The whole matter was subject to the control and direction of the Governor and Territoral Deputation, and the official acts of such officers within the general scope of their powers are presumed to have been done by lawful authority. ( *United States* v. *Perchman*, 7 Peters, 95.)

So far as we have examined the grants made by the different Governors within pueblo limits, they seem to have been in conformity with such general object of building up a town by encouraging settlement and cultivation, and with the uses to which such lands had been dedicated. If the tract granted was of a larger size than that usually given for a building lot or for gardening purposes, the Governor generally first consulted the Ayuntamiento or Alcalde, to ascertain whether there was any objection to the grant, or sent the grant to them for their action prior to its being delivered to the grantee. Moreover, the tracts so granted were usually at a considerable distance from the principal settlement, or upon the very outskirts of the pueblo lands, and a special clause was generally introduced, making the lands so granted subject to the regulations and tax or *canon* of the respective pueblo. [We shall hereafter examine more particularly the meaning of this word *canon.*]

These facts are highly significant, and tend to confirm the view we have taken of the Spanish and Mexican laws relating to pueblos. The power of the Political Chief and Territorial Deputation, as well as that of the Ayuntamiento and Alcaldes, over the lands assigned to pueblos as pueblo lands, existed prior to the Colonization Law of 1824, and did not result from that law, nor from the Executive Regulation of 1828, which was based upon it. In fact, the law of 1824 expressly excludes from its provisions all lands pertaining to pueblos. And this view, we think, is fully sustained by the very able and interesting reports of the Junta appointed by the Supreme Government of Mexico to propose measures for the settlement and colonization of Upper and Lower California. These reports were printed in a collective form in 1827, and gave rise to the Executive Regulation of November 21st, 1828. This Junta or commission was composed of the most distinguished statesmen and lawyers of Mexico, and among them was Don Pablo Vicente de Sola, who had for some years been Governor of Cal-

ifornia.   The opinions of these men are well worthy of consideration. (Dictamen y Planes de la Junta, 11, etc.; Navarro's Opinion, cited above.)

But it is said that regular grants in colonization and of undoubted authenticity were made by the Governor, after 1834, to lands south of Mission creek, and within or partly within the general limits of the four leagues claimed to have been assigned by law to the pueblo of San Francisco; and it is contended that we must adopt one of two alternatives—either that the pueblo had no title to *any* lands within the four square leagues, or that such grants in colonization are utterly null and void.   We do not feel compelled to adopt either of these conclusions, nor do we see any reasons to justify us in doing so.   That the pueblo had a right or interest in *some* of the lands within the general limits, we believe to be beyond a reasonable doubt, and we think the circumstances we have already alluded to as connected with the secularization of the Mission may fully account for the grants in colonization, which are alleged to have been made by the Governors, of lands which were occupied by the Mission in 1834, when the pueblo of San Francisco was first founded.

Again, we have been referred to the proceedings of juridical possession in October, 1835, of the Buri-Buri, or Sanchez Rancho, in which the " Pueblo of Dolores " was represented as a *colindante*, or adjacent landholder, as showing that the pueblo there referred to must have been the unorganized town intended by the secularization laws and regulations to be formed out of the Mission, and not to that which is claimed to have been formed in 1834 at the presidio; because the distance between the presidio square and the northern boundary of the Buri-Buri rancho is greater than the limits which the law assigned to that pretended pueblo, and because there is no evidence whatever that any additional land was ever assigned or dedicated to it.   In the first place, we do not think the fact that the pueblo was represented as a *colindante*, shows that such municipality had any claim to the land *next to* the northern boundary which was, in that juridical act of possession, assigned to the Buri-Buri rancho.   It seems to have been customary in such proceedings to summon all the neighboring landholders, in order that they might witness the act of possession, and see that their own claims were not infringed.   We are told that there are cases among the records of the Surveyor General's office, where landholders were summoned as *colindantes*, although their lands were many miles distant

from the tract to which the juridical possession was to be given. More-over, there is no evidence to show that a separate pueblo was ever founded at the Mission. There could have been no object in forming one within the general or natural limits which had already been, by law, assigned to another. As already stated, it is much more reasona-ble to suppose, in the absence of positive evidence to the contrary, that on the final extinction of the Mission, its ungranted lands, which were susceptible of becoming town lands, were regarded as pertaining to the municipality which had been previously established. Moreover, there is abundant evidence to show that the municipal organization at the Mission was the same as that which had previously been established at the presidio, and that both constituted *one and the same pueblo.* While, therefore, we regard the Buri-Buri documents as in no way conflicting with our view of this case, we find in them strong evidence that a *pueblo was at that time in existence, and that it was officially recognized as having some right or title to land.*

But it is objected, that if such pueblo had existed since 1834, and it had any title to land, there ought to be found in the archives of the city, or of the Surveyor General, the strongest possible evidence of these facts. Considering that nearly all the old pueblo archives, where such evidence would naturally be looked for, were burned or lost in 1851, and the very imperfect condition of the archives in charge of the Surveyor General, we are only surprised that so much evidence of these facts is still preserved. Of course, those who have sought for a special grant, with boundaries particularly designated by natural or artificial objects, have been disappointed. We think there was no good reason to look for such a grant, as none was required; nor, so far as we can learn, was it usual to issue one. Moreover, the law so expressly designates the manner in which the four leagues were to be laid off, that there could have been no particular necessity of marking them out upon the ground in order to segregate the land from the public domain. If a larger tract had been assigned or granted, some act of grant ought to be shown; or if the four leagues had been located in a manner different from the usual form, we might expect to find some special designation of boundaries. Again, if a part of the four leagues had been private property, or otherwise exempted from becoming pueblo lands, it may have been desirable to mark out the dividing line between such lands, although such marking out of boundaries was by no means necessary in order to vest a right or title in the pueblo. And

again, although not requisite to vest title, it may have been considered important in making other grants, that the exact boundaries of the four square leagues should be marked out as stated in the Report of 1840. The Mexican laws relating to the survey of the four square leagues which the laws assigned to the pueblo (found in Chap. 11, 96, of the "Ordenanzas de Tierras y Aguas") are so very plain and specific that there could have been no possible difficulty in determining the exact boundaries. They are precisely fixed by the law itself.

But it is urged that the "statement" or report to the Departmental Junta on the sixteenth of January, signed by Jimeno and Arguello, negatives the idea that any lands had been assigned or granted to this or any other pueblo in California. Upon a careful examination of the original "statement," we find that the only part of it relating to pueblo lands is a single paragraph, under the head of *ejidos*, or *commons*, in which it is stated that none of the pueblos, except Monterey, *have their ejidos and propios marked out* ("tienen demarcadas los ejidos y tierras de propios," etc). These words are susceptible of several interpretations. They may mean that the two classes of pueblo lands there mentioned had never been specially designated, as they ought to have been, in order to separate them from the other lands of such municipalities and to dedicate them to the objects implied by the names *ejidos* and *propios*, which are used; or they may mean that the four square leagues which properly belonged to such pueblo had never been actually marked out on the ground, and "that, therefore, the Governor, in making concessions of land in the vicinity thereof, had granted the same temporarily, waiting for such regulation, or definitive designation, of town boundaries, before issuing definitive titles." Again, they may refer to lands outside of the four leagues, and which the old laws say may also be assigned to pueblos, in case it should be deemed advantageous and proper. But neither of these interpretations conflicts, in the slightest degree, with the view which we have taken. On the contrary, they are most strongly confirmatory of that view. If none of the pueblos, except Monterey, had any right or title to land, why mark out their boundaries, or why separate the *ejidos* and *propios?* Moreover, if they had none, why was it not proposed to grant lands to such pueblos? But nothing of that kind is recommended, and the only grants spoken of were those already made to individuals *in the vicinity* of the lands of such municipalities, and which were made as mere temporary concessions, in order to avoid any infringement of the rights or limits of the pueblos.

Hart v. Burnett.

Again, it is said that the very terms of the acts of the Governor and Territorial Deputation, in August and November, 1834, giving to Ayuntamientos a right to grant (*dar*) lands pertaining to pueblos, and the forming of such municipality at the presidio of San Francisco, show that they had no authority so to do, because article twenty of the former requires report of it to be made for the approbation of the General Congress, and article second of the latter requires it to be reported for the approbation of the Supreme Executive. We do not so understand these articles. That the act for the election of the Ayuntamiento was immediately carried into effect, there can be no question. It seems that the Governor did not think any precedent approval of the Supreme Executive requisite to give it validity. But this, as well as many other acts of the Governor and Deputation, was by the laws required to be submitted to the President for such measures as he might see fit to take thereon. If approved, it remained as it was; but if disapproved, orders would have been issued to annul and revoke the act. The same remark applies to so much of the Act of August 6th as relates to pueblo lands. But art. twelve of that act contemplated a change of the revenue laws, which could be made only with the sanction of Congress. Hence the references of the act to that body for approval. So far as the establishment of the pueblo of San Francisco and its organization and powers were concerned, we think that the existing laws conferred abundant authority upon the Governor and Deputation. But if the approval of the Supreme Executive were really necessary to give validity to that part of these acts, it will be presumed. (*The United States* v. *Clark*, 8 Peters, 452, 463; *Delassus* v. *The United States*, 9 Id. 134; *Patterson* v. *Jenkins et al.* 2 Id. 225, 237; *Polk's Lessee* v. *Wendell*, 5 Wheat. 295; *The United States* v. *Perchman*, 7 Peters, 95–6; *Strother* v. *Lucas*, 12 Id. 437.)

Counsel have raised various other objections, which we think may be readily answered, and the facts upon which they are founded may be easily reconciled with the view which we have taken; but our limits will prevent us from discussing them, and even from referring to all the laws and authorities from which our opinion has been formed.

III. We will next consider the general character of the right or title which a pueblo acquired to the lands which, within the limits of four square leagues, were susceptible of such acquisition.

In doing this, we will refer very briefly to the different kinds or classes of pueblo lands, and to the powers of the municipal officers

36

over them.   The right or title by which the pueblos held these lands was, of course, in no way dependent upon the powers which the political authority of the State might at any time confer upon the officers of such municipalities.   If counsel had observed this distinction, they might, probably, have been saved much time and labor in their arguments and voluminous briefs.   Nevertheless, as the character of the powers which such officers were authorized to exercise over such lands may tend to throw some light upon the nature of the title by which they were held, we briefly notice the authorities on this point.

The Spanish laws give different names to different portions of land within the limits of a city, pueblo or town, according to the various uses to which they are applied.   Thus, there are *solares,* or house lots of a small size, upon which dwellings, shops, stores, etc., are to be built. There are *suertes* or sowing grounds, of a larger size, for cultivating or planting, as gardens, vineyards, orchards, etc.   There are *ejidos,* which are quite well described by our word *commons,* and are lands used in common by the inhabitants of the place for pasture, wood, threshing-ground, etc.; and particular names are assigned to each, according to its particular use.   Sometimes additional *ejidos* were allowed to be taken outside of the town limits.   There are also *propios* or municipal lands, from which revenues are derived to defray the expenses of the municipal administration.   There were also other names, such as *terminos, concejiles, tierras comunes, tierras de labor, tierras de regadio, abrevaderos, dehesas, pastos, montes, plazas,* etc., etc.

Such were the principal divisions of the land included within the limits of a town, and devoted to the use of its inhabitants.   And these divisions, when once made, were not merely nominal, for there were numerous laws relating to each, and having respect to the management, disposition, and use of each; and the provisions which were made for one class were usually very different from those relating to another class.   (Escriche Dic. verbo ejidos, propios, etc.; Febrero Mexicano; Sala Mexicano; Recopilacion de Indies, book 4, tit. 7.)

The right of the municipal authorities of pueblos to make grants or distributions, in *solares* and *suertes,* to individuals and settlers of lands within the limits of such pueblos, seems to have been conferred in very early times, and is very often referred to in the more recent laws and orders as a subsisting right.   But certain classes of such lands, as *ejidos,* etc., could not, in general, be so granted or distributed to individuals for their exclusive use or occupation.   Sometimes municipal officers

were prohibited from making grants or distributions of any town lands of any class or description without the royal license; and at others, special officers were appointed by the Crown for that purpose.

It has been doubted by some if the grants or distributions of the pueblo lands to individuals, made under the earlier Spanish laws, were intended to be grants in full ownership. But we think this question was definitely settled by the law of January 4th, 1813, which makes numerous provisions for distributing or granting in *suertes* the lands of the pueblos which were not required for *ejidos* or commons, and declares that, in whatever mode such lands are distributed or granted, it shall be in full ownership—*en plena propiedad.* (Leyes Vigentes, 57, 59.)

There seems to be some difference in the various laws and orders which were issued at different periods, with respect to what particular officers were to make such distributions of lots for building and other purposes. In the cities and larger towns, this duty, at least in early times, devolved upon the *cabildos* and *corrigedores* of such cities and towns. By Neve's Regulations of 1775, for the establishment of the new pueblos of San José and Los Angeles, the right of distributing the lots was, at least in the beginning, to be exercised by the Governor himself, or by a person commissioned by him for that purpose. But these pueblos were not, for the first two years, to elect any municipal officers, and even after that time, only for such offices as should in the meantime be established. The ordinary Alcaldes, for judicial and police purposes, were to be furnished by the Governor. By the plan of Pitic, in 1789, the lands were to be divided up, and the first distribution made by the engineer and commissioner, who were also to issue the certificates of title. By Nava's order of 1791, for changing presidios into pueblos, the first distribution of house lots and lands within the limits of the four square leagues, was to be made by the commandants of the presidios; but when a sufficient settlement was made to authorize the municipal organization in place of the military, it is presumed that these duties were to devolve upon the Ayuntamientos, as in other cases. By the law of 1813, the expedientes of titles were to be made by the Ayuntamientos, and referred to the Provincial Deputations for approval. By the law, act or decree of August 6th, 1834, relating to pueblos in California, the Ayuntamientos were to ask that there be marked out or assigned *propios* and *ejidos* for each town; and provision was made for granting, *en censo enfiteutico*, building lots for the erection of houses or dwellings, at a fixed price, and for the leasing

of the *propios,* from which the towns were to derive revenues for the support of the municipal administration.   The granting of such house lots and the leasing of such *propios* were evidently to be made by the Ayuntamientos.   The meaning of the phrase *en censo enfiteutico* and of *el canon,* which, by the order of October 26th, 1835, the grantees of such house lots were to pay to the Ayuntamiento of San Franciso for such grants, will be alluded to and explained hereafter.

Concessions of house lots were made by the several Alcaldes of San Francisco soon after the formation of that Ayuntamiento; these grants were either fifty or one hundred varas square.   In the year 1835, José Joaquin Estudillo applied to the Governor for a grant of two hundred varas square.   This petition was referred to the Territorial Deputation, and the committee of that body on municipal lands reported that grants of house lots ought to be limited to one hundred varas square.   Accordingly, the Governor, on the twenty-sixth of October, 1835, wrote to the Alcalde, "that the Ayuntamiento of that pueblo (*ese pueblo*) may grant lots which do not exceed one hundred varas, for the building of houses in the place called Yerba Buena;" and "that you may make it known to the inhabitants of that pueblo, in order that they may not apply with their memorials to this political Government, as it is one of the favors which the Ayuntamiento can grant."

This order of the Governor leads us immediately back to the law or plan of *Propios y Arbitrios,* of August 6th, 1834.   Now, if according to this order, the Ayuntamiento of that pueblo (*ese pueblo*) could grant lots of land to settlers, and the law of August 6th authorized such Ayuntamiento to impose, at its discretion, a ground rent or *canon* on such grantees, the right of such pueblo to such lands must have been something more than that of mere temporary occupation and use.   According to Escriche, "*El canon*" means "the annual charge or rent which is paid in recognition of the *dominium utile* by the person who holds the *dominium utile.* (*Vide* Escriche, verba *canon* and *pension.*   And for the meaning of the phrase "*perteneciente a los propios,*" vide Escriche, verba *propios* and *pertinencia.*)   The meaning of the former has already been explained, and the latter, according to that authority, is "that which is necessary to, or consequent upon, the principal, and enters with it into the ownership; as when it is said that any one purchased such an estate with all its appurtenances."   Here, the lands which the Ayuntamientos had a right to grant in lots constituted the principal, and the "*canon perteneciente*

*a los propios*" of "*ese pueblo*," which the Ayuntamiento was author-
ized to require to be paid as a consideration for such concessions or
grants, or an annual rent therefor, was an acknowledgment of the direct
dominion which the pueblo, as the owner of such *propios*, had in the
land which was conceded, granted or rented.

Again, article two of the law of August 6th, says that these *propios*,
which may be designated to each pueblo, may be rented or granted *en
censo enfiteutico*.   Escriche says that "*censo enfiteutico*" is the right
which we retain to require of another a certain annual charge or rent,
by reason of having transferred to him forever, or for a great length
of time, the useful ownership of some real estate, reserving to ourself
the direct dominion.   Again, the same author says : "the direct owner
or imposer of the *censo* is he who transfers the useful dominion of the
real estate ; while the grantee or *enfiteutico* is he who acquires the use-
ful ownership of the thing charged."   Moreover, it is said that such
owner of the *dominio utile* cannot be ejected from such real estate by
the *dominio directo*, except in case of neglect for several consecutive
years to pay the ground tax according to the terms of the grant; that
he may impose upon it, without notice to or consent of the *dueno
directo*, any servitude, rent or other charge, and pledge, mortgage or
sell it.

It would seem from these definitions that pueblos held the direct
dominion of these lands, subject to certain trusts and uses, and that the
moderate and small portions which they were authorized to grant to
individuals, were to be held by the latter as subject to such municipal
tax, but in all other respects in absolute ownership, with full right of
disposition.   These inferences would seem to result from the very words
used in these documents.

But be this as it may, the right of such municipal officers of this
particular pueblo to make such concessions or grants in lots of one
hundred varas square was, in 1835, fully recognized by the highest
authority in California—the Governor and Territorial Deputation.

It appears that the Mexican law of March 20th, 1837, provided that
in pueblos having a population under a certain specified standard,
Jueces de Paz were to be elected, and were to exercise the powers of
Ayuntamientos.   But it also appears from the archives that this law
was not carried into effect in California until some time in 1839, and
that the system was again changed at the end of 1843.   By the Gov-
ernor's proclamation of November 14th, 1843, which in some respects

modifies this organization, Monterey and Los Angeles were to elect Ayuntamientos, composed each of two Alcaldes, four Regidores and one Syndico, and that in the other pueblos, *among which San Francisco is named,* elections were to be held for the appointment of "two Alcaldes of first and second nomination." These new "Alcaldes de nominacion," or Jueces, were to enter upon their duties the first of the following January, and in addition to the judicial powers of the ordinary Alcaldes and the political powers of the Prefects, they were to exercise "the powers and obligations which the Ayuntamientos have." (Limantour Land Com. Ex. "O," 45, *et seq.*; Wheeler's Land Titles; Int. and Schedules.)

We think that the documents and authorities to which we have referred are sufficient to show that pueblos had such a right and interest in the lands within their limits that they could distribute, concede, or grant them in lots to individual settlers, subject in this as in all other matters to the instructions and orders which might be given them by the superior authorities, and that the lots so distributed, conceded or granted, were, at least after the law of 1813, passed to the grantees and their heirs and successors in full property and ownership, subject only to the municipal tax or *censo.*

It is said that this Court, in the case of *Woodworth* v. *Fulton,* (1 Cal. 295) virtually decided: First, that San Francisco never was a pueblo. Second, that it had no right or title to land which it could transfer or convey to others. Third, that if it had any title, Alcaldes, acting under American authority after the military occupation and conquest of the country, could not convey without authority from the American Government.

It is also said that the first two of these grounds were virtually abandoned and overruled by the same Judges in the subsequent case of *Reynolds* v. *West,* (1 Cal. 323) in which they sustained the validity of a grant in San Francisco made by a Mexican Alcalde before the war; and that in *Cohas* v. *Raisin* (3 Cal. 443) this Court overruled the third ground of the decision of *Woodworth* v. *Fulton,* by sustaining a grant made by an American Alcalde during the war with Mexico, and while California was in the military occupation of the United States.

Without examining here the opinions of the individual Judges in the last case, with respect to the character of the right or title which the pueblo of San Francisco held to the lands within its limits, we will suppose the question which the Court undertook to decide was simply

this: Conceding that the pueblo had such a right or title to the lands within its limits that, as held in *Reynolds* v. *West*, its Alcalde or municipal officer could convey such land to others in full property, did such power of conveyance continue in such municipal officers during the military occupation of California by the United States, without special authority from the conquering power? Supposing this to be the only question which was actually passed upon by the Court in that case, we will now proceed to examine the correctness of the conclusions to which the Court arrived.

It is a well established principle of international law, that the military occupation of a conquered territory does not, in general, effect any change in the laws of that territory. The political connection between its inhabitants and their former sovereign or State is interrupted or suspended so long as the occupation continues, and is entirely severed on the completion or confirmation of the conquest, whether by treaty of cession or otherwise. The right of the conqueror to govern the enemy's territory which he may occupy, is not derived from the Constitution or political institutions of his own State, but flows directly from the laws of war, as established by the usage of the world, and confirmed by the writing of publicists and the decisions of Courts; in fine, from *the law of nations*. It is held by the same code, that, although the conqueror *may* suspend the laws and entirely displace the former local and civil authorities, or limit or change their powers, this is not usually done; and consequently, that such changes are not to be presumed, but must be proved. Even where the conquest is completed by cession or treaty of peace, although the laws political which bound the country and its inhabitants to the former sovereign are thereby completely abrogated, the municipal laws of the country continue in force until changed by the proper authority; and the existing government and its officers continue to exercise the powers and authority conferred by such laws, so far as they are not inconsistent with the will, expressed or necessarily implied, of the new sovereign. Neither military occupation or complete conquest produces, as a general rule, any change in private property, no matter whether belonging to individuals or municipalities, or by what kind of title it may be held. These views are sustained by the best authorities. (*Fleming* v. *Page*, 9 How. 603; *Cross* v. *Harrison*, 16 Id. 164; Heffter, Droit International, secs. 131, 186; Isambert, Annales Pol. et Dip. Int. 115; Schwartz, De Jure Victoria, ch. 26; Vattel, Droit des Gens, liv. 3, ch. 13, sec. 197, *et seq.*;

Wildman, International Law, vol. 1, 163, *et seq.;* Ortolan, Diplomatie de la Mer. liv. 2, ch. 13; *Campbell* v. *Hall,* 1 Cowper, 204; Kent, Com. on Am. Law, vol. 1, 92; Wheaton Elem. Int. Law, 4, ch. 2, secs. 5, 6; Riquelme, Derecho Pub. Int. lib. 1, tit. 1, cap. 12; *Am. Ins. Co.* v. *Canter,* 1 Peters, 542; Burge, Commentaries, vol. 1, 31, 32.)

Again, suppose it to be admitted that pueblos had no absolute right of property in any part of the four leagues of land within their general limits, and that the legal title still remained in the Mexican Government, subject only to the uses of the towns for the purposes and under the restrictions imposed by the laws and regulations; it by no means follows, that, upon the complete conquest and cession of California, this land became a part of the public domain of the United States.

In the case of the *City of New Orleans* v. *The United States,* it was held by the United States Supreme Court, that property may be dedicated to the public use without vesting the legal title, and that, when such use had once been created, it could be destroyed only by an exercise of the right of eminent domain. In that case, France had permitted a certain part of the city of New Orleans to be used as a quay. The same use had been continued under the Spanish sovereignty, and after its retrocession by Spain to France, and its cession by the latter to the United States. Neither of these Governments had ever conveyed any legal title to these lands, either to the city of New Orleans or to the public; it was therefore contended that, by the last cession, the title or right of property in this land had passed, with all other public rights, to the United States. But the Court said that, admitting the legal title to have been in the King of Spain, if he held the land in trust for the use of the public, the title in him was subject to such uses, and the act of cession could not destroy them; that the United States acquired no right to dispose of such land, as other public lands of the United States; moreover, that the right to regulate this use, and to carry out the trust, belonged to the State of Louisiana and the people, such a right never having been delegated to the Federal Government.   (10 Pet. 736, 737.)

If such a rule was applicable to the lands of this quay, so held, *a fortiori* must it apply to the pueblo lands of San Francisco, which, as already shown, were held by that pueblo by a much stronger right or title.   (See 7 Texas, 288.)

It has been stated by counsel for plaintiff, and the correctness of the statement was not denied, but has been virtually admitted in some

Hart *v.* Burnett.

of the briefs of defendants' counsel on file in this case, that there are very few,. if any, royal charters for the incorporation of cities or towns, since the reign of Ferdinand and Isabella, in Spain or the Indies ; and that not a single instance of such a charter can be found in any of the collections of the Mexican laws and decrees. Cadiz has a royal charter of nobility, with the title of " Noble and Heroic ; " and the same may be said of Saragosa, and some other cities. But these are very different from charters of incorporation, and contain no titles, grants or rights to land, or control over land. The cities themselves had existed hundreds of years before these royal charters were issued. The royal order of August 19th, 1833, cited by counsel, changing the pueblo of Port Royal, of Manzanillo, into the villa of that name, forms no exception to this view. This is no charter of incorporation, nor does it contain any grant of land. It provides for the demarcation and designation of *propios, ejidos* and *dehesas,* and the assignment of jurisdictional limits (*terreno jurisdiccional;*) but we have searched it in vain for any grant, or any intention to subsequently make a grant, of any land to that municipality. Probably here, as in most other cases, the only charter of incorporation or grant of land made or contemplated, was the license to establish an Ayuntamiento in such pueblo or villa, and the pueblo, villa and Ayuntamiento, when established and organized, immediately became invested with all the rights and powers which were conferred by the general laws or particular act. Again, it is said that the city of Lima, in Peru, never had a royal charter of incorporation, or a grant of land ; and yet that city and its inhabitants have enjoyed the lands within its municipal limits for more than three hundred years. Suppose that city should be ceded to the United States ; would all such lands, not held by royal grant, become a part of the domain of the United States ? Suppose it be true, as admitted in the briefs of counsel, that but few, if any, of the cities or towns of Mexico have ever received any special grant, and that, as here contended, the laws gave them no title, without special grant, to the lands which they have distributed to the inhabitants and settlers ; does it follow, that if the United States should acquire that country, by conquest or cession, such lands would become a part of the public domain, and consequently, that the holders thereof could have no title, except by an act of the political power of the new State ?

If this be really the law, we think that such a change of sovereignty

would be infinitely more disastrous to the United States than to the land-holders, who might thereby be despoiled and ruined.   The power which the Federal Government would acquire over the property of individuals would be greater than that held by any monarch of modern days; and very soon it would utterly corrupt our Federal administration, and destroy our Federal organization.

But we cannot think that this is a correct view of the law in these cases.   On the contrary, we are of the opinion that Spanish and Mexican towns had, under the general laws, such a right or title to lands within their limits as will enable and require the courts to protect them, and those holding under them, in the enjoyment of those lands; that the determination and regulation of these rights belong to the States, and not to the Federal Government, for the reason that neither conquest nor cession could confer upon that Government any such power, and because, as held by the United States Supreme Court, the Constitution prohibits it from exercising any such power in the States.

But counsel have referred us to the *fueros* (franchises) and *cartas pueblas y forales* (town charters and franchises) granted by the sovereigns and lords in Biscay, Navarre, etc., in opposition to the view we have taken, and as showing the necessity of such grants to confer any right of property upon towns.   It is a sufficient answer to this argument to remark, that these *fueros*, etc., never extended to Spain or to the Indies, and form no part of the Spanish law.   The King of Spain was merely Lord of Biscay, and President of the Junta of the other Lords of Biscay.   There were separate and distinct *fueros municipales* in Leon, Castile, Navarre, Arragon and Catalona.   These received particular names from the persons or places to which they were granted; as the *fuero of Najera,* the *fuero of Sepulveda,* the *fuero of Logrono,* the *fuero of Sahagun, of Toledo, of San Sebastian, of Cuenca, of Caceres,* etc., etc.   The privileges thus conceded in early ages to particular cities and towns, or to the Lords of those places, still subsist, at least to a certain extent, and are therefore alluded to and discussed by modern commentators of Spanish jurisprudence; but they have no relation whatever to the Spanish and Mexican laws applicable to towns and pueblos in California.   (Escriche, verbo *Fuero Municipal.*)

But suppose an actual allotment or demarcation of land was requisite under Mexican law in order to vest a title in the pueblo, as has been so strenuously urged by counsel.   The mere failure of the Mex-

ican Government to assign these lands, if that was necessary, would not, under the circumstances, destroy the right of the pueblo to them. We have shown that the pueblo existed, and exercised a certain right of ownership in these lands, and that it was entitled to do so by the laws of Mexico.   Under the broad and liberal terms of the Act of Congress of 1851, the claim of the city would be an equitable claim on the Federal Government, which her officers would be bound to recognize and perfect, and which, indeed, has been done, so far as her Courts are concerned, at least with respect to so much of the claim as has been confirmed.

The evidence in favor of the existence of a pueblo in San Francisco prior to July 7th, 1846, and of its general right, for pueblo purposes, to four square leagues of land, to be measured—according to the ordinanzas—from the center of the plaza at the presidio, is, to our minds, irresistible.

1st. We have the general laws of Spain and the Indies, authorizing the formation of pueblos, assigning their general boundaries, directing how they were to be surveyed out, designating the uses to which such lands were to be devoted, and defining the character of the right which the pueblo acquired in them, and the control which its municipal authorities, as well as the King and his officers, were to exercise over them.

2nd. We have the special orders of the King, and the highest officers of his Government, with respect to the establishment of pueblos in California, and more particularly for the conversion of presidios into pueblos, and the extent of land assigned to the pueblos so formed.

3rd. We have documentary evidence, showing that at a very early period, and almost immediately after the discovery of the bay of San Francisco, the Viceroy and Governor of California contemplated the establishment of a pueblo at this identical point; and that the foundation of the presidio and Mission of San Francisco, in 1776, was then considered, and so announced, as merely preliminary to the organization of a great town, into which they were to be converted, as soon as a sufficient number of settlers could be procured for that purpose.

4th. We have documentary evidence, of unquestionable authenticity, showing that the Governor and Territorial Deputation, in 1834, ordered an election at the presidio of an Ayuntamiento, consisting of an Alcalde, two Regidores and a Syndico—officers recognized by law as belonging only to pueblos; that this, and subsequent elections of the

same kind, were held at the same place; and that such municipal organization was then, and has been ever since, recognized in numerous official documents, signed by the different Governors, Secretaries of State, and other Government officers, as the " Pueblo of San Francisco," or the " Pueblo of San Francisco de Assis."

5th. We have documentary evidence, showing that the Political Chiefs, Deputations and other Government officers recognized, in numerous official papers, that this pueblo had some interest in, and its municipal authorities some control over, the lands within the general limits of four square leagues; and that, at different periods, they were authorized to grant, in particular localities within such limits, small parcels of these lands to private persons in full ownership.

And 6th. We have documentary evidence, showing that the municipal officers of this pueblo did for a long term of years, both before and since the conquest, exercise this authority by granting small lots of land to numerous individuals, and that their power was recognized, both by the Mexican Government in California, and by the Government of military occupation which succeeded it.

IV. In pursuing this discussion thus far, we have not deemed it necessary to determine the precise character of the right or title by which the pueblo of San Francisco held its pueblo lands, nor the precise boundaries by which such lands were limited and defined. It was sufficient for our purpose that it had some right or title to lands, and that these lands were defined by the law, and that their boundaries *could be* ascertained and fixed. We now, however, must consider the question, whether the pueblo of San Francisco, or the city of San Francisco as its successor, had such a title to the lands within its limits which had not been conceded or granted in the manner we have indicated, as to subject them to be levied upon and sold under execution.

This question has been most elaborately discussed, numerous points have been raised, and a multitude of authorities have been referred to. It would be impossible, in this opinion, to discuss all of these points and authorities, nor shall we attempt to do so; for the view we have taken of this question renders it unnecessary to consider many of those upon which counsel have argued with great zeal and ability.

It has been argued with much force, that while cities, pueblos and towns, under Spanish and Mexican law, had certain uses in the lands within their limits, the title to such lands, although subject to such uses, still remained in the Crown or Government, and numerous authorities

have been referred to, to sustain this position.   Thus, in book 4, title 12, law 8, of the Recopilacion de Indies, it is said: " Our pleasure is that the Viceroys and President-Governors shall have power to *revoke* and *annul* the gifts (*gracias*) which the councils (*cabildos*) of cities have made, or shall make, of lands in their districts, *if they have not been confirmed by us;* and if they belonged to Indians, they shall be ordered to be returned to them, and the vacant lands (*valdios*) shall remain such," etc.   Again: book 7, title 5, law 2, Recop. says: " Our will and pleasure is, that the cities, towns and villages shall retain their rights, revenues and *propios*, and that no gifts (*gracias*) of them be made; wherefore, we command that any gifts or gift which we shall make of the same, or any part thereof, to any person, shall be *of no value*."   Again: book 7, tit. 7, law 10: " The King prohibits any one from making gifts (*gracias*) in the royal name, of any commons and pastures (*terminos y pastos*) of the cities, towns and places of the kingdom;" and in law 11, of the same book and title, it is commanded that the Justices and Councilmen (*Justicias y Regidores*) shall not grant any lands (*dar tierras algunas*) without a previous license for that purpose.   Again: Perez, in commenting upon the settlement of the Indies by Ferdinand and Isabella, says: " Their Majesties esteemed it proper to cede to the towns of America and to their Councils, *en clase de dote o privilego de poblacion*, a certain portion of lands, in order that they might have recourse to them for their support and improvement (*usufructandolos*) for pastures, cultivation, or in the manner directed in their municipal ordinances."   (Perez Comp. 334–335.)   Elizondo says:— " The Kings, the fountains of jurisdiction, are the owners (*duenos*) of all the *terminos* situated in their kingdoms, and as such, can donate them, divide or restrict them; the same being true of their *pastos*, although the pueblos enjoy them—it being presumed that they are granted only so far as respects their use and administration, the dominion remaining in the sovereigns themselves, so that they may afterwards limit, enlarge or restrict them, and give any new form to the possession and enjoyment thereof (*sus goce y aprovechamiento*).   And hence it is that pueblos cannot alienate their *terminos* and *pastos* without precedent royal license and authority.   The ancient limits (*terminos*) are never presumed to be altered or changed, but on the contrary, to remain in their primitive condition; especially being assigned by a royal commissioner in whom no power is vested to give and assign *terminos* to one town to the prejudice of others, but to mark out those

inclosed and private, to which the letter of the commission refers, and which must be considered as such after being marked out, so that each town (*poblacion*) and its inhabitants may use them, their *pastos* and *ejidos*, as the endowment (*dote*) of the *ciudad*, *villa* or *lugar* to which they belong. From the foregoing it is inferred that any city, village or pueblo has an established right to the lands adjacent to it; consequently the inhabitants of another *lugar* cannot pasture in the same, nor enjoy their other uses (*aprovechamientos*) without showing a legitimate title authorizing them to do so." (Practica Un. Forense, tomo 3, 107–108.)

Again, the same author says: " There is assigned (*diputada*) by law, as *pertenencia* of pueblos, nothing more than that which, by privilege of the Princes, (*privilegio de los Principes*) by custom, or by disposition of men one to another, is conceded to them; so that, although there is assigned to the towns, at the time of their establishment, a *territorio* and *pertenencias*, which may be common to all the inhabitants, without the right to each one separately to use them exclusively (*por si*) there is reserved to the Princes the prerogative (*regalia*) to decide the *terminos* of their provinces and villas, prescribing to them the use and enjoyment, but leaving the *dominio* in the sovereigns themselves." (Idem, tomo 5, 226.)

In order to fully understand the preceding extracts from Elizondo's Commentaries, it is necessary to examine the technical meaning of the words used. Thus, *dote* means *dowry*, when applied to the patrimony of the wife, but when applied to towns it means a *gift* or *endowment*. *Aprovechamiento*, when applied to pueblo lands, has particular reference to the commons, as the *dehesas* and *montes*, and implies not only the enjoyment, but a *right* to the enjoyment of them. *Dominio* does not necessarily imply ownership; it may mean simply the *dominio alto*, (right of eminent domain, which belongs to every sovereign State over private property) or the *dominio directo*, or the *dominio utile*, which have already been explained. So of the word *propiedad*; it does not necessarily imply a full right of disposition, for the *dominio utile* may be in one and the *nuda propiedad* in another. And again: the word *regalia* may, in Spanish law, simply mean a right which the sovereign has *over* anything *in* which a subject has a right of property or *propiedad*. (Vide the words indicated in the dictionaries of Escriche, of Salva, of Velasquez, of the Academy, etc.)

But our limits will not permit us to pursue this critical investiga-

Hart v. Burnett.

tion; and we therefore resume our examination of the other more important authorities referred to by counsel for defendants.

Book 4, tit. 7, law 11, of the Recopilacion de Indies, in reference to laying out new towns, says: "Let solares be distributed by lot to the settlers (*pobladores*) continuing from those at the principal square (*plaza mayor*) and leave the others for us to give to those who may afterwards come to settle, (*poblar*) or what may be our pleasure." "Propios," says Febrero, "are that species of property which, *by some title*, pertains to the commonalty of each pueblo, and the revenues whereof are dedicated to the conservation of the civil organization and municipal establishment of the councils, comprehending likewise under this name all those things declared to be such in virtue of any legal dispositions. (Feb. Mex. tom. 1, 304–309.) The law of March 20th, 1837, says: (Art. 8) "On the previous report of the Prefects, and having heard the opinion (*dictatem*) of the Departmental Junta, they (the Governors) may grant license to the Ayuntamientos or authorities charged with the administration and expenditure of the municipal funds, for the extraordinary expenses which may be directed to objects of necessity or common utility." And (Art. 9) "In cases of necessity or for motives of public convenience, they may grant license to the same authorities, on previous consent (*anuencia*) of the Departmental Junta, to alienate (*enagenar*) any of the property (*algunos de los bienes*) of the propios and arbitrios; and any cession, donation or contract, made without this requisite shall be null and of no value." (Col. de Decretos, 1836 y 1837, p. 180.) "Among the attributes of gratuitous administration (*administration graciosa*) *id est*, for making gifts or grants without claim," says Lares, "are included the acts of tutelage (*tutela*) which the Executive (*Gobierno*) exercises over corporations and establishments which are considered in society as moral persons, and with the privileges of minors. This state of tutelage and protection has been the object of the critical examination of publicists, who are divided in opinion," etc.  *  *  "According to the importance and nature of the object which the act of tutelage has to secure, so will be the different manners in which this act will be exercised. If it relates to a subject of small interest, the administration will proceed by orders or decrees, or by means of its respective agents; if the matters are of weight, it will issue formal regulations. But in whatever mode it may be done, the contentious appeal against these acts of administrative tutelage, whether superior or inferior, would be repugnant to its nature.

\*   \*   The acts of administrative tutelage are acts of inferior adminis-
tration, which do not admit of any appeal. This tutelage of adminis-
tration is applicable to all acts of alienations, sales, exchanges, rentings,
acceptance of trusts or legacies, compromises and suits of Ayuntamien-
tos and other corporations which are under the Executive. The
approval or disapproval of a sale, or of a compromise, are acts of tute-
lage which, like all acts of that nature, do not admit of appeal."
(Derecho Admin. 120, 122.)

The above are the most important authorities referred to by counsel
against the pueblo title. The quotations which they have made are,
in most instances, but brief extracts from long laws which contain
numerous provisions, and sometimes these extracts are not fully ex-
pressive of the sense and object of the law. We have carefully
examined their references to laws and text-books, and it seems to us,
that taken together, they show that, under the old Spanish system, the
lands assigned to towns, whether by general law or special act, were in
the sense of endowments, to be held in trust for the purposes and
objects specified in the laws or in the particular grant; or, as expressed
by *Perez, en clase en de dote o privilegio de poblacion,* (in class of en-
dowment or town privilege) but not in absolute ownership, with full
right of disposition. The lands so assigned were for the general object
of building up and sustaining the town and its population, and were to
be applied to that object in the manner which might be directed by
the laws or by royal orders. The Government, or its authorized
agents, were, therefore, to designate the portions of such lands which
were to be used for particular purposes, as those which were to be
given to individuals in *solares* and *suertes;* those which were to remain
common for the use of all alike, as the pastures, woods, public squares,
watering places, etc., and those from which the municipal officers were
to derive revenues for their support and the expenses of the municipal
government. The lands so assigned to these special objects could not
all be used or disposed of in the same manner. Thus, the building
lots were to be given to the settlers for their individual and exclusive
benefits; but the *commons* were for the common use of all, and could
not, in general, be reduced to individual ownership except by common
consent, or an exercise of the right of eminent domain. There were
numerous laws enacted at different times which relate to each class of
land belonging to towns, and much misunderstanding has resulted from
not observing to what particular class the provisions of a law refer.

And this conclusion is greatly increased by the ordinary English trans-
lations, where, for the want of corresponding English words, these
various classes are usually translated by the general terms "municipal
lands" or "town lands."

It also appears from these authorities that neither the King nor any
of his officers were to grant away to others the lands which had been,
by law or otherwise, assigned to any town, and that, if such grants
should inadvertently be made, they were to be considered as void.
And it further appears that the municipal officers of any town were
not, without superior authority, to alienate any town lands, and if they
did so without previous license or subsequent confirmation, their acts
were to be considered as void.

But we see nothing in these laws opposed to the views we have
already expressed, that the towns had such a right, title and interest
in these lands as to enable them to use and dispose of them in the
manner authorized by law or by special orders, and consonant with the
object of the endowment and trust.   Undoubtedly the right of control
remained in the sovereign, who might authorize or forbid any municipal
or other officer to grant or dispose of such lands, even for the purposes
of the endowment or trust.   Such general right, with respect to a pub-
lic corporation, exists in any sovereign State, and must, of course, have
existed in the absolute monarchy of Spain, where the property of
private corporations and individuals was to a great degree, subject to
the royal will and pleasure.

In justice to one of our predecessors, it is proper to remark, that we
have here quoted only such laws as were referred to by counsel, and,
for that reason, have not alluded to laws 1 and 2, title 16, book 5,
of the Novissima Recopilacion, relied upon by Justice Heydenfeldt in
his opinion in *Cohas* v. *Rasin*, 3 Cal. 446.   Some of the counsel have
denied that the laws so relied upon were of any force or authority in
Mexico.   There seems to be a misunderstanding or misapprehension
in this matter.   The laws referred to were, beyond all question or
peradventure, in force in Mexico.   It is true, that some Mexican
writers have doubted whether the new laws introduced into that Reco-
pilacion, which had never been transmitted to the Indies prior to 1811,
and which refer particularly to old Spain, are of binding authority
there.   But the laws referred to by Justice Heydenfeldt are, according
to every Mexican writer whom we have consulted, in force in Mexico.
In the first place, these laws are copied *verbatim* from laws 1 and 2,

37

title 5, book 7, of the Recopilacion, which, by royal decree, was of binding authority in the Indies. In the second place, they are copied in full in the " Pandectas Hispano Mexicanas," or General Code of Laws in force *(vivas)* in the Republic of Mexico, published in 1840, by the Licentiate, Juan H. Rodriguez de San Miguel. *Vide* Nos. 2430, 2431. Moreover, they are quoted and referred to as laws in force *(leyes vigentes)* by numerous Mexican text writers. With respect to the binding character of the Novissima Recopilacion generally, in Mexico, we refer to Sala Mexicana, vol. 1, 140–144; Febrero Mexicana, vol. 1, caps. 3, 4, 96–160; Schmidt's Civil Law of Spain and Mexico, 98; Rockwell's Spanish and Mexican Law, vol. 1, 16.

The question has been raised whether the character of this title in towns was not enlarged and became a title in absolute property, with full power of disposition under the Constitution of 1812, the laws of 1813, and the Constitution and laws of the Mexican Republic after its independence.

We have already noticed the law of the Cortez in 1813, with respect to the nature of the grants by the Ayuntamientos of town lands to individuals, making them in full property, and explained the meaning of the words used with respect to such grants by the Governor and Territorial Deputation in their acts of August 6th, 1834, and October 26th, 1835, but we have not been referred to any law either of the Cortez, of Mexico, or of California, changing the character of the right or title by which the towns themselves held these lands. If they before held them in trust for certain objects and uses, subject, in this matter, to superior control and authority, we must infer, unless the contrary be shown, that the same continued, except so far as such control by superior authorities might be modified by the change from an absolute monarchy to a government of constitutions and laws.

It has been contended on the one hand, that, inasmuch as the Regulation of November 21st, 1828, authorized the Governor of California to grant *solares* of one hundred varas, and as the law of March 20th, 1837, prescribes it as one of the duties of a Prefect to regulate the distribution of the *common lands* of the pueblos of his district, it must follow as a necessary consequence, that the full title to such pueblo lands remained in the Mexican Government; while, on the other hand, it is contended that inasmuch as the law of August 18th, 1824, exempts from colonization the lands of pueblos, and as the Governor and Territorial Deputation in 1835 recognized the right of Ayuntamientos to

grant pueblo lands in lots of one hundred varas, it must follow as a necessary consequence, that such pueblos were the owners of an absolute title to such lands. We are of opinion that neither of these inferences is correct, but that both are opposed to the entire tenor and purport of the laws and proceedings of the Spanish and Mexican Governments respecting pueblos, and other municipal organizations.

In the first place, the Executive regulations of 1828, respecting grants of *solares*, could not have had exclusive reference to lands held by pueblos; for these by the law of 1824, which authorized the regulation of 1828, were exempt from such colonization. It was probably designed, at least in part, to authorize the Governor to grant such house lots to individual settlers in places where there were no pueblos, and for the purpose of forming a nucleus from which, when the number of inhabitants became sufficiently large, a pueblo might be organized, precisely as seems to have been contemplated by Nava's order of 1791, respecting the captains and commandants of presidios, preparatory to their change into pueblos. Again, it is not certain that the law of 1837 has reference to grants of lands; it is argued that it authorizes only the forming of regulations for the distribution of the *common* lands of pueblos, which it is said were lands dedicated to the common use of all the inhabitants, and not susceptible of being granted in private ownership. If Prefects were authorized to grant lands in private ownership—a point we do not decide—that power is not expressly given by the Act of March 20th, 1837.

The Regulation of 1828 authorized the Governor or Political Chief, subject to certain control by the Territorial Legislature and Supreme Executive, to grant the public domain in colonization; but no authority was given to him to delegate that power to another, and such authority is not implied under any system of laws with which we are acquainted. It follows, therefore, that if the full and absolute title to pueblo lands remained in the Mexican Government, and subject only to the law of 1824, and the regulation of 1828, as has been contended, any attempt of the Governor or Territorial Legislature to confer upon the Ayuntamientos and Alcaldes power to grant such national domain, was nugatory, and the grants made by such municipal officers were void, for the want of legal authority.

But we have seen that the Governor and Legislature did authorize such officers to grant lots in pueblos to private persons, and it is shown by the records in this case that these officers did exercise that power

for a long term of years, not only in San Francisco, but in other pueblos of California, without any doubt being expressed, or any question raised with respect to its legality ; and many millions of property are now held under the grants so issued.   Can it be that the highest officers of the Government, for so long a term of years, entirely misunderstood their duties and powers under their own laws, and that their acts were mere *usurpations*, and utterly *null and void*, as assuredly they must have been if the lands which they authorized such municipal officers to grant away belonged absolutely to the State, as a part of the national domain ?   And are we now, with our imperfect knowledge of their laws, customs, and institutions, called upon to declare, by deciding that such lands were, before the conquest, wholly vested in the Mexican Government, and since that time, in the United States—that such grants conferred no right of property, and thus spread universal dismay and ruin?  As already stated, such a decision would be opposed, not only to common justice and common sense, but to the entire tenor and purport of Spanish and Mexican laws.   But conceding, for the sake of the argument, the right of Prefects and of the Governor to grant these lands, there is no necessary inconsistency in holding the title of the pueblos, for we have shown these grants to be in the nature of a public trust, and the exercise of this power by one agent of the Government or another, implies nothing decisive as to the general title, any more than the Act of the Legislature allowing Commissioners to sell lots in San Francisco proved that city had no title.

On the other hand, if the pueblos held the lands within their limits by an absolute title of ownership, with full right of disposition, why were such lands to be divided into classes, and dedicated to, and used for, special objects, with so many laws and regulations respecting each class and object ; and why were so many restrictions placed upon their disposition, the power to alienate being sometimes entirely taken away, and at others, limited only with respect to the size of the lots to be granted ?   And how are we to reconcile the opinions of learned publicists and commentators on the laws, who say that the sovereign retained the prerogative of regulating the uses, enjoyment, and disposition of the lands assigned *to* towns for the use of their inhabitants, and that without his license the respective Ayuntamientos, Alcaldes, Regidores, etc., could not alienate or burthen with charges the lands of the community ?   If the pueblos held such lands under an absolute title of full property, the same as an individual held his *solar*, what would

Hart *v.* Burnett.

it have availed to restrict their power of granting to lots of one hundred varas square?   Could they not have granted all these lots to a single person, or have contracted debts, as in this case, and by conniving with some creditor, permit him to purchase it all in under an execution for the payment of such debt, and thus defeat the entire object had in view in assigning these lands to the pueblo?

There is but one sensible answer to these questions, and we think that answer is given in the laws themselves, and in the recorded proceedings of the officers who administered them, and who must be presumed to have interpreted them correctly.   It is, that the lands assigned to pueblos, whether by general law regulating their limits to four square leagues, or by a specific designation of boundaries, were not given to them in absolute property, with full right of disposition and alienation, but to be held by them in trust, for the benefit of the entire community, with such powers of use, disposition, and alienation as had been already, or might afterwards be conferred for the due execution of such trust, upon such pueblos, or upon their officers.   And this view of the question, we think, fully reconciles the apparently conflicting dispositions of the laws, and the commentaries of publicists respecting the relative rights of the Crown and of the municipalities, to which the opposing counsel have referred, and the most important of which we have already noticed.

V.   But it has been most strenuously urged by counsel that, even admitting that the pueblo of San Francisco held its lands merely in trust for a specific object, or that its title was inchoate, or otherwise imperfect—that it had a perpetual usufruct only in the four leagues of land measured from the center of the presidio square—such right or title was merely a mode of expressing, in the civil law, a right of perpetual enjoyment of property, or title of ownership by the pueblo in its lands, and that the change of government and laws converted such civil law title into a common law title of fee simple absolute; or, at least, that the Act of March 3d, 1851, conferred such title upon the city of San Francisco, and that, therefore, these lands were subject to be levied upon and sold to pay the debts of the city.

We have examined the law of 1851 with due care and attention, but we have not been able to find in it any provision which confers upon San Francisco any title to land.   The fourteenth section of that law raises the presumption that any city, town or village of California, which existed on the seventh day of July, 1846, had a grant of land. But what kind of a grant?

According to the view which we have taken of the Spanish and Mexican law relating to pueblos, this presumption existed without this act, and we doubt not that Congress was of the same opinion when it passed the law. That law simply reäffirmed a legal presumption which already existed, so far as the pueblos were concerned, merely requiring them to prove that they existed on the seventh day of July, 1846, without going back to the period of their first organization as such municipal corporation. So far as their claim to four square leagues of land was concerned, they were not required to produce any title, the fact of their corporate existence being *prima facie* evidence of such title. But we have searched the law in vain to find any *granting* clause, and we are of opinion that it contains none.

This is the language of the fourteenth section: "The provisions of this act shall not extend to any town lot, farm lot, or pasture lot, held under a grant from any corporation or town to which land may have been granted for the establishment of a town by the Spanish or Mexican Government, or the lawful authorities thereof, nor to any city, or town, or village lot, which city, town, or village existed on the seventh day of July, 1846; but the claim for the same shall be presented by the corporate authorities of the said town; or where the land on which the said city, town or village was originally granted to an individual, the claim shall be presented by or in the name of such individual, and the fact of the existence of the said city, town or village on the said seventh of July, shall be *prima facie* evidence of a grant to such corporation, or to the individual under whom the said lot-holders claim; and where any city, town or village shall be in existence at the time of passing this act, the claim for the land embraced within the limits of the same may be made by the corporate authority of said city, town or village."

There are no apt or usual words of grant. No land is described either by general or particular description. The act was drawn by able lawyers, who are not to be supposed to use language so inaptly as to attempt to create a grant by words implying a presumption of its preëxistence. The words do not import a grant. They have another and more natural meaning, and imply a different purpose. The *Senate debates* show an express disclaimer of an intention to grant lands; and there was a rejection of the grant to the towns, when the proposition, in the form of an amendment, was directly made after the bill was reported; and for the reason given by the chairman of the Judiciary Committee, Mr. Berrien, that it was not expedient to grant lands, and the bill did not so design.

Hart *v.* Burnett.

When was there ever a grant made by giving to the grantee, on proving a certain fact, *prima facie* evidence of its having been made before; and this embodied, too, in a provision defining the mode of presenting claims to a tribunal for *confirmation?* Besides, the context extends the presumption to the grantor of the lot-holders, when such grantor is a private individual. Can it be supposed that Congress meant to grant land to such grantor? If so, how much, and for what reason?

Moreover, if such lands had been granted, assigned or dedicated to the pueblo of San Francisco, or if the people of that municipality had acquired an interest or use in such lands under the Mexican Government, they were withdrawn from commerce, and Mexico could not have transferred to the United States any title, under and by virtue of which the latter could change such uses, except, possibly, by an exercise of the right of eminent domain. And as held by the Supreme Court in the case of *The City of New Orleans* v. *The United States,* no right to regulate such uses could be acquired by the Federal Government, that right being, by the Constitution, given to the State of California and the people. Congress, therefore, could not change the trust under which San Francisco held these lands, nor could it destroy, or in any way modify, the uses to which they had been dedicated. Such power could be exercised only by the State sovereignty. If Congress could have changed this trust by a direct grant to the city, could it not have done so by a grant to any one else? That Congress could have granted to the city of San Francisco any lands belonging to the public domain, upon any conditions, and by any title it pleased, is not doubted; nor is it doubted that it could have surrendered to such municipality any right or title in the United States to the lands of the pueblo; but it could neither change an existing trust, nor destroy existing uses.

While we do not accord to the Act of Congress the force or the character of a present grant, yet we attach to it, in practical effect, an operation which confirms the title of the city; for it cannot be denied that when the Federal Government makes a *prima facie* case against itself, of a grant to the city of land, from the fact of the existence of the town in July, 1846, and when it does this for the purpose or as connected with the object of the city's presenting before its own tribunals a claim for such land, it is not to be presumed that it meant to dispute that presumption, or to deny effect to it. To say nothing of the almost absolute impossibility of disproving the negative of the propo-

Hart v. Burnett.

sition of fact which the Government thus assumes, and to say nothing of the bad faith which would be involved in its permitting numerous claimants of property to present their claims in the name of such city, as under a primitive source of valid title, and then, after such presumption, denying such source of title, apart from these things, we suppose no candid mind could possibly arrive at the conclusion that the case we have made in our statement, when added to the presumption afforded by the law of the actual fact of a grant duly made, could be so overcome. We know that, in point of fact, the Government does not mean, and has never designed, to make such a contestation. On the contrary, the claim has, so far, been recognized by all departments of the Federal Government, and the only appeal pending from the decisions of the Courts is that made by the city itself.

Now, this presumption of a grant being, as we have seen, equivalent, in practical effect, to a grant, so far as the city is concerned, let us inquire of what grant is the existence of a pueblo in 1846 a presumption? Plainly, not of a grant by the Federal Government, but of a grant by the Mexican Government; and of what sort of a grant? The answer is, of that species of grant which Mexico, by her laws, was in the habit of making to pueblos, with all the qualities, conditions and restrictions which characterized such grants. It is true, there is no practical difference, so far as affects the Federal Government, between furnishing such a presumption against herself, and making a grant in the usual form of the property; but there is a very great difference so far as the pueblo is concerned. It is the difference between proof of an old title and a grant of a new one; between the Federal Government giving the town a right, and acknowledging the right as having been given by Mexico; all the difference, in short, between proof of title and title itself. By raising this presumption, the Federal Government affirms the title not to be in the Government, but just the contrary; it affirms the title to be against and out of the Government and in the pueblo, and furnishes proof of this fact to the pueblo, whereby as against the Government she may maintain the claim.

Similar reasoning is applicable to another phase of this case. If, as has been contended, the decision of the Board of Land Commissioners and the dismissal of the appeal by the Government be conclusive of the title of the city, the same result follows. The city presented this title, basing her claim upon a Mexican grant, express or presumed. That claim is affirmed. It matters not whether this affirmance was

Hart *v*. Burnett.

upon proof independent of the Act of Congress, or upon proof given by the act. In either case the affirmance was of the pueblo claim, and the effect of it is not at all altered by the kind of evidence used on the trial, or the source from which the testimony was obtained. Nor was the effect of the decree of affirmance to create a title from that date. It took effect upon the title at its inception, or, at the latest, from the date of the treaty of cession, and the title became validated and adjudged such a title as was claimed and asserted in the petition to the Board of Commissioners.

The result of this reasoning is, that upon this hypothesis, independently of all original claims of the city to the grant of lands to the old pueblo, her predecessor, she has the title to them, not by a concession of the lands by the Federal Government, but by a concession by that Government of such a state of proofs of an anterior title, as establishes such title against that Government, the only other claimant. But she stands on this title, not as a title *granted* by the Federal Government, but as a title acknowledged by that Government.

With respect to the other point mentioned above, viz: that the change of government and laws from Mexico to the United States converted the civil law title, by which the pueblo held these lands, into a common law title of fee simple absolute, counsel have referred us to no authorities to sustain the proposition, and we presume none could be found.

VI. But reference has been made to the several acts of the Legislature of California incorporating the city of San Francisco, and regulating the powers and responsibilities of such incorporation, and also to various decisions under the English common law with respect to the question, whether property of such towns or municipal corporations is subject to levy and sale under execution for debts contracted by the municipal government of such towns or corporations. It remains for us to examine these laws and authorities.

The first charter of San Francisco, April 15th, 1850, gives to that city a right to "grant, purchase, hold and receive property, real and personal, within said city," and to "lease, sell and dispose of the same for the benefit of the city." But we find nothing in these words which changes, or is intended to change the tenure by which such property was then held, or to destroy or alter any existing trust or use. The same may be said of the corresponding words in the charter of April 15th, 1851. But article third of that act provides for funding the

debts of said city, and the payment of such debts from "the net pro-
ceeds of all sales of real estate belonging, or that may hereafter belong
to the city," and the Commissioners of said Sinking Fund were "pro-
hibited from permanently disposing of any property belonging to
the city by sale, lease or otherwise," etc.   And by a previous act,
passed April 1st, 1851, it was declared that "the city of San Fran-
cisco shall not have power either to sell, lease or in any manner con-
vey any lands situated within the corporate limits of said city, from
and after the passage of this act, until the tenth day of May next or
thereafter," and that "every sale made by said city, its officers, agents
or Commissioners, contrary to the provisions of this act, shall be null
and void."   The Act of May 1st, 1851, created the Commissioners of
the Funded Debt, and declared that "all property of the city of San
Francisco which is necessary to be retained for all or any of the munic-
ipal purposes of the city, shall forever be exempt from sale by execu-
tion."   The judgment under which the lands involved in this case were
sold was rendered September 18th, 1851; the execution was issued
November 1st, 1851, and the sale by the Sheriff was made November
26th, 1851, and the purchase price of four hundred and eighty fifty
vara lots was the sum of fifty dollars.

VII.   Having referred to the different acts of the Legislature with
respect to these municipal lands and the dates of the judgment, execu-
tion and sale in this case, we will proceed to examine the argument of
counsel on the validity of this sale under the laws in force at the time.

In discussing this question, it will be necessary to consider the char-
acter of the title by which these lands were held prior to the cession,
as well as its character under existing laws.   It is true, that the ques-
tion whether these lands were subject to execution depends upon the
laws of the forum *rei sitae* in force at the time of the sale; but while
those laws define what property is so subject, we must look to the
former system to ascertain the nature and qualities of this species of
property, in order to determine whether it be within the definition.

As a general rule, trust property is not subject to the debts of the
trustee.   Thus, property held by a guardian as such, though it be in
his own name, is not subject to his debts; neither is the property held
by an executor as such; and so with other fiduciaries.   Nor, as we
shall show more fully as we proceed, is property held like this by
trustees for the use of the public, subject to forced sale for the debts
they may create.   Especially is this true with respect to property held

by a public body by grant made for purposes of Government, or any branch or department of Government. We suppose if Girard or McDonough had given to the cities of Philadelphia or New Orleans large sums of money or valuable real estate, to be held by those cities for founding and sustaining public schools or supporting the poor, it would not be contended that this property could be seized or sold for the debts contracted by those municipalities, even if contracted in connection with the matters of the trust; and we can see no substantial difference, so far as the principle of exemption is concerned, between these cases of grant for these two purposes of Government, and a grant of the same property for general purposes of Government. The reason of the rule of exemption is easily seen. A man or a Government may, as a general rule, devote his property to any lawful purposes, and Courts of justice will usually give effect to the appropriation. The grant made is to be construed according to the intent of the grantor, and this intent is to be ascertained by the language employed, and by surrounding circumstances. The purpose for which a grant is made, not unfrequently gives construction and limitation to the grant. The property, in this case, came from the Government stamped with the will of the Government, that it should be used and disposed of, in a particular way, for public use and benefit; that use, and that use alone, being the policy of the Government, declared by its public law. There is no legal obstacle to the carrying out of this will and this policy. It was no part of the intention of the grantor that this property should be sacrificed at public forced sale; the contrary *was* the intent. A trust was given these municipal agents to keep, preserve and administer, but no power to destroy the estate. Hence this property was not subject to forced sale, because such was not the law of the land, the intent of the grantor, or the policy of the Government. Such was the condition of this land under Mexican rule. Whether the original trusts were precisely the same after the act of incorporation of San Francisco is not material. The general nature of them was the same. It is true, that by the charter the Common Council have the right to sell, lease, etc., this property; but the terms upon which this may be done are cautiously and carefully defined. It is in the nature of an express power, clearly defined and to be strictly pursued; it is provided that it shall be done as a legislative act passed in solemn form. As under the old system there was no power of sale, except for limited purposes and to particular portions

of this property, and as this was a public trust, we cannot see why the Legislature had not the power to prescribe a given and an exclusive mode of alienation or disposition of the public property to these public agents.

We have already shown that under the Mexican system, the pueblo held these lands in *trust* for the use and benefit of the people thereof. Let us suppose, that under the Mexican laws, there existed the same remedial process of enforcing judgments as exists under our laws; would these lands have been subject to levy and sale to satisfy judgments against the pueblo or its municipal officers? The ready answer to this question would have been: "These lands are held for the inhabitants in perpetuity for their use and benefit, to be used in building up, sustaining and supporting a town, whose interests and rights are lodged in the hands of certain agents, acting under defined and expressly limited powers, given for the carrying out of the objects and uses prescribed; but with no power to alienate or change, much less to destroy the trust." That those agents were clothed with the power to make grants to settlers or others of limited quantities of this land, or to dispose of portions of it for the support of the municipality, implies no power to sell it out in gross, or even to mortgage it; for if this were the case, the prosperity, if not the existence of the town, would depend, not on the laws, but on the will of these agents acting in violation of their spirit and letter. If it be true, as seems clear from the citations we have given, that the municipal officers could not mortgage or sell these lands to pay a debt created by them, we do not see how it can be contended that they could accomplish the same result by borrowing money, and then confessing judgment, or suffering it to be entered, or submitting to suit, and thus indirectly doing through the Sheriff, what they could not do by their direct action. Not only is there nothing in the legislation of the State of California up to the date of this sale, to change this general trust or to enlarge these powers, but there is much, as we have shown, to limit and restrain these municipal agents who succeeded the old pueblo in the control and direction of this property. We see nothing which changes the substance of the trust. The property remained afterwards as it had been before, subservient to the public uses and purposes for which it was given; the land of the pueblo, now the city of San Francisco, dedicated by law to its public municipal purposes, to be kept and disposed of for the benefit of all, with no power of disposition except

that given by law, to be exercised by those agents and officers appointed by law, and in the mode which is prescribed by law. If a grant had been made in the language which gives the true history and nature of this trust, all doubt would vanish. Suppose a donor had thus devised: "All my tract of land A to the city of San Francisco, the said land to be granted in lots to actual settlers paying a tax thereon for revenue, except so much to be used as commons, for pasturage, etc., for the use and benefit of the inhabitants of said city in perpetuity; said grant being made that the said city may be built up and settled, and its government supported." Suppose after this a judgment is obtained against the city, and the whole land sold at a cent a lot; would any man contend that the sale passed the title? Would not the toleration of this be a complete perversion and destruction of the trust; the giving to one what was designed to be a benefaction to many—turning a great public endowment into a private speculation, and making a monopoly in the hands of a few, of what before was the right of all? Would any one make such a donation knowing this to be the effect of it? Would the Government do it if it supposed its own laws so disappointed its own will? Is the case less strong, when we see expressions in the old ordinances forbidding expressly these municipal officers to make other alienations than those before described and characterized, and declaring such interdicted alienations void? And could it be supposed that *any* Government had such a system as gave to its subordinate agents the right at pleasure to thwart its will and practically nullify its laws?

If this trust, thus impressed upon these lands, has ever been changed, it rests with the respondents to show how, and when, and where, and in what respect this change has been effected. That this property came from the Mexican Government stamped with this trust, we think we have abundantly demonstrated. We do not dispute the proposition that the Legislature, perhaps without the consent of the city of San Francisco—certainly with it—could, by virtue of its paramount political sovereignty, change the trusts upon which these lands were held. It might undoubtedly authorize another and different mode of disposing of them, and by other and different agents. But we have assumed and will further show that, originally, these lands were not subject to sale under execution. It rests with respondents to show that, under California laws, they became so subject. Under what laws? It is said that the Constitution provides that municipal corporations may be sued

as private persons; but the Constitution does *not* say that the lands of a corporation held in trust for public purposes, and which were not at the time of the adoption of the Constitution subject to forced sale, shall now be so subject. The Constitution never meant to provide that property before exempt from forced sale, because such forced sale would be in violation of the trust under which it was held, should now be liable *to forced sale, and to be sacrificed at such sale,* in utter destruction of the purposes for which it was granted. We do not seek an exemption of property from the general law making it subject to execution; but we deny that property never before subject to execution has been made so subject · by the Constitution. Nor is there anything in the original charter of the city which gives countenance to this pretension. On the contrary, we have shown by it a publicly declared policy opposed to this notion.

We see no reasons of policy for such a doctrine as that contended for. If the corporation owes money, undoubtedly it ought to pay it; and if itself unwilling, it ought to be forced to pay it. A city is entitled to no more immunity in respect to its honest engagements, than a private person. But the creditor was not without remedy. He had the same means of redress which existed against all other municipalities—the compulsory process of *mandamus* to compel the levy of a tax if no money was voluntarily. provided, or an appeal to the Legislature. The history of the litigation, of which this case, voluminous as it is, is only one chapter, sufficiently attests the impolicy of granting this forced process of sale as to this property—a process which has led to a sacrifice unparalleled in the annals of judicature.

It is impossible for us to see why these municipal lands should be any more subject to sale than the quay of New Orleans, or the commons of Cincinnati, or the levees and fronts of other cities, dedicated as easements to the public use. All these lands were of great pecuniary value; they were held and used for profit, or upon the same general trusts and uses as were these municipal lands. If the criterion of the question of *their* leviable character was the trust for the public— *their* necessity or utility for the growth of the municipality or the comfort, or advantage or support of the inhabitants, we cannot perceive that the same reasons do not exist for holding *these* lands of the city exempt from legal process.

Nor can we see that the principle, always recognized, that the revenues of a municipal corporation, *necessary* for its government, such as

Hart *v.* Burnett.

taxes, etc., cannot be seized by execution, does not apply to the sources expressly provided for that revenue; why it should apply to the money and not to the land out of which the money is to proceed.

But even if we are mistaken in this suggestion, we think we cannot be mistaken in these propositions—that property, whether of a corporation or natural person, is only subject to forced sale, *because* the law so provides; that the agents of a corporation have only the powers given them by law; that those of this corporation had no power to sell these lands in gross, either under the old system or the new, nor did they ever attempt to exercise such power; that they could not give any authority to sell them, either by their action or non-action, by contracting debts whereby they might be sold, or by direct contract with these purchasers to sell, but that they could act only in the mode prescribed and in pursuance of the trust created by the law; that the Sheriff pretending to act for the city had no higher power than these agents, and could not, any more than they, sell these lands in this way at public sale to pay the debt of the city; that the property was the property of the city for the use of its inhabitants for all time, subject only to the alienation by such agents and in such mode as given by law; and that a sale of it by the Sheriff has never been authorized by law, and is an act utterly void, because directly destructive of the trust upon which, and for which alone, the property was given.

The argument which opposes this view proceeds upon the assumption, that when property is shown in a municipal body, that property is shown to be subject to execution for its debts. But this is a mere begging of the question. It is subject, not from the fact that it is property, but from the law which gives the creditor this power over it. There may be a peculiarity, but there is no inconsistency in holding that the same law which gives property may define its tenure, limit its use, and control its disposition, or may deny any power, or prescribe an exclusive mode of alienation. So far as these lands are concerned, they were given for purposes of common benefit to the inhabitants of the pueblo, and for the support of Government, not for a temporary purpose, but for all time; they were given that the lots might be parceled out and enjoyed by those who would settle on and improve them, and that those lots and parcels not needed for actual occupation as homesteads and appurtenances thereto, and as places of business and the like, might be used as easements or commons by the residents. To hold, therefore, that this purpose and this whole policy might be de-

feated through the medium of forced sales, and that this magnificent domain might be made the subject of individual aggrandizement and speculation, is to change the whole spirit of the grant and the whole policy of the Government. If the Government saw fit to change that policy, it might do so, or if it chose, it might alter the terms of the trust; but its intention to do this must be shown by clear and affirmative acts. It cannot be presumed, and there is nothing shown us from which such presumption can arise.

If, therefore, we concede that the agents of this corporation had a right to contract this debt, and the debt became the proper debt of the corporation, and that the corporation owns these lands, it still does not follow that the law which devoted this property to this permanent purpose must be defeated to give place to the law under which the debt was created. Both can stand. The creditor retains his debt and has all the remedies he had to enforce it at the time it was contracted; the city retains the lands given to it for certain purposes, and those trusts and uses, annexed by the law to the tenure, continue. The object of the Government and the spirit of the grant are preserved without injury or injustice to any one. There is nothing inconsistent in the title in the pueblo, and the use, partial or total, in the public. What are these pueblos but a collection of people at a particular point—like the hundreds in England, or like the inhabitants of townships who are grantees, for school purposes, under acts of Congress? They may be regarded as corporations, or *quasi* corporations, for governmental purposes; as a local public organized as a district or township, holding lands, to be granted and used for settlement, and to support the government of the local jurisdiction, and for the comfort, maintenance and convenience of the inhabitants.

If Congress gave to the inhabitants of each township lands in fee for school purposes, and these were organized by the State into corporations, with powers of government as to school objects, with the right to contract debts in this matter, would any one contend that the lands could be seized and sold under execution against the corporation? Would not the answer be, the grant was to the inhabitants for perpetual use, and cannot be divested by the agents so as to disappoint and exclude that use? And what is the difference in principle between the two cases?

Having stated these general views, we proceed to examine the authorities to see how far we are sustained by them. And here we

may remark that the nature of this property is so peculiar that it could scarcely be expected that adjudged cases bearing directly upon the facts can be found.    The learned counsel for the respondents, with all their research, have not been able to find a single case in the United States in which the lands of a municipal corporation, dedicated to special purposes like these, have been held subject to execution.    The cases in our own State we will presently review.

*Doe ex dem Parr* v. *Doe*, 1 Adol. and Ellis, N. S. 700, (41 E. C. L. 736) is the first case cited to sustain the doctrine that municipal lands may be sold.    But that case merely holds that the defendant's motion to be allowed to defend without entering into the consent rule should be denied.

One of the Judges states the question as to the validity of an extent upon the town hall of the borough, but waives the expression of any decisive opinion.    But this is no decision; and if such property had, in England, been held expressly to be liable to extent, yet we know that no such doctrine obtains in the United States.    Court houses, town halls, jails, etc., are not subject to levy and forced sale.    Nor do we apprehend that plazas, parks, public squares, etc., dedicated to the public use, would be so held.    And yet the distinction which would exclude these, and admit the municipal lands must be very nice.

We see nothing in the case of *Mayor of Poole* v. *White*, 15 Meeson and Welsby, which goes to sustain the respondent's doctrine.    In *Harvey* v. *East India Company*, 2 Vernon, 395, a distringas was issued on a decree against that corporation.    Nothing appears to be decided in that case by the Lord Keeper, but that a decree having gone against defendant, a distringas should issue at once, and that the corporation was not entitled to be further heard as to matters in avoidance to the writ.    *Lyell* v. *The Board of Supervisors of St. Clair County*, 3 McLean, 580, was a suit in the United States Circuit Court against the county named.    By the law of Michigan, a county was subject to suit.    This was a proceeding by creditor's bill to subject certain bonds or mortgages to the plaintiff's debts.    The Judge says : " Suits against counties are placed on the same footing as against individuals, by the statute, so that it would seem a creditor's bill may be filed against the Supervisors of a county.    The objection that a *fieri facias* cannot be issued against a county is technical, and is by no means conclusive of the objection founded upon it.    The statute which regulates a creditor's bill, requires a *fieri facias* to be returned *nulla bona* before the bill is filed.    In

38

other words, this evidence of the inadequacy of remedy at law is required. But this has been done in the present case, and the objection is that the writ could not be issued against a county. This is not admitted. A judgment having been legally obtained, it is not perceived why the property of the county may not be levied on. The power given to the Supervisors to levy the amount by' a tax on the county is cumulative, and does not necessarily prohibit the ordinary course of the execution, as in case of an individual.

" In Massachusetts the doctrine is established, that on a judgment against a county or town, the property of any citizen may be taken in satisfaction. (6 Met. 552.) But this doctrine is not sustainable in this State. The imposition of a tax by the Supervisors, they being subject to a *mandamus*, is a more reasonable and just mode. The county being made subject to a suit, no serious objection is perceived against reaching the rights in question by the ordinary exercise of chancery powers, independently of statutory provisions." (See 10 Cal. 404.) It is not denied that ordinary debts and choses in action held by a corporation may be attached, and it may be true that some species of property may be levied on and sold to pay the debt. But the question is not touched by this decision, for the burthen of our argument is to show that *this* property, *characterized and conditioned* as we have shown, is not so subject.

We come now to review the decisions of our own Courts, though we shall have occasion to notice them briefly under another head, in connection with the rule of *stare decisis* invoked by the respondents. *Smith* v. *Morse* (2 Cal. 524) is a leading case. The main points made and argued by the Court, related to the validity of a conveyance by the city to certain Commissioners, and the effect of the Funding Act. The only portion of the opinion which touches the question of title is this short extract, which refers only to a water lot: " It was contended, upon the argument of this case, that the city of San Francisco had no title to a portion of the property in question. It is admitted, in the agreed case, that the title was in the city, so far as the question of the right to sell the water property of the city is concerned. The city is estopped from setting up any right in the State. She cannot take advantage of her own wrong by showing an indebtedness to the State. The Sheriff merely sold the right, title and interest of the city. And whenever the State chooses to assert her right in the premises, it will be time enough for this Court to determine the character of the title

which the plaintiff acquired." It appears that so far as this upland property was concerned, (which was, we presume, a part of the old municipal lands) the case expressly admitted the title of the city, and so the record shows ; the point to which the Court directs its attention in this brief extract is, as to a portion of the property derived from the State by grant, and this is summarily disposed of, without affirming or denying the right of the city, upon the ground of estoppel. No question was made as to the leviable character of the upland property. It is evident, therefore, that the questions presented in that case and the facts of the record were different from those here, and it is not necessary to disturb that case for any purpose of this decision. In the case of the *People ex rel. Thorne* v. *Hays,* (4 Cal. 130) the only question was as to the right of redemption. The Court was divided. The able dissenting opinion of Mr. Justice Heydenfeldt leaves great doubt of the correctness of the judgment; but we do not disturb it. No question of property was or could have been raised. The mere right of redemption was passed on, which was irrespective of the value or title of the property. *Wood* v. *San Francisco* (4 Cal. 193) is as remote from the point here involved. That was ejectment against the corporation to recover a wharf at the end of a street, the plaintiff claiming through a sale under judgment. But the Court only held that the property was not leviable. The validity of the sale or title of the city did not arise. If anything, this case makes against respondent, and does not seem entirely consistent with the case of *Smith* v. *Morse,* for the city was allowed to set up her own want of title, which seems to be denied by the first case.

*Seale* v. *Mitchell,* (5 Cal.) is badly reported. As reported, it would seem on close inspection to be no authority upon the point of the city's title. Upon looking into the record, we find no error assigned by the appellants. But in the transcript is the statement on appeal, from which it appears that the grounds for the motion of nonsuit were these: 1. The Sheriff's deed was void. 2. On the ground that the *plaintiff had proved no title* in the city of San Francisco, under which the plaintiff claimed. The respondents filed a brief of points, in which they contended that the plaintiff was bound to prove against them, who claimed under an Alcalde grant, that the city had title at the time of the judgment; that this must be shown by paper title, or by possession of the city at the date of the judgment, and that the mere fact that the lot was within the boundaries of the pueblo, created no presumption of

title in the city at the date of the judgment and execution sale. But no sort of question was raised or considered as to the character or quality of the title, or whether it was subject to levy and sale. The point, therefore, was neither made nor decided as to the matter here—whether this property was subject to sale—but the judgment of non-suit upon these points, so made, was reversed and cause remanded, the Court passing upon and deciding nothing more than the propositions submitted and argued, though in doing so some general expressions are employed, which, however, are in nowise binding upon succeeding Judges.

*Welsh* v. *Sullivan* (8 Cal. 166) deserves particular notice. That case was first decided at the July Term, 1857. It was argued with great learning and ability upon the first point—the city's title to the land—and is the first case in which that important question was thoroughly discussed. But in the elaborate and learned brief of Judge Bennett, leading counsel for appellant, we find nothing but the bare statement of the proposition as to the leviable quality of the estate. Mr. Chief Justice Murray delivered an extended and able opinion, in which he discussed the first question here made at considerable length. But the question as to the effect of the Sheriff's sale was not discussed by the learned Chief Justice in any of the aspects in which that question has been argued here at the bar, or in this opinion. The Chief Justice seems to have taken it for granted that if he maintained the proposition that the title was in the pueblo, the validity of the Sheriff's sale followed as a necessary consequence. The opinion appears to be a little inconsistent in claiming title upon the grounds taken in *Cohas* v. *Raisin,* and then attributing to the Act of Congress of 1851 the effect of creating a new tenure, and operating a confirmation in fee to the city. We have seen that no such effect can be given to the act of Congress. It created only a presumption of that which existed before, and conferred no new faculty or quality on the former title. We do not see how the mere acknowledgment by the Federal Government of the claim of the pueblo or of the city makes that claim any different from that which the pueblo asserts, and which the Government confesses. The acknowledgment of the Government, it being the only adverse claimant, may be conclusive, but it is conclusive only of the title asserted, and in manner and form as asserted. But this opinion was that of the Chief Justice alone. Mr. Justice Burnett concurred in the judgment in this guarded language: " I concur in affirming the judgment of the Court below on two grounds: First,

that the title to the property in question vested in the city of San Francisco by virtue of the act of Congress.  Second, that the title of the city passed to the purchaser under the Sheriff's sale.  *Neither of these grounds is discussed by the learned counsel of defendant.*  And as to the questions decided in the two cases of *Woodworth* v. *Fulton* and *Cohas* v. *Raisin,* they are not necessarily involved in this case, and I express no opinion in respect to them."  Justice Terry specially concurred upon the ground that the question was decided in *Cohas* v. *Raisin* (3 Cal.) and he thought the doctrine of *stare decisis* applicable. A reconsideration was had, and the case was again reviewed at the October Term, 1857.  Mr. Justice Burnett delivered an opinion, in which some of the views of the former Chief Justice, then dead, were corrected, and also the judgment rendered at the former term modified. The opinion was concurred in by Judge Terry, then C. J.  The opinion rests upon the effect of the act of Congress; Mr. Justice Burnett sustaining the judgment below upon the ground, if we rightly apprehend him, that the instruction of the Court " that if the jury found the Limantour claim fraudulent they should find for the plaintiff," was right, because the act of Congress vested the title in the city necessarily if Limantour did not have it.  This was the only ground upon which that ruling could be maintained.  The only authoritative opinion in this case, then, appears to be that the act of Congress operated as a grant to the city of San Francisco, which gave to the vendee, at Sheriff's sale under the execution, a title to the premises.  This ground, we feel confident, for reasons already given—and many more might be added—is not tenable.  The act of Congress, as we have shown, has not a single feature of a grant ; at most, it only creates a presumption of anterior and adverse title in the city, and probably neither the United States nor the city, in the face of this acknowledgment, could claim that there was no such preëxisting title.  If the United States could disprove this presumption, then it would be no grant at all; if it could not, then the presumption stands as a conclusion of a title, existing at least in 1846, before the United States had a pretense of claim.

It is useless to comment at large upon *Cohas* v. *Raisin.*  It is unnecessary to call in question the views expressed by Mr. Justice Heydenfeldt on the main propositions assumed by him as involved in the case.  The Alcalde's grants considered by him may be good titles, and there is nothing inconsistent in holding this, and holding the inval-

idity of the Sheriff's sale.   It does not follow, because the title was in the pueblo, or in the city as its successor, that it was such a title, or so held as that it might be disposed of by forced sale.

We are not without authority in support of the views we have taken. A somewhat analogous principle was held in the case of *Edgerton* v. *The Third Municipality of New Orleans* (1 La. Ann. 435).   In that case, the question was made, whether the taxes levied for the support of the corporation could be seized.   The Court decided they could not. This language is employed in the opinion :   " The power to create the corporation of the city of New Orleans for purposes of local government, involves the power to preserve and protect it; but that protection would be unavailing if it could be deprived of the regular supply of means, without which it cannot work its task.   For all useful and practical purposes, the exercise of the right claimed would, in the present embarrassed condition of the municipalities, as effectually abrogate their charters as if they had been repealed by law.   We conceive such a state of things to be repugnant to the letter and spirit of the Constitution.

"It is urged that the defendants cannot avail themselves of the privileges of public power, because they may be sued, and that suing them would be doing a vain thing, if in default of any other property their taxes cannot be seized under the judgment obtained against them.   We all know that Judges and Governors may also be sued, notwithstanding the political powers they exercise, and although their salaries may be their only means of paying their debts, those salaries are not liable to seizure.   It is true, that out of superabundant caution, our codes make special provision in relation to salaries of office, but the same rule prevailed before upon general principles."

A stronger case, and one going far beyond the necessities of this, is found in the 9th vol. of Watts & Sergt. 28.   It is the case of the *Susquehanna Company* v. *Bonham*.   The opinion of the Court was delivered by Sergeant, J., who said :   " The spirit of the decision in *Ammant* v. *New Alexandria and Pittsburg Transportation Company* (13 Sergt. & Rawle, 210) seems to be, that privileges granted to corporations to construct turnpike roads, canals, etc., are conferred with a view to the public use and accommodation, and that they cannot voluntarily deprive themselves of the lands and real estate and franchises which are necessary for that purpose ; nor can they be taken from them by execution and sold by a creditor, because to permit it would tend to defeat the

Hart *v.* Burnett.

whole object of the charter, by taking the improvements out of the hands of the corporation, and destroying their use and benefit. It has therefore always been held, and our acts of Assembly are constructed on that idea, that the franchises and corporate rights of the company, and the means vested in them, which are necessary to the existence and maintenance of the great object for which they were created, are incapable of being granted away and transferred by any act of the corporation itself, or by process of another against it *in invitum.* By the second section of the Act of fifteenth of April, authorizing the incorporation of defendants, they are made capable, among other things, of purchasing, taking and holding such lands, tenements and estates, real and personal, as are necessary in the prosecution of their business as a canal company. And by section eight, they are empowered to enter upon and occupy for the purpose, all the land necessary and suitable for constructing the canal. It is admitted by the Court below, that the evidence proves beyond a doubt, that the property levied on here is essentially necessary to the enjoyment of the corporate rights and privileges of the defendants, the house being necessarily occupied by the collector of tolls on the canal for himself and his family, and as a collector, in which he performs the duties of his office. That being the case, what difference can there be whether it is on the site of the canal or on ground adjacent? Especially where it may happen, and indeed, such appears to be the case here, that if confined to the former, the site would be inconvenient, unsafe and unfit for a dwelling place for the collector's family. Nor would the company have expended their money in procuring another building, if they could have been accommodated without it, in the office built on ground already taken as part of the line of the canal. The remedy for creditors in such case by sequestration was suggested in the opinion of Chief Justice Tilghman, (13 Sergt. & Rawle, 210) and has since been carried into effect by the provisions of the Act of sixteenth June, 1836, and it gives to the creditor all the redress the Legislature thought he could have against the property necessary to the company, consistently with the preservation of the public interests."

The case of *Ammant* v. *New Alexandria and Pittsburg Transportation Company* (13 Sergt. & Rawle, 210) is still more direct to the point we have been discussing. That was the case of a levy of an execution upon the land upon which the company were permitted to enter, near by and contiguous to their turnpike road. It was held that

their right of way and the privileges connected with it were not subject to levy. The Court draws the distinction between the property which the company held as such, and that property or interest in it which they held as subservient and indispensable incidents to the public use for which it was given. The stress of the opinion is to show that, when a public trust is so directly connected with property as that taking the property destroys the trust, the property cannot be sold under execution. The principle applies directly to this case, where the land was originally given to the *quasi* corporation, not as so much property to enrich it, but as a general fund to support the town, and to be granted for its use and settlement. It cannot be sold under execution any more than the trust could be sold, or repudiated by the grantees. The trust is directly and indissolubly associated with the property, and a coercive sale of the last is equivalent to a destruction of the first. It might as well be contended that medicines and meat furnished to a town to feed and minister to the sick in the hospitals could be sold to pay the debts of the town. Or, if a league of land were given to be laid off into town lots and donated to the settlers, in order to build up a town, that it could be all sold out at once under an execution for debts contracted by the trustees, who were to lay off the lots and distribute them. The very purpose of the gift would be destroyed by this use of it.

And in these Pennsylvania cases we find the true solution of this question, and the broad and satisfactory reason which solves it. It is a solecism to suppose a system of laws which creates a trust for the public, the constitution and preservation of which is a leading feature of State policy, and yet the same system allow a right on the part of individuals to destroy that trust, and deprive Government of its power to regulate and administer it. The Mexican Government had provided its own means for the administration of its laws. Those means are of the attributes and faculties of sovereignty, and were or might have been essential to the existence of the State. The sole power of selecting and determining these agencies of administration is in the Government. Nor were the pueblos alone interested in this Government or in the fact or means of preserving it. It was alike the interest and duty of the State to provide for its people this Government and the means of maintaining it; and it did not rest with the pueblos, representing a portion of those people, to decline or to waive the benefits to themselves and to the State of this Government; and especially

did it not rest with a portion of the inhabitants of such pueblos to waive or decline these benefits. The Government had a right to rule its own people in its own way; it did provide this means of local government by the constitution of pueblos, which were political departments, and a provision for their support, by means of grants of land, and coupled with this, as a part of their powers of local administration, a right to grant lots for settlement and to hold lands necessary and useful to the inhabitants. This was their title and this the trust; a public trust connected with the title; and this title and this trust were the means of civil government provided by the sovereign authority for its own benefit and that of these people. This being so, it would be a radical error to imagine that these appointed means of government are not as inalienable, save by the Government or its express authority, as are the powers of government themselves. A destruction of either the power or the means to execute it, invades the same principle and causes the same evil; it denies to Government the right to execute its own laws in its own way, and places it in dependence upon the will of a citizen. The giving of these lands for this purpose, therefore, was a denial of all other use whereby the end designed by the grant could be defeated. The title of the land was a part of this very trust, without which the trust became worthless and must fail. These observations apply with nearly, if not quite, the same force to the title of these lands after the cession.

If the cases cited by the Supreme Court of Pennsylvania go too far, in holding that the property of railroads, etc., is so connected with the public trusts for which those corporations were created as that no forced sale can be made of such property, yet the error, if any there be, is not in the principle, but in the application of it to the facts of the cases decided by that enlightened tribunal.

It is no answer to say that the policy of the Mexican Government, in respect to pueblo lands, and the tenure by which they were held, are not a portion of our system of laws. We do not see that if a particular or general trust were created under that system, and the execution of such a trust be not incompatible with our own policy and laws, why it is less effectual because it had its origin in another and different Government. But if the trust became changed as to the mode of administration and the particular agents, the lands remained for the same general purpose for which they were given, namely: for the support and settlement of the city; and if there was power to sell,

lease, etc., on different terms from those prescribed or followed under Mexican law, this makes no substantial difference in the character of the tenure as a trust estate exempt from seizure. No authority was given by the new government to sell these lands at forced sale to pay the debts of the city, the effect of which authority might be to prevent the settlement of the town, and to destroy this source of municipal revenue; but when the power of sale was given at all, it was given to particular agents, who were limited and restrained by specific and guarded regulations, having the force of powers of attorney with special authority. If, therefore, we have shown that this land came to the city impressed with this character, it became a fund for the support of the local government, with a trust to be administered for that object, and could not be subjected to seizure any more than the revenues arising from the taxes; and if it also came impressed with the trust so to be disposed of as to promote the growth of the city and the comfort and convenience of the inhabitants, this purpose cannot be thwarted by a forced sale, transferring the title to a few persons who might use it or refuse to use it, so as to prevent any settlement at all, or to greatly embarrass and delay such settlement. The trust being that the agents and officers of the town should exercise control *for this purpose* over this property, and not that one or more purchasers at execution sale should exercise the power or defeat it at pleasure, should prevent the formation or settlement of a town, or destroy it afterwards, by denying all means or these means of support.

In the *Heirs of Villars* v. *Kennedy*, (5 La. Ann. 725) is found some curious learning in regard to cities and their common lands, which bears some relation to this subject. We extract from the opinion of the Court, delivered by Mr. Justice Preston: " It will be seen by the thirty-fifth chapter of the Book of Numbers, and the twenty-first of the Book of Joshua, that the children of Israel were commanded, with great particularity, in founding cities for emigrating tribes, to lay off extensive suburbs outside of *the walls*, for the common use of the inhabitants. The Christian sovereigns of Europe, either from a reverence for the example, or the intrinsic utility of the custom, incorporated it into their laws for the government of their colonies in the Indies. By the term *city*, in Spanish jurisprudence, was understood a place surrounded by walls. (7th part., title thirty-three, law six.) And by the laws of the Indies it was expressly provided, that no houses should be erected within the distance of three hundred paces from the

walls or breastworks of the town, this being necessary for the good of our service, and for the safety and defense of the towns. (See the Laws of the Indies, book four, title seven, law twelve; or White's new Recopilacion, vol. 2, 47.)

" In Merlin, *verbo* Fortification, volume twelve, Brussells edition of 1826, it will be seen, that by an ordinance of the King of France, dated the twenty-fourth of September, 1678, ramparts, ditches and other places which had served for the fortifications of the cities of the kingdom could not be alienated by his officers, because they were things out of commerce and belonged to the King. It will be seen further, under the word *communaux,* that cities could not alienate their commons, and in the collection of the laws and ordinances of the colonies by Moreau de Saint Mercy, he gives some very striking cases in which even public officers had attempted to locate themselves permanently on places destined to public purposes, in which their pretensions were rejected, having, as expressed in one decree, the shame of having speculated without profit upon an object, the destination of which rendered it worthy of the protection of the colonial laws. (See his work, 262 and 309.)"

In *Municipality No.* 3 v. *Hart,* (6 La. Ann. 572) the Supreme Court of Louisiana reäffirm the decision of *Edgerton* v. *The Municipality,* that taxes or judgments for them cannot be seized; but hold that ordinary debts due the corporation may lie.

In *Police Jury* v. *Mitchel,* (4 La. Ann. 84) the question of the liability to seizure of the public buildings, jails, etc., under execution was before the Court. The decision was, that being provided for public purposes, they were not liable upon the principle of Edgerton and The Municipality before cited. The case of *New Orleans* v. *The United States* (10 Pet. 738) is an able exposition of the rights of cities in their public lands. The case involved the title of the city to the quay which, it was claimed, had been dedicated to public purposes. The Court says : " The land having been dedicated to public use was withdrawn from commerce, and so long as it continued to be thus used could not become the property of any individual ; " and again, at page 736 : " That this common, having been dedicated to public use, was withdrawn from commerce and from the power of the King rightfully to alien it has already been shown, and also, that he had a limited power over it for certain purposes." The opinion proceeds then to show that the Federal Government did not succeed to this power, but that it was the State Government.

*Lewis* v. *San Antonio* (7 Texas, 288) is a very strong case on several points. This case holds that the town lots were commons, like the commons in New Orleans, treated of in 10 Peters, and withdrawn from commerce and individual appropriation. It holds further, that the authorities of the pueblo could not, by estoppel or otherwise, defeat the grant. It was claimed that the authorities had adopted a subsequent grant of two leagues, and laid out the town accordingly, and in consequence of this, locations by third persons had been made on the land now claimed. But the Court answered the point in the language of the Supreme Court of the United States, in 10 Peters, which case has already been commented on: " It may safely be assumed that they (the authorities) had not the power by the acts referred to, to divest the city of a vested interest in the commons." And this was held in connection with the declaration that the property was dedicated to public use, and that it was the policy of Spain not to permit land so dedicated to be thus alienated. It would seem that this is conclusive of any right to subject it by execution; and in 10 Peters, 734, cited before, the United States Supreme Court evidently consider that the commons, or *ejidos*, retained the same character under the new government which they had under the old, and therefore were unaffected by these acts of the city authorities.

· To show the character of these lands and the relation of the pueblo to them, it is only necessary to refer to the Spanish authorities, many of which have already been given. These lands may, for illustration, be comprised within the two general titles of *ejidos* and *propios;* the latter term designates that property whose revenue is assigned to the support of the Government, and which was given in order to furnish the means of such support; and *ejidos* are common lands, not very different from those which exist in the older States by the name of commons, on the outskirts of towns and villages. That such property was not subject to execution by the civil law is expressly held. ( *Vide* Escriche, verb Juicio Executivo, 980; partida 5, law 15, title 5 and note 2.) This being the use of the *propios,* they would be protected like *arbitrios* or imposts, a twin source of municipal revenue within the terms of the reasoning in the Louisiana cases; for to hold that they could be sold by execution, would be to hold the power of a creditor to destroy the government; or, as the civil law authorities express it in the reason given for the grant, " as an individual cannot live without food, neither can a town exist without its rents."

Hart *v.* Burnett.

VIII.   But it is earnestly insisted by the counsel for the respondents, that whether these views be correct or not, we are precluded from giving effect to them, because the question has been definitely settled by the adjudications of this Court; that the rule of *stare decisis* has closed the controversy, whatever its original merits.   We acknowledge the force of the general argument of the counsel, but feel compelled to dissent from its application to the case at bar.   The review we have made of the authorities strips the proposition of the imposing character it assumed upon its first presentation.   Really, the whole argument rests upon a single decision of two Justices of this Court, rendered so late as October, 1857, during, we believe, the pendency of this suit; for we have shown that no single binding judgment touching the point now in controversy was made before, and that single decision is made finally to rest, not on the original right of the pueblo or on the previous decisions, but upon a new assumption, namely : the grant by Congress—a point which was never before taken in this Court, and which is, as we think, manifestly indefensible.   The counsel then, must maintain that a single decision of this Court upon the construction of an act of Congress, by which, too, the federal judiciary are not bound, is conclusive of all rights of property in the same category, although that decision is of recent date, and there is no showing that extensive rights of property have vested in consequence of it or under it.   Nay, more—that this decision, so made, can destroy the rights of the city of San Francisco, not a party to that judgment, to many acres of city land; can destroy the rights of all the old pueblos in the State to all their immense possessions; can abrogate and repeal, practically, the laws of the Legislature, regularly passed, giving title to the actual possessors of thousands of acres of city property, and those laws which, if we are right, forbade the sale, the validity of which is thus confirmed.

This is a startling proposition.   If it be true, a singular anomaly is shown.   The very decision which is relied upon, though without authority, to sustain this pretension—that of *Cohas* v. *Raisin*—ignores the ground now assumed to give validity to the principle it is invoked to sustain.   That decision overruled *Woodworth* v. *Fulton*, which held the city lands to be the property of the United States, upon which settlers could go, protected by the general law in reference to cities or towns on the public domain; and if this effect be given to a single decision, the consequence would be that we must return to that doc-

trine, as probably many settlements have been made and much money expended on the faith of it; and *Woodworth* v. *Fulton* was reäffirmed in *Reynolds* v. *West,* 1 Cal. 322.

The great importance of the question, and the zeal with which a contrary view is pressed, have induced us to go into a full examination of this question of *stare decisis,* though at the expense of some repetition. We have shown our construction of the case of *Seale* v. *Mitchell,* in 5 Cal.; but we will suppose that this last *is* to be considered as an authority on that point equal in dignity and force to the case of *Welsh* v. *Sullivan ;* then it must be argued that these two decisions—for there are none others to this point—are enough to constitute the "rule of property" involved. This singular result, then, is before us: that *Woodworth* v. *Fulton* and *Reynolds* v. *West,* affirming the doctrine that the city had no title, were held to be insufficient, while these other two are held sufficient to establish the law that she *had* a title, and that it was leviable; and *Vanderslice* v. *Hanks* and *Leese and Vallejo* v. *Clark,* were insufficient to establish a rule of property, while more modern decisions have that effect. But we proceed to consider the point on this gratuitous concession that *Seale* v. *Mitchell* is an authority for the respondent.

It is important to ascertain with precision of what description of adjudications this doctrine is predicated. A decision is not even authority except upon the point actually passed upon by the Court and directly involved in the case. But even then, the mere reasoning of the Court is not authority. The point decided by the Court, and which the reasoning illustrates and explains, constitutes a judicial precedent. The books are full of cases in which learned Judges have earnestly deprecated the attempt to urge the mere *dicta,* or the arguments of Judges, as authoritative expositions of the law. Chief Justice Marshall, in the case of *Cohens* v. *The State of Virginia,* (6 Wheat. 399) thus defines the rule: "It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which these expressions are used; if they go beyond the case, they may be respected, but they ought not to control the judgment in a subsequent suit where the very point is presented for decision. The reason of this maxim is obvious. The question actually before the Court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom

investigated." Chief Justice Best, in *Richardson* v. *Mellish*, (2 Bing-ham, 248) says: " The expressions of every Judge must be taken with reference to the case on which he decides, otherwise the law will get into extreme confusion. That is what we are to look to in all cases. The manner in which he is arguing is not the thing—it is the principle he is deciding."

We attach but little weight, then, to the cases of *Cohas* v. *Raisin* and its successors affirming the same general principle. No point was involved as to the *character* of the tenure—whether leviable or not—of the pueblo lands. That question was neither argued nor considered. There was no necessity for any limitation of the general proprietary right therein asserted. The proposition therein announced may be true for all the purposes for which it was used; and even if that propo-sition be the thing decided—and not the minor point, the right of American Alcaldes to grant lots—yet this proposition, as Chief Justice Marshall says, is to receive its definition, sanction and limitation as authority, from the particular facts which show its application. The proposition in *Cohas* v. *Raisin*, thus limited, would be, at most, that the pueblo of San Francisco had a grant of lands, and could convey lots by her officers after the conquest. If a Court, in construing a lease in a case in which the term only is involved, affirm that a plaintiff has a fee in the land, and is, therefore, entitled to recover, the case is only a precedent establishing the validity of the title for the term, not for the fee ; for the facts do not call for any larger proposition. *Touchard* v. *Touchard* (5 Cal.) follows the same course of observation taken by its predecessor, *Cohas* v. *Raisin*. The only question in that case was, whether the pueblo making a grant with conditions subsequent, the conditions not complied with, could regrant so as by the new deed to vest title in the last grantee. The Court held she could. The appel-lant's argument was, that the land must be denounced by or to the Government before it could be regranted; and the Court answered this argument by the propositions as to the character of the pueblo title ; in other words, the Court said the land need not be denounced, because it did not belong to the Government, but to the pueblo. But it was not necessary to give all the terms and conditions of the title. This reasoning was neither necessary nor conclusive ; for the same result, if truly deduced, in either case, would follow, whether the land was clothed with a public trust or not. It had passed from the Gov-ernment, and that was enough to show that this process of denounce-

ment—a process peculiar to governmental lands—did not apply.    But *Touchard* v. *Touchard* was subsequently overruled as to the only point —the power or effect of the regrant—really involved or decided by the case, and from that time ceased to be authority for anything.

Originally the obligation of the Courts is to declare the law as it exists.    They have no right to substitute their own dogmas or assumptions for the law.    It would seem, therefore, that *the mere fact* that an error has been committed is no reason or even apology for repeating it, much less for perpetuating it.    But even in the correction or removal of such errors the law is reasonable, and looks to the welfare and repose of society and the protection of the public interests.    Accordingly it sometimes happens, that the reversal of an erroneous ruling would prove of greater evil consequence than to suffer it to remain.    It becomes then a matter of policy to refuse to overrule it.    Among the more general reasons for this refusal are the importance of consistency and stability in the decisions, and the uneasiness and uncertainty which changes of them produce in the public mind; but this consideration is not alone of overruling weight, for it applies to all decisions, especially of Courts of last resort, whether they create or do not create rules of property; and it is not pretended that, as to these last, it is not the duty of the Court to reform clear and admitted error in a previous decision.    The reason given for this rule of *stare decisis* is, that rights vest by decisions which affirm a title under a given state of facts, and therefore, it would be unjust to deprive a party of property acquired under such circumstances.    This rule, unquestionably, applies to cases where particular modes have been declared effectual for passing property, and where technical or formal objections to such modes are interposed, the effect of which objections would be to make a mere legal claim prevail over justice and right.    But it is not so clear if two men claim property—one under a statute, and the other under a decision— that the man claiming under a wrong decision, which destroyed the good title under the statute, is entitled, as a matter of justice, to the property as against the first.    Again, that this matter—the vesting of a right—is not the conclusive thing which gives effect to the principle, is seen in the fact that a single decision is not necessarily or usually held protected by this rule.    The rule itself is stated in vaguer terms than almost any other principle of law.    It is thus stated by Kent (1 Com. 476): "A solemn decision upon a point of law, arising in any given case, becomes an authority in a like case, because it is the high-

Hart *v.* Burnett.

est evidence which we can have of the law applicable to the subject, and the Judges are bound to follow that decision so long as it stands unreversed, unless it can be shown that the law was misunderstood or misapplied in that particular case. If a decision has been made upon solemn argument and mature deliberation, the presumption is in favor of its correctness, and the community have a right to regard it as a just declaration or exposition of the law, and to regulate their actions and contracts by it. It would, therefore, be extremely inconvenient to the public if precedents were not duly regarded and implicitly followed. It is by the notoriety and stability of such rules that the professional men can give safe advice to those who consult them; and people in general can venture with confidence to buy and trust, and to deal with each other. If judicial decisions were to be lightly disregarded, we should disturb and unsettle the great landmarks of property. When a rule has been once deliberately adopted and declared, it ought not to be disturbed, unless by a Court of appeal or review, and never by the same Court, except for very cogent reasons, and upon a clear manifestation of error; and if the practice were otherwise, it would be leaving us in a state of perplexing uncertainty as to the law."

The language of Sir William Jones is given, which reflects the rigid rule of the old English Judges, who hold, with the utmost strictness, to the sacredness of precedents. But it may be doubted whether this doctrine is ever professed now in England. The Lord Chancellor, in the case reported in 12 E. L. and E. 1, says: "At the same time, I should venture to state to your Lordships as my opinion, that although you are bound by your own decisions as much as any Court would be bound, so that you could not reverse your own decision in a particular case, yet you are not bound by any rule of law which you could lay down, if, upon a subsequent occasion, you find reason to differ from that rule. That is like every Court of justice, and I regard this as a Court of justice; it is inherent in the nature of every Court of justice that it should have liberty to correct any error into which it may have fallen." The strict rule was certainly not very closely followed by Lord Mansfield, the founder of the Commercial Law of England; indeed, the splendid eulogy of Burke ascribes to him rather the quality and successes of a lawgiver than those of a judge.

Chancellor Kent proceeds to qualify this doctrine as follows: " But I do not wish to be understood to press too strongly the doctrine of *stare decisis,* when I recollect that there are more than one thousand cases

39

to be pointed out in the English and American books of reports, which have been overruled, doubted or limited in their application. It is probable that the records of many of the Courts in this country are replete with hasty and crude decisions; and such cases ought to be examined without fear, and revised without reluctance, rather than to have the character of our law impaired, and the beauty and harmony of the system destroyed by the perpetuity of the error."

Then comes this significant language : "Even a series of decisions is not always conclusive evidence of what is law ; and the revision of a decision very often resolves itself into a mere question of expediency, depending upon the consideration of the importance of certainty in the rule, and the extent of property to be affected by a change of it. Lord Mansfield frequently observed that the certainty of a rule was often of much more importance in mercantile cases than the reason of it, and that a settled rule ought to be observed for the sake of property ; and yet, perhaps, no English Judge ever made greater innovations and improvements in the law, or felt himself less embarrassed with the disposition of the elder cases, when they came in his way to impede the operation of his cultivated judgment." Lord Kenyon, his successor, was quite as unreserved in his treatment of Lord Mansfield's judgments as the latter was of those of his predecessors. He overruled several of Lord Mansfield's decisions on the ground that they disturbed the landmarks of property, saying : "I cannot legislate, but by my industry I can discover what my predecessors have done, and I will tread in their footsteps." This learned and accomplished jurist evidently did not consider that *stare decisis* meant an adherence to the last decision, when so to adhere was to desert the ancient law.

The High Court of Errors and Appeals of Mississippi, in 2 Smedes and Marshall R., overruled a former decision of the Supreme Court of that State. The decision was of long standing, being one of the earliest cases in that Court after its organization. The question was that of the rule of distribution of estates of deceased persons in certain cases—a matter affecting the title to property. The Court says : "We are fully sensible that the stability of jurisprudence requires an adherence to the decisions of our Courts. If solemn judgments once made are lightly departed from, it shakes the public confidence in the law and throws doubt and distrust on its administration. Yet even this backwardness to interfere with previous adjudications does not require us to shut our eyes upon all improvements in the science of the law, or

require us to be stationary while all around is in progression.    *    *
Perhaps no general rule can be laid down on the subject. The circum-
stances of each particular case, the extent of influence upon contracts
and interests which the decisions may have had; whether it may be
only doubtful, or clearly against principle; whether sustained by some
authority, or opposed to all; these are all matters to be judged of when-
ever the Court is called on to depart from a prior determination." It
is just to remark, that no Court in the United States was more distin-
guished than this for conservatism and impartiality.

The rule as laid down by Chancellor Kent, in the first extract given
from the Commentaries, is almost literally taken from 16 Johns. 402.

In 25 Ala. 210, the Supreme Court of that State holds that a series
of decisions made and followed up from the earliest judicial times is
binding upon the Judges, but says that if those decisions be opposed to
the State or Federal Constitutions, they would take pleasure in dis-
carding them.

*Foxcroft* v. *Mallett* (4 How. U. S. R. 353) was a case affecting the
construction of a grant and a mortgage under it. The general ques-
tion of the title had been passed upon, as Mr. Webster contended, and
rightly, we think, in a series of cases in the Supreme Court of Maine,
in which the title was affirmed. The case was thoroughly argued, the
appellant contending that these decisions were final and conclusive
upon the Supreme Court. But the Supreme Court denied the conclu-
sion urged, not upon the ground that the objection insisted on—the
effect of the mortgage in question—was not involved in these previous
decisions, but that the question "did not appear to have been agitated."
Mr. Justice Woodbury, delivering the opinion, used this language : " In
conclusion, it has been urged against the judgment we have formed in
favor of the right of the demandant, that several actions have been
tried in Maine, where his interests have been brought in question as to
the premises, and decisions had against him ; and that such local adju-
dications in respect to the titles to real estate should control the opin-
ions of this Court.    (9 Cranch, 87 ; 2 Wheat. 316 ; 10 Id. 152 ; 12
Id. 153 ; 2 Gallis, 105.)    But on examining the particulars of the
cases cited to govern this, (3 Fairfield, 398 ; 4 Shepley, 84, 88 ; 14 Me.
51) it will be seen that the construction of the mortgage to the college,
in respect to this reservation or condition, never appears to have been
agitated. If it had been, the decision would be entitled to high respect;
though it should not be regarded as conclusive on the mere construc-

tion of a deed as to matters and language belonging to the common law, and not to any local statute." (3 Summers, 136, 277.)

This last sentence is certainly very suggestive of the idea, that the Supreme Court did not consider the doctrine of *stare decisis* necessarily to arise from even a series of decisions affecting the very titles in controversy.

Equally significant is the case in the same Court—*Lane* v. *Vick et al.* This case involved the title to a large tract of land in the city of Vicksburg, including a great portion of the city in extent and value. The case was decided at the January Term, 1845, of the Supreme Court of the United States. The case involved and went off upon the construction of the will of one N. Vick; the plaintiff claiming, that by the will the daughters of the testator were entitled equally with the sons to the land. The case of *Vicks* v. *The Mayor and Aldermen of Vicksburg* (1 How. Miss. 420) involved the construction of this will, not as the leading object of the bill, but incidentally, and that question was fully argued by the counsel. The Judge delivering the opinion, in noticing a substantive ground of the complaint's claims, says : " It becomes important to notice and construe the will."    *    * " The whole proceeding was based upon a wrong construction of the will. The daughters of Vick acquired no right by devise to this land of their father ; " and then go on and decide that the claim of the bill, on the ground affected by this supposed misconstruction of the will, cannot be maintained. This decision was made in 1837. The case in 3 How. U. S. R. rested entirely upon the construction of this will ; and the plaintiff contended that this construction by the Supreme Court of Mississippi was erroneous. For the defendants, the Vicks, it was argued that the construction of the Mississippi Court should be received as the final adjudication of the matter. Mr. Justice McLean delivered the opinion of the Court. He said : "·It is insisted that the construction of the will has been conclusively settled by the Supreme Court of Mississippi, in the case of *Vicks et al.* v. *The Mayor and Aldermen of Vicksburg* (1 How. 379).

" The parties in that case were not the same as those now before this Court ; and that decision does not affect the interests of the complainants here. The question before the Mississippi Court was, whether certain grounds, within the town plot, had been dedicated to public use. The construction of the will was incidental to the main object of the suit, and of course was not binding on any one claiming under the

will. With the greatest respect, it may be proper to say, that this Court do not follow the State Courts in their construction of a will or any other instrument, as they do in the construction of statutes.

" Where, as in the case of *Jackson* v. *Chew*, (12 Wheat. 167) the construction of a will had been settled by the highest Courts of the State, and long been acquiesced in as a rule of property, this Court would follow it, because it had become a rule of property. The construction of a statute by the Supreme Court of a State is followed, without reference to interests it may affect, or the parties to the suit in which its construction was involved. But the mere construction of a will by a State Court does not, as the construction of a statute of the State, constitute a rule of decision for the Courts of the United States." Here, for seven or eight years, the decision of the highest Court of Mississippi had remained undisputed, and affected the title to many hundreds of city lots; and yet the Supreme Court of the United States did not consider the decision as constituting a rule of property within the principle of *stare decisis.*

In *Lion* v. *Bertiss*, (20 Johns. 483) Spencer, C. J., says : *"Stare decisis* is a maxim essential to the security of property. The decisions of Courts of law become a rule for the regulation of the alienation and descent of real estate; and when that rule has been sanctioned and adopted in our Courts, it ought to be adhered to, unless manifestly wrong and unjust."

In the case of *Jackson* v. *Chew*, (12 Wheat. 168) the Supreme Court of the United States illustrates what it means by a settled course of adjudication, at least, as applied to the facts there. The Court says : " In the case now under consideration there have been two decisions in the highest Courts of law in the State upon the identical question now in judgment, and which were in conformity to a settled course of adjudication for twenty years past."

But we might take bolder ground. We might admit that the general doctrine, as contended for, that a single decision or two decisions on a question of property are decisive and conclusive, as a general rule, however flagrantly erroneous those decisions were; and yet hold that this principle, like all general rules, has and must have its exceptions. It would devolve upon us then to show that to this rule there were exceptions, and next, that this case constitutes one of them; and we should feel no distrust of our ability to maintain this ground. Let us suppose a case, by way of illustrating the first of these propositions:

Suppose this Court had decided, on its first organization, that the public lands belonged to this State, and that, therefore, the patents of the General Government were void. The United States Courts, of course, hold a contrary doctrine. Suppose this decision had been consistently maintained ever since the existence of the State until the present time, when the question came up for review again. Would we be bound, and would any Court be bound, its predecessors to the contrary notwithstanding, to hold to this doctrine as the permanent, unalterable law of this tribunal? If so, it must be held to be the true doctrine for all time; and then, it not being recognized by the Federal tribunals, we should have a perpetual conflict of opinions and jurisdictions, and practical revolution or civil war; or, at least, two irreconcilable systems of law and sets of rights prevailing in the State. It may be said that this is an extreme case; but so, as we shall show in the sequel, is the case before us. But the purpose of this view is answered by the establishment of the point that *there may be* an exception to the general rule; though we are very far from conceding that this case is within the general principle. On the contrary, we think we have shown that it is clearly excluded from its operation.

Nor is this Court without example in this very respect. Early in its judicial history, it held (*Leese et al.* v. *Clark*, 3 Cal. 18; *Vanderslice* v. *Hanks*, Id. 18) that a Mexican grant without the approval of the Departmental Assembly, or segregation of the land by the grantor, passed no title to the grantee upon which ejectment could be maintained. This doctrine did not merely touch the remedy; it related to the character of the title. The early cases held that this title was a mere inchoate claim upon the bounty or favor or justice of the Government, requiring its action before a legal interest in the land vested in the grantee. The decision remained as the doctrine of the Court for several years, until it was abandoned in 1857 by Chief Justice Murray, who had announced it; and it was afterwards directly overruled by this Court in 1858. Thus for a series of years was a principle of law of real estate, going to the very foundation of titles, held and maintained, and afterwards reversed and abandoned. We need say nothing of the case of *Woodworth* v. *Fulton*, expressly reaffirmed in *Reynolds* v. *West*, and the subsequent cases overruling the doctrine in that case. But enough to maintain this proposition results from the language used in announcing the rule by all Judges and authors, for they state the rule, as has been seen, with a qualification which implies of itself an exception.

And apart from all express authority, reason must convince us that no such inexorable rule could exist. The rule itself implies that the doctrine protected by *stare decisis* cannot stand of itself. But it is a solecism to say that causes should be tried upon wrong principles—be decided against the law—whether it be for the purpose of justice or not, so to decide them. The law is not so false to itself as to require its own permanent overthrow, unless the subversion be necessary to the public interests; and whether it be so necessary in a given case or not, is for the Court to decide, as a matter of legal discretion, whenever the rule is invoked. For as this rule of *stare decisis* is avowedly put upon the ground of policy, we cannot conceive that the application of the rule could be rightly so made as to overthrow the paramount public policy of deciding causes by the rules of the law, when those rules work justice and do equity in the major part of the cases to which they apply, and protect the rights of the many against the claim of a few.

This would be practically the working of wholesale injustice and the destruction of legally acquired rights of property under cover of a conservative policy, formed to protect such rights and to enforce justice.

This case, however, is not within the rule of *stare decisis.* This will be seen from the review we have made of the cases in this Court. It is only necessary to refer to the citations we have made at such length, to show *that the point of the title to this property under Sheriff's sale has not been so definitively settled as to have worked itself into the body of the law of real estate in California.* The question of the conclusiveness of adjudications is not necessarily dependent upon the number of them. It is true, that some of the authorities use the terms "a series of decisions"—an "uninterrupted series," "a long established rule," and the like expressions; but we apprehend that the language was designed to imply not solely the age of the rule, but its permanent, settled, stable character. A single decision, never called in question, but consistently acted on and generally acquiesced in for a great many years, would probably fall within the rule; while several decisions, like those of *Leese and Vallejo* v. *Clark* and *Woodworth* v. *Fulton* would not. We must give force to these qualifications expressed in the words "settled," "acquiesced in," and the like. They cannot mean "settled," by the mere fact or force of the adjudications, for then there would be no use for these terms; they would be without meaning, for *every* judgment upon a title would upon this construction settle the law; nor is the "acquiescence" that of the parties to the case, for

they are bound to acquiesce, at least to submit. The meaning is, that the sense of the profession and of the public has recognized the rule as fixed and established—as being closed to further debate, and that conveyancers and intelligent men dealing in such titles, pass them as good and marketable; that the property is considered and treated as owned under the title in question, with the incidents of ownership, and the benefit of such claim to the owner. If it be not the meaning of these qualifying terms to convey an idea of this condition of stability and repose, it is difficult to assign a meaning to them. But there has been no acquiescence, no repose to these titles. The question has not been *"settled,"* if *" settled"* means put to rest, nor has it been recognized as settled. On the contrary, the whole matter has been in perpetual dispute, controversy and discussion. Bar and Bench have been divided; suits brought and litigated at every step and in all Courts; adverse possessions held and maintained by those who contest the title; controversies pending, involving the same principle in the Federal Courts, and those Courts (as in the case involving the title to land in the old pueblo of San José) decided against the Sheriff's title, the title of the city herself to the lands disputed, and this question still pending in the Supreme Court of the United States; the grounds taken in the Circuit Court of the United States and before the Land Commission, and those assumed here as to the general title, variant and clashing, and the doctrines pronounced by our own Judges, when affirming the title, inharmonious and shifting. Besides all this, the city of San Francisco, by ordinance, practically ignores the title here, and the Legislature validates, so far as it can, the act which ignores it. And then, the decisions of this Court have been conflicting—" interrupted "—in which event, the subsequent decision has diminished weight. For, as observed by an eminent Judge, " the decisions of Courts are not the law, they are only the evidence of the law, and this evidence is stronger or weaker according to the number and uniformity of adjudications, the unanimity or dissension of the Judges, the solidity of the reasons on which the decisions are founded, and the perspicuity and precision with which those reasons are expressed." Add to this, that these are public and notorious facts, and that the original Sheriff's deed, as held in *Argenti* v. *The City,* contained upon its face, in the paltry sum paid for the land, a *caveat* to a purchaser of all defects in the title thus deraigned.

Moreover, the cases relied on were not decided, so far as the point

we have been discussing goes—the leviable character of this title—upon "*solemn argument and mature deliberation ;*" and this seems to be one of the conditions by which Chancellor Kent qualifies the conclusive effect of the adjudication.  This consideration becomes the more important, when we reflect that the interests of many parties and of other communities than San Francisco are involved ; and their rights ought not in such a case to be concluded without an opportunity to be heard, or when argument had not been made by others.

It may be remarked that, in this particular case, the real plaintiff was the original purchaser at the Sheriff's sale, in 1851, and therefore, *no equity* of the rule of *stare decisis* would apply to him, whatever his technical legal right to claim it.

"The *rule of property,*" then, is not necessarily created or shown by the mere decision, or two or three decisions of a Court.  It is the settled, fixed, stable principle regulating titles and the estimate of their validity and value in the minds of practical men, who draw their conclusions from judgments which have been commonly acquiesced in as settled law, or the general titles affirmed, by which they have passed beyond contention and dispute.

Nor is the loose expression " *that rights have vested*" under such decisions, to be construed in the sense supposed, if by this phrase be meant that the vesting of any rights under a judgment—however limited in extent or the number of persons claiming—makes the principle therein asserted irreversible ; for probably no judgment such as this is ever without *some* effect on the transfer of property ; and therefore, if this were the criterion, *every* judgment affirming a title would be protected.  Nor is there either principle or justice in giving to the smaller right or interest of one, however acquired, a protection at the expense of the larger interest of another, or of many others, acquired as honestly.  It is not seen how, as a matter of abstract justice, it can be held that many men claiming under a statute regularly passed, homesteads which they have improved at a large expense, confiding in the validity of the statute, should, when it is admitted—for that is the case we are supposing—that their claims were originally good, be forced to surrender them to enrich a purchaser, who bought relying upon a wrong decision of the Courts, and who therefore claims to be protected in his purchase.  Why, in other words, the claimant, under an erroneous decision, affirming incorrectly a title, should be any better protected than many claimants under a statute

which correctly affirmed the title; especially when the latter was for years in possession of the premises, and so held at the time the purchaser bought, the purchaser buying, therefore, with notice that his claim would be contested? The rule of *stare decisis* is for the benefit of *bona fide* purchasers buying since the establishment of the doctrine or rule; and to give the benefit of the rule to them, it is urged that we must establish a principle which protects the present plaintiff, and those like him, representing, probably, no inconsiderable proportion of this city property. These last claimants, it is not pretended, are protected by any equities of the rule of *stare decisis;* for they bought before these decisions, and their case on its real intrinsic merits presents the naked question of title. The question then on this claim of justice—and the justice here is not far from the law of the case—is this: Is it just to protect all claimants of this property under execution sales—those claimants resting for title upon an erroneous decision—that protection to be afforded by taking the property from the possession of hundreds who rightly claim it under statute, and this to give effect to a rule of policy which, in this way, is to protect those who bought portions of this property since the decision in *Welsh* v. *Sullivan*; the number of whom and the extent of whose purchases are unknown? Is not the answer, that it is not policy to do injustice to the majority that justice may be done to the smaller number, and this, though the equities of the smaller number were equal *per capita* to those of the adverse side? But how is this question as it affects the city, thus summarily deprived of her magnificent endowment in favor of these original vendees, who have invested in the speculation but a trifling proportion of the value of the property bought? And how would it be with other pueblos who have never yet had an opportunity to be heard upon the question, whether their lands have passed under such sales?

We are here led to the observation, that it is not pretended, at least, it cannot be reasonably contended, that this doctrine of *stare decisis* was perfected—supposing it ever was—until after the case of *Welsh* v. *Sullivan*, in July or October, 1857. The Van Ness ordinance was passed in 1855, and the statute confirming it, in March, 1858. The statute confirmed the ordinance from its passage, and the ordinance gave effect to a possession in January, 1855. Thus the claim under the Van Ness ordinance had its inception, and so far as the city and county could convey the property was made good, in 1855. If, how-

Hart v. Burnett.

ever, it needed the legislative confirmation, and could only take effect as a title from that fact, it received it in 1858, but a few months after *Welsh* v. *Sullivan* was decided.   So this title by *stare decisis*, and the title by statute, seem to have been nearly contemporaneous, unless indeed the statutory title was, by relation, anterior.   [But *when Welsh* v. *Sullivan* settled the question, in the sense of the books, if it ever has done so, is a curious inquiry, into which we do not propose to enter.]   The cases cited seem to hold, we may add in illustration of some of these views, that the principle of the doctrine of *stare decisis* applies as well to the words of a statute as to a decision.   (Dwarris on Statutes, 704.)

We cannot appreciate the force of the argument which ascribes a destructive or revolutionary tendency to the view just presented.   We have endeavored to show that it has the sanction of authority and the support of reason.   A true conservatism does not consist in the maintenance of innovations upon established law, when the general effect of a restoration of the law is wise and just.   We only destroy the innovation, and in doing so we conserve the law.   And we cannot see that, under the circumstances of this case, we should not be violating our duty in giving perpetuity to an error, as much as if, in the first instance, we consciously committed it.

Again: the views which we have expressed respecting the rule of *stare decisis* are particularly applicable to cases decided in this Court involving questions of Spanish and Mexican law.   The bench and the bar in California, generally, have not been familiar with these laws; it has been exceedingly difficult to procure copies of the Mexican statutes, and sometimes impossible to procure the works of the most distinguished commentators on the Spanish civil code.   And even when procured, it was equally difficult to obtain correct translations of such laws and of the works of such law writers.   Add to this the fact that nearly all the Mexican orders, laws, decrees, etc., respecting California, are still in manuscript, scattered through immense masses of unarranged archives, almost inaccessible, and known, even imperfectly, to scarcely half a dozen persons, and will it appear surprising that errors have been committed by our judiciary?   Must we persevere in these errors, no matter how great, or how much opposed to justice they may be, even after new lights, new authorities, and new laws are brought to our notice, proving these mistakes beyond a doubt?   We cannot believe that any Court would sustain such a doctrine respecting its decisions.

In illustration of these views we need only refer to the fact that this same embarrassment has been felt by other Courts coming to pass upon the laws and usages of a foreign Government, which they have been suddenly called to administer. The Supreme Courts of the United States, and of Texas especially, have experienced this difficulty, and have felt bound to modify their first rulings and decisions upon important questions arising under Spanish law, by the knowledge obtained after further investigation and research.

We are not insensible to the eloquent admonition of counsel that we do nothing to disturb the titles to real estate in San Francisco. We have no disposition to disturb them. So far as is consistent with the law, we are anxious to protect and preserve all rights of property in that large and growing city. But titles must rest upon some better and more stable basis than upon an erroneous judgment of this Court. We uphold everything decided in the past jurisprudence which we think not plainly erroneous.

Nor do we see that we directly or indirectly disturb any title heretofore recognized, unless that of the plaintiff and those in the same category with him be an exception. But in ignoring this claim, we settle and quiet the titles of the larger number now in possession adversely. The last remark brings us to consider the effect of the act called the Van Ness Ordinance, and the acts of the Legislature in connection therewith.

IX.   We have seen that the title of this property, before the treaty, was in the pueblo, and that the city succeeded to the same title, clothed substantially with the same trusts or similar trusts. But these trusts and this property are under the political domain and control of the sovereign. The property, and trusts, and corporation were municipal, and therefore subject, as political institutions, trusts, and property, to the superior political authority. This principle has been asserted by the Supreme Court of the United States in the celebrated Dartmouth College case, (4 Wheat. 660) and afterwards confirmed in 10 How. 534; also held in 13 Wendell, 9 Cranch; see, also, 1 Tucker's Com. 454.   This ordinance was not only the act of the city—by its confirmation by the Legislature, it became the act of the State. Its purpose was to quiet titles in San Francisco, and it seems justified by a policy, which if too generous, yet bears some analogy to the laws and purposes which gave existence to the rights of the pueblo. The ordinance was passed by the Common Council on the twentieth of June,

Hart *v.* Burnett.

1855, and was confirmed by that body on the twenty-seventh of September following, and was also confirmed by the Legislature on the eleventh of March, 1858. The first section is in these words: "It shall be the duty of the Mayor to enter, at the proper land office of the United States, at the minimum price, all the lands above the natural high water mark of the bay of San Francisco, at the time of the admission of California into the Union as a State, situated within the corporate limits of the city of San Francisco, as defined in the act to incorporate said city, passed April 15th, 1851, in trust for the general use, benefit, and behoof of the occupants or possessors thereof, according to their respective interests.

" Sec. 2. The city of San Francisco hereby relinquishes and grants all the right and claim of the city to the lands within the corporate limits to the parties in the actual possession thereof, by themselves or tenants, on or before the first day of January, A. D. 1855, and to their heirs and assigns forever; excepting the property known as the slip property, and bounded on the north by Clay street, on the west by Davis street, on the south by Sacramento street, and on the east by the water lot front; and excepting also any piece or parcel of land situated south, east or north of the water lot front of the city of San Francisco, as established by an act of the Legislature of March 26th, A. D. 1851 ; provided such possession has been continued up to the time of the introduction of this ordinance in the Common Council; or, if interrupted by an intruder, or trespasser, has been, or may be, recovered by legal process; and it is hereby declared to be the true intent and meaning of this ordinance, that when any of the said lands have been occupied and possessed under and by virtue of a lease or demise, they shall be deemed to have been in the possession of the landlord or lessor under whom they were so occupied or possessed; provided, that all persons who hold titles to lands within said limits by virtue of any grant made by any Ayuntamiento, Town Council, Alcalde or Justice of the Peace of the former pueblo of San Francisco, before the seventh day of July, 1846 ; or grants to lots of lands lying east of Larkin street and northeast of Johnson street, made by any Ayuntamiento, Town Council or Alcalde of said pueblo since that date, and before the incorporation of the city of San Francisco, by the State of California, and which grant, or the material portion thereof, was registered or recorded in a proper book of record deposited in the office or custody or control of the Recorder of the county of San Francisco,

on or before the third day of April, A. D. 1850, or by virtue of any conveyance duly made by the Commissioners of the Funded Debt of the city of San Francisco, and recorded on or before the first day of January, 1855, shall, for all the purposes contemplated by this ordinance, be deemed to be the possessors of the land so granted, although the said lands may be in the actual occupancy of persons holding the same adverse to the said grantees.

" Sec. 3. The patent issued, or any grant made by the United States to the city, shall inure to the several use, benefit and behoof of the said possessors, their heirs and assigns, mentioned in the preceding section, as fully and effectually, to all intents and purposes, as if it were issued or made directly to them individually and by name."

The second section of the Act of 1858 following, is in these words :

" That the grant or relinquishment of title made by the said city in favor of the several possessors, by sections two and three of the ordinance first above recited, shall take effect as fully and completely, for the purpose of transferring the city's interest, and for all other purposes whatsoever, as if deeds of release and quit claim had been duly executed and delivered to and in favor of them individually and by name; and no further conveyance or other act shall be necessary to invest the said possessors with all the interest, title, rights, benefits and advantages which the said order or ordinances intend or purport to transfer or convey, according to the true intent and meaning thereof; provided, that nothing in this act shall be so construed as to release the city of San Francisco, or city and county of San Francisco, from the payment of any claim or claims due or to become due this State against said city and county, nor affect or release to said city and county any title this State has or may have to any lands in said city and county of San Francisco."

We think this act valid and effectual for the purposes therein mentioned. The effect of it, and of this decision, is to declare valid Alcalde grants made before and after the cession of California; also the title to all lots held under sales by Commissioners of the Funded Debt; and it releases to parties in *actual possession,* by themselves or tenants, on the first of January, 1855, the lots so held by them respectively, giving to the release the effect of a perfect title. The lots within the limits of the old pueblo not so granted or occupied or otherwise disposed of, of course remain the property of the city. This is, in general terms, the effect of this legislation, and it is not necessary for

Hart *v*. Burnett.

any purpose of this explanation to be more particular or definite in the statement. Nor is it necessary to express any opinion as to the effect of the sale of the property granted by the State to the city and sold under judgment. Those titles do not rest upon the same facts as those passed upon, and the question of their validity is now before us in other cases, and will soon be decided. Most of those lots, we believe, are and have long been in possession of the claimants under these sales; and therefore, such possession would seem to be protected by the ordinance and act of the Legislature.

X. Lastly, the counsel for respondents contend that the defendants cannot set up the want of leviable title in the city, or as they express it, the exemption of this property from forced sale; and they cite several authorities to show that if a debtor does not object to the sale of property exempt by law, a third person cannot. But these cases do not apply. Undoubtedly the owner has a right to assent to have property sold, though exempt by law from sale. He can do what he pleases with his own; he may waive a privilege personal to himself. But the corporation had no right to assent to the sale of this property, since, for this purpose, it was not its own, nor was the exemption its privilege. It could not, by its silence or otherwise, dispose of the trust property in this way. The plaintiff must show his title before he can dispossess any tenant on the strength of it. He has attempted to do this by deraignment from the city, and has failed; and, as held in *Wood* v. *The City*, he cannot recover. A similar decision in principle was made by the Court of Appeals of Kentucky (1 Dana, 359).

We have extended this opinion to a length which is only to be justified by the great importance of the case, the public interest in the questions, and the long and bitter controversies which, for years, have divided the Bar and the Bench. We cannot hope to give satisfaction to all of the many parties who, in one way or another, are interested adversely to the decision; but we feel a natural desire to show that we have given the subject a careful consideration in all of its material bearings and aspects, and to prevent any misapprehension which might result in injury to public or individual rights. We close by affirming these propositions:

First—That San Francisco was, at the date of the conquest and cession of California, and long prior to that time, a pueblo, entitled to and possessing all the rights which the law conferred upon such municipal organizations.

Second—That such pueblo had a certain right or title to the lands within its general limits, and that the portions of such lands which had not been set apart or dedicated to common use or to special purposes, could be granted in lots, by its municipal officers, to private persons, in full ownership.

Third—That the authority to grant such lands was vested in the Ayuntamiento, and in the Alcaldes or other officers who at the time represented it, or who had succeeded to its "powers and obligations."

Fourth—That the official acts of such officers, in the course of their ordinary and accustomed duties, and within the general scope of their powers, as here defined and explained, will be presumed to have been done by lawful authority.

Fifth—That these municipal lands, to which the city of San Francisco succeeded, were held in trust for the public use of that city, and were not, either under the old government or the new, the subject of seizure and sale under execution.

Sixth—That this property and these trusts were public and municipal in their nature, and were within the control and supervision of the State sovereignty, and that the Federal Government had no such control or supervision.

Seventh—That the Act of the State Legislature of March, 1858, confirming the so-called Van Ness Ordinance, was a legal and proper exercise of this sovereign power; and that this act gave full effect to the provisions of that Ordinance, and vests in the possessors therein described, as against said city and State, a title to the lands in said Ordinance mentioned.

Eighth—That the city of San Francisco holds the municipal lands of the pueblo, not legally disposed of as hereinbefore explained; and that her title is wholly unaffected by Sheriff's sales under execution against her, so far as those sales touch or affect the aforesaid pueblo lands.

Ninth—That a defendant in ejectment, holding such lands merely by possession, may set up the invalidity of such sales, or the plaintiff's title derived therefrom, to defeat the plaintiff's action.

It becomes unimportant to notice any other points, for those already decided determine the merits of this controversy.

Judgment reversed, and the cause remanded.

Cope, J. delivered the following dissenting opinion:

Hart *v.* Burnett.

I regret that I am unable to agree with my associates in the conclusion at which they have arrived in this case.   The questions affecting the merits of the controversy, were long since settled by this Court, and whatever may be our opinion of the correctness of that settlement, I think that a due regard for the doctrine of *stare decisis* requires that it be strictly adhered to.   I shall never hesitate in a proper case to coöperate with my associates in correcting the errors of this tribunal, but I am unwilling to interfere where the effect may be to create confusion in titles, and destroy rights acquired and held upon the faith of former adjudications.   We cannot suppose that the people of San Francisco have been so unmindful of their interests as to disregard the previous decisions of this Court, and rely for the protection of their rights upon a change in the opinion of the Judges, or in the organization of the Court.   It is safe to assume that these decisions have been generally acquiesced in, and have been accepted and acted upon by the people of that city as the paramount law and rule of property. Titles emanating from the city, must have become the subject of trade and commerce, and under the influence and upon the faith of these decisions, large sums of money must have been expended in the acquisition of these titles.   In point of fact, we know that these expenditures have been made, not only as investments, and for purposes of speculation, but whenever it could be done by the actual possessors of property, for the purpose of protecting their possessions. If under these circumstances the doctrine of *stare decisis* has no application, I think it would be difficult to state a case in which that doctrine could be properly invoked.

I shall present, as briefly as possible, the reasons which control my opinion upon this subject, and it is necessary in the first place to refer to the decisions of this Court.   In *Smith* v. *Morse* (2 Cal. 524) the controversy related to property situated, with reference to the title, similarly to that in dispute in this case.   It was considered unnecessary to pass upon the question of title, but it was held that if the property belonged to the city it was subject to levy and sale.   In *Cohas* v. *Raisin* (3 Cal. 443) it was held that the pueblo of San Francisco, to the rights of which the city has succeeded, was vested, by the laws of Mexico, with title to all the land within the limits of the pueblo.   The conclusion of the Court, as announced in the opinion of Mr. Justice Heydenfeldt, was : " That before the military occupation of California by the army of the United States, San Francisco was a Mexican

40

pueblo or municipal corporation, and was invested with title to the land within her boundaries." The opinion of Chief Justice Murray was never published, and the consequence is that the opinion of Judge Heydenfeldt has always been regarded as the unanimous opinion of the Court. There is, however, no conflict in the two opinions, and the substantial grounds of the decision were concurred in by the whole Court. The absolute title of the pueblo is the leading idea of both opinions and the controlling principle of the case. The decision was placed expressly upon the ground that the grant to the pueblo was in full property, and carried with it and vested in the pueblo all the rights and incidents of absolute ownership. In *Touchard* v. *Touchard* (5 Cal. 306) the case of *Cohas* v. *Raisin* was referred to and approved. In speaking of that case, the Court said: " We had occasion to examine the power and authority of towns under the Spanish and Mexican systems, to acquire and dispose of lands, and the conclusion there attained, after a careful examination of the Spanish and Mexican decrees, places their right upon as high ground as that of natural persons—a right of property beyond even the reach of royal interference." An examination of this case will show that the reference to *Cohas* v. *Raisin*, though incidental, was entirely pertinent, and it must therefore be regarded as an authoritative exposition of the principle of that case. In *Seale* v. *Mitchell* (5 Cal. 401) the Court passed upon and sustained the very title in controversy in this suit. The action was ejectment, and on the trial of the case the plaintiff, to prove his title, gave in evidence a judgment obtained in the Superior Court of the city of San Francisco, by Peter Smith, against the city. Upon this judgment an execution had been issued, and the plaintiff had purchased the property in dispute at Sheriff's sale. The execution and a deed from the Sheriff were also given in evidence. It was admitted that the property was situated within the limits of the former pueblo of San Francisco. Upon this evidence the plaintiff was nonsuited, but the published report of the case does not show upon what grounds the nonsuit was asked. It appears from the record, however, that it was asked, *first*, upon the ground that the deed from the Sheriff was void; and *second*, upon the ground that the plaintiff had failed to establish any title in the city. In response to the argument upon the latter of these grounds, the Court said: " In the case of *Cohas* v. *Raisin*, we decided that before the military occupation of California by the army of the United States, San Francisco

was a Mexican pueblo, or municipal corporation, and was invested
with title to the land within her boundaries. It results from this that
when a plaintiff sues for a lot in the former pueblo of San Francisco,
and deraigns his title from the city, it is *prima facie* evidence of title."
The conclusion was, that the nonsuit had been improperly granted,
and the judgment was reversed. I do not see how this case can be
distinguished from the case at bar. It affirmed the same title upon
which the plaintiff seeks to recover in this suit. In *Welsh* v. *Sullivan*
(8 Cal. 165) the question of the validity of this title was again brought
before the Court, and after full argument, Chief Justice Murray deliv-
ered an elaborate opinion, in which he maintained the authority of
*Cohas* v. *Raisin*, both upon principle and upon the doctrine of *stare
decisis.* The Associate Justices concurred in the decision. Mr. Justice
Terry held that upon the principle of *stare decisis,* the Court was bound
by its former decisions; and Mr. Justice Burnett placed his concur-
rence upon the ground that the title vested in the city under the Act
of Congress of 1851.

I have not alluded to the case of *Woodworth* v. *Fulton,* for the reason
that it is not proposed to return to the doctrines of that case, and the
fact that it was overruled furnishes no argument against the authority
of the cases to which I have referred.

A further examination of the decisions upon this subject is unneces-
sary. If these decisions were permitted to stand, there is little doubt
that the effect would be to settle finally the exciting questions involved
in this controversy. I cannot avoid the conviction that their overthrow
evinces a disregard for the sanctity of judicial determinations for which
no circumstances can furnish a sufficient justification. Any change in
the rules and principles regulating the administration of justice should
be introduced with great caution, and every such change, the tendency
of which is to disturb titles and impair the security of vested rights, is
in contravention of the spirit and policy of the law. A steady and
uniform rule of property is of much more importance than the legal
reasons upon which the rule was originally founded, and no Court can
be justified in disturbing such a rule upon the ground that it originated
in an erroneous conception of the law. However gross the error, if
it has taken root and become a rule of property, it is sacred and invio-
lable.

Where a rule has become settled law, says Mr. Broom, it is to be
followed, although some possible inconvenience may arise from a strict

observance of it, or although a satisfactory reason for it is wanted, or although the principle and policy of the rule may be questioned. *Misera est servitus, ubi jus est vagum aut incertum,* is a maxim which applies with peculiar force to questions respecting real property. (Broom's Leg. Max. 111.) When a doctrine is once fixed, says another learned author, as if it be so fixed by a decision, and subsequent practice grounded on it, it is to be adhered to. One ground of such adherence is the inconvenience of uncertainty in the law, an inconvenience which, with regard to property, may affect every man by the circumstance that the ablest conveyancers may not be able to direct him. Another reason for adhering to a rule of property is, that many estates may depend upon the rule, and the danger that the new determination may have a retrospect and shake many questions already settled. (Ram. on Leg. Judg. 126, 127.) "When a rule," says Chancellor Kent, " has been once deliberately adopted and declared, it ought not to be disturbed, unless by a Court of appeal or review, and never by the same Court, except for very cogent reasons and upon a clear manifestation of error; and if the practice were otherwise, it would be leaving us in a state of perplexing uncertainty as to the law." (1 Kent's Com. 476.) " No man," says Sir William Jones, " who is not a lawyer, would ever know how to act, and no man who is a lawyer would, in many instances, know how to advise, unless Courts were bound by authority as firmly as the Pagan deities were supposed to be bound by the decrees of fate." (Jones on Bail. 46.) "*Stare decisis,*" says Chief Justice Wilmot, " is a first principle in the administration of justice; and this, not from any fear of bringing appeals or writs of error in particular cases, but because these cases have furnished the light, by which conveyancers have been directed in settling and transferring property from one man to another. Upon the faith of an established rule, and the acquiescence of judges and of the whole nation in it, property to the amount of millions may depend. The Judges now, as their predecessors have always done, bow down to the rule *pro salute populi,* which is the supreme law of every community." (Wilm. Notes, 312.) " It is for such reasons," says Mr. Greenleaf, " that judges have deemed themselves bound to adhere to the rules of the law of real property, with a closeness sometimes bordering upon servility, but in truth, dictated by sound wisdom." (Greenl. Cruise on Real Property, 543.) " The altering settled rules concerning property is the most dangerous way of removing landmarks." (Parker, C. J.,

in *Goodwright* v. *Wright*, 1 P. Wm. 399.)  " My opinion is," says Lord Chancellor Macclesfield, in *Wagstaff* v. *Wagstaff*, (2 P. Wm. 288) "never to shake any settled resolutions touching property or the title to land, it being for the common good that these should be certain and known, however ill grounded the first resolution might be." The same view was expressed by Mr. Justice Wilmot, in *Robison* v. *Bland* (1 W. Bl. 264).  " There is no mischief," said Lord Mansfield, in *Rice* v. *Shute* (2 W. Bl. 696) "that attends setting aside rules of practice, when erroneous, though in rules of property it is otherwise." And again, in *Hodgson* v. *Ambrose* (1 Doug. 341) he said : " The great object, in questions of property, is certainty ; and if an erroneous or hasty determination has got into practice, there is more benefit to be derived from adhering to it than if it were to be overturned." Lord Camden, in *Morecock* v. *Dickens*, (Ambl. 678) speaking of the English rule, that the registration of a deed is notice of its contents, said, that if it were a new case, he should have his doubts; but the point was settled by a previous decision, and much property had been settled, and many conveyances made upon the strength of it.  "A thousand neglects to search," added he, " have been occasioned by that determination, and I cannot therefore take upon me to alter it." In *Doe* v. *Manning* (9 East, 71) Lord Ellenborough expressed a similar opinion, saying : " It is no new thing for the Court to hold itself concluded, in matters of real property, by former decisions, upon questions, in respect of which, if they were *res integra*, it probably would have come to very different conclusions."

Authorities in support of this doctrine might be multiplied to an indefinite extent. In *Towle* v. *Forney* (4 Kernan, 423) the Court of Appeals of New York, per Denio, C. J., said : " Theoretically the judgments of Courts are only evidence, more or less authentic, of the law, and not the law itself; and it is unhappily true that cases sometimes occur where a prior judgment upon the same legal question cannot be conscientiously followed after the principle has received a further and more deliberate examination.  The cases, however, are extremely rare in which the determination of the highest appellate Court can be properly departed from, when the same legal question again arises before a Court of the same Government.  If it shall be thought that an erroneous rule has been established by the adjudication relied on as a precedent, it is better that it should be changed by the Legislature, by an act which cannot retrospect, than that the Courts should over-

turn what they have themselves established, and thus disappoint all who have acted upon the rule which had been considered settled. If this is so where an abstract rule of law, determined in a prior case, is sought to be applied to new facts, the reason is stronger where, as in this case, a series of particular acts has been passed upon and held to produce a given result, and the same identical facts are again before the Court between other parties. In such a case, there being no pretense of collusion, and no reason to impute carelessness or inattention to the Judges, the determination should be considered final and conclusive upon all persons in interest, or who may become interested in the question, as well as upon the parties to the particular action. The present case affords a forcible illustration of the importance of this doctrine." The Supreme Court of Alabama, in *Rawls* v. *Kennedy*, (23 Ala. 240) said: "We have elaborated our views as to the operation of these statutes more than we should have done, for the reason that it has been urged that the question we have discussed is not an open one in this Court; that a different construction was given to the Act of 1843, in the case of *Henry* v. *Thorpe*, (14 Ala. 103) and the construction there given was recognized and affirmed in the later cases of *Doe* v. *Haskins* (15 Ala. 619) and *Coxe* v. *Davis* (17 Ala. 716). If this be so, and the construction thus given was made under such circumstances as to give to these cases the force of adjudications upon the questions here presented, whatever may be our own views as to their correctness, we should feel bound, from a just regard to the rights of others who may be supposed to have acquired titles under them, to adhere to the rules which they have established. The evils arising from a wrong decision, great as they may be, would, in our opinion, weigh but little in comparison with the consequences which might ensue to the community from the establishment of a precedent under which the most solemn adjudications of this Court, in relation to the titles of real property, might be questioned and abrogated."

If there be anything in the facts of this case to exempt it from the operation of the rule laid down by these authorities, I am unable to see it. It is true, so far as *Cohas* v. *Raisin* is concerned, it is admitted that the decision was correct, and upon the mere question of the validity of a grant made by an American Alcalde, during the military occupation of the country by the army of the United States, its authority is not disputed. But the theory of that case was that the pueblo was the absolute owner of the property, and it cannot be denied that this

theory is entirely subverted and overthrown.  It was this theory which was approved in *Touchard* v. *Touchard*, and subsequently adopted in *Seale* v. *Mitchell* and *Welsh* v. *Sullivan;* and it is this theory, thus approved and thus adopted, which I think should not now be over-turned.  The last two cases affirmed the identical title in controversy in this suit, and the public had a right to consider that all questions in relation to its validity were finally and conclusively determined.  It is idle to speculate upon the consequences of the decision in this case; it involves the most important interests of a wealthy and flourishing com-munity, and I am unwilling to do anything, the effect of which may be to impair the security or diminish the value of these interests.  No doubt any decision that we could make would be productive of hard-ship to individuals, but we have reason to apprehend a less serious result in this respect from adhering to former adjudications, than from any other course.  But, however this may be, the stability and uni-formity of our decisions, in matters of property, are of much greater importance than any consideration connected with the preservation of individual rights.

I will say in conclusion, that if the questions presented in this case were *res integra*, I should have no difficulty in arriving at a conclusion in accordance with the opinion of my associates; and as it is important that some settled rules should exist on these subjects, in any future case involving the same questions, I shall consider myself bound by the present determination of the Court.

In my opinion, the judgment of the Court below should be affirmed.

On petition for rehearing, BALDWIN, J. delivered the opinion of the Court—FIELD, C. J. concurring.

Petition for rehearing.  We are entirely satisfied that there is no error in the decision rendered by us in this cause.  The amplest oppor-tunities were afforded for the fullest discussion of all the propositions involved, and a protracted and careful examination given to all the matters before us.

It is *now* insisted that we were misled in relation to the Van Ness Ordinance; that "in point of fact" that ordinance was repealed prior to the passage of the Act of 1858, confirming it.  The Van Ness Ordi-nance was a part of the record in this case, and also in the case of *Holladay* v. *Frisbie*, and in the case of *Wheeler* v. *Hampson;* but this

repealing order was not in these cases.   Of course we could take no notice of it in our opinion, and it was not considered.   In the opinion in the present case, the effect and validity of this act and of the ordinance were involved in the consideration of the doctrine of *stare decisis*. It would make little for the general argument of the respondent if he maintained that this act of the Legislature was inoperative, since the only effect of this conclusion would be to show that the property was that of the city, and not of the claimants under the ordinance.   But we are by no means convinced that the mere order—if it were properly before us—of the Board of Supervisors (appended to the petition, and of date March 2, 1858) destroyed the power of the Legislature to give effect to the provisions of the previous ordinances of the city.   (See 3 How. U. S. R. 550 ; 9 How. 184, in addition to the cases cited in the opinion.)  And this, even if the Board of Supervisors, under the stringent and restrictive provisions of the Consolidation bill, had authority to act upon the subject.   (But see secs. 67–74 of the act.)   It would be difficult to show that if the Legislature has the acknowledged power of repealing the charter of a municipal corporation, the effect of which repeal would be to cause the whole property held for public use to revert to the State, why it would not have power to give effect to an ordinance disposing of portions of it on a professed consideration, when such ordinance had been partially executed and continued in force for a number of years, and probably important rights had vested under it.

However, it is unnecessary to consider the point further, for upon the concession—which we are far from making—that this act of the Board of Supervisors was effectual to defeat the rights claimed to have vested under the Ordinance of 1855, the respondent cannot maintain his action to recover the premises in controversy.

Petition denied.

NOTE.—Messrs. McDougall & Sharp and F. M. Haight, were for Respondent, and not for Appellants, as is stated in the preface of the case.

# NOTES AND COMMENTS.

## NOTE 1.

GRANTS OF LAND BY GOVERNORS, WITHIN THE LIMITS OF PUEBLOS.

The following is a list of the grants, and pretended grants, made by Governors, within, or partly within, the limits of the pueblo of San Francisco:

November 30th, 1836. Governor Gutierrez to F. Guerrero; four hundred varas north of the Mission, and on the Yerba Buena road.

May 21st, 1839. Governor Alvarado to S. Vallejo and J. P. Leese; two hundred by one hundred varas on the point of the "disembarcadero de Yerba Buena."

October 10th, 1839. Governor Jimeno to J. C. Bernal; one square league, being "Rincon de Salinas y Potrero Viejo." It will be seen, by an examination of the archives, that Bernal applied for a grant of this land, and "La Visitacion," on the second of November, 1834, two days before the order was issued, by the Governor, for organizing the pueblo of San Francisco. On the second of January, 1835, Governor Figueroa decreed on this petition as follows:

"As it appears, from the preceding reports, that the land asked for by Jose Cornelio Bernal, is of the property of the pueblo of San Francisco de Assis, to which it serves as *ejidos* for the common cattle, the petition is not granted, as it cannot be given in ownership, (*en propiedad*) but the party interested may keep his cattle there, the same as other citizens do," etc.

When the same party again applied, in 1839, for this grant, the authorities of the pueblo, and the person in charge of the Mission, were consulted, and both gave their written consent to the grant. Only a small portion of the grant falls within the pueblo limits.

January 25th, 1840. Governor Alvarado to J. J. Noe; three hundred varas, called "Comaritos," "at the estero and embarcadero of the ex-Mission of San Francisco."

February 27th, 1843. Governor Micheltorena to J. Y. Limantour; four square leagues, covering the largest portion of the lands of the pueblo of San Francisco. This claim has been rejected on the ground of fraud.

May 1st, 1844. Governor Micheltorena to F. and R. Haro; one-half league, called "Potrero de San Francisco."

December 23d, 1845. Governor Pico to J. J. Noe; one square league. The petition in this case was referred to the municipal officer of San Francisco for report, and the grant made on his recommendation. Nearly one-half is within the pueblo limits.

February 10th, 1846. Governor Pico to Santillan; three square leagues. This grant is bounded on the north by Yerba Buena; north-east by the Presidio of San Francisco; west by the lands of Francisco Haro; south by a part of the rancho of the Sanchez, and east by the bay of San Francisco.

May 6th, 1846. Governor Pico to Jose Andrade; six hundred varas in front of ex-Mission of San Francisco.

July 24th, 1846. Governor Pico to Fitch & Guerrero; one-half a league, called "Parage del Arroyo."

Hart *v.* Burnett.

**NOTE 2.** SCHEDULE OF GRANTS BY MUNICIPAL AUTHORITIES OF SAN FRANCISCO BETWEEN THE YEAR 1835, AND JULY 7TH, 1846.

| DATE OF GRANT. | BY WHOM SIGNED. | GRANTEE. | QUANT'Y. | DESCRIPTION, ETC. |
|---|---|---|---|---|
| 1836—June 2 | Estudillo, Alcalde | W. A. Richardson | 100 | No.  In Yerba Buena. |
| July 8 | " " | J. P. Leese | 100 | No. 56 " " |
| 1837—March 14 | Martinez, Alcalde | J. Fuller | 100 | No. 24 " " |
| November 8 | " " | F. Sanchez | 100 | No. 76 " " |
| December 7 | " " | J. Feil | 200 x 50 | No. ? " " |
| 1838—March 30 | De Haro, Alcalde | F. Casares | 100 | No. 49 " " |
| December 1 | " " | W. Gulnac | 200 x 50 | No. 49 " " |
| 1839—January 18 | " " | S. Vallejo | | No. ? " " |
| April 18 | " " | J. Pena | | No. ? " " |
| December 1 | Guerrero, J. de P | W. Hinckley | 100 x 50 | No. 19 " " |
| December 9 | " " | J C. Davis | 100 | No. 18 " " |
| 1840—January 15 | " " | J. P. Leese | 100 | No. 7 " " |
| January 15 | " " | J A. Vallejo | 50 | No. 3 " " |
| January 15 | " " | J. B. Cooper | 100 | No. 50 " " |
| January 15 | " " | J. Vioget | 100 x 50 | No. 23 " " |
| January 16 | " " | J. Vioget | 100 x 50 | BackLeese house" |
| August 4 | " " | G. Escolante | | In Yerba Buena. |
| November 18 | " " | L. Galindo | 50 | At Dolores. |
| November 18 | " " | C. Valencia | 50 | At Dolores. |
| November 18 | " " | F. Gomez | 50 | At Dolores. |
| 1842—March 8 | Sanchez, J. de P | W. Hinckley | 50 | At Dolores. |
| March 8 | " " | G. Allen | 50 | No. 21 Yerba Buena. |
| May 1 | " " | P. Sherback | 50 | No. 20 " " |
| October 12 | " " | C. Moreno | 50 | M. Dolores. |
| 1843—April | " " | V. Miramontes | 50 | No. 55 Yerba Buena. |
| April | " " | F. De Haro | 50 | No. 31 " " |
| April 14 | " " | J. Noe | 50 | No. 51 " " |
| April 15 | " " | D. Felis | 50 | No. 32 " " |
| April 15 | " " | J. Bautista | 50 | No. 33 " " |
| July 3 | " " | W. A. Leidesdorff | 100 x 50 | Nos. 49, 30 " " |
| August 13 | " " | B. Valencia | 50 | No. 16 " " |
| August 20 | " " | D. Felis | 200 | In Dolores. |
| October 15 | " " | G. Escolante | 50 | No. 15 Yerba Buena. |
| November 15 | " " | F Guerrero | 60 | No. 4 " " |
| December 15 | " " | T. Malla | 50 | No. 154 " " |
| December 15 | " " | H. Bee | 50 | No. |
| December 15 | " " | J. Castaneda | 50 | No. 53 " " |
| December 15 | " " | T. Maya | 50 | No. 54 " " |
| December 27 | " " | J. Martin | 50 | No. 35 " " |
| 1844—March 10 | Hinckley, Alcalde | C. W. Fluge | 100 | No. 26 " " |
| April 1 | " " | J. Briones | 50 | |
| July 12 | " " | R. Ridley | 50 | No. 139 " " |
| July 12 | " " | J. R. Berry | 50 | No. 138 " " |
| July 19 | " " | B. Dias and J. P. Mesa | 50 | No. 17 " " |
| November 13 | " " | C. Glien | 50 | No. 7 " " |
| December 1 | " " | E. T. Bale | 50 | No. 136 " " |
| December 15 | " " | J. Rose | 50 | No. 83 " " |
| December 15 | " " | A. A. Andrews | 50 | No. 104 " " |
| December 17 | " " | G. Reynolds | 50 | No. 84 " " |
| December 17 | " " | E. S Bernal | 50 | No. 37 " " |
| December 21 | " " | J. P. Dedmund | 50 | No. 58 " " |
| December 24 | " " | W. Johnson | 50 | No. 134 " " |
| December 24 | " " | W. Richardson | 50 | No. 59 " " |
| 1845—April 9 | Padilla, Alcalde | R. Haro | 50 | No. 174 " " |
| April 18 | " " | T. Smith | 50 | No. 66 " " |
| May 3 | " " | J. Pena | 50 | No. 161 " " |
| May 10 | " " | E. Sota | 50 | No. 44 " " |
| May 10 | " " | L. Pena | 50 | No. 86 " " |
| August 10 | C. Sanchez, Alcalde | F. Sanchez | 50 | No. 25 " " |
| August 22 | " " | F. Le Page | 50 | No. |
| October 20 | " " | W. Fisher | 50 | No. 61 " " |
| November 25 | " " | P. Estrada | 50 | No. |
| November 30 | " " | M. Pedrorena | 50 | No. 74 " " |
| December 4 | " " | S. Smith | 100 x 50 | No. |
| December 7 | " " | G. Briones | 50 | No. 5 " " |
| 1846—April 2 | | R. T. Ridley | 100 | In San Francisco. |
| April 22 | Noe, J. de P | W. Leidesdorff | 50 | No.  In Yerba Buena. |
| April 22 | Sanchez, J. de P | J. A. Forbes | 50 | Nos. 183, 184 " |
| May 14 | Noe, " | H. Fitch | 50 | No. 22 Yerba Buena. |
| May 15 | " " | F. Haen & G. Dopling | 50 | No. 189 " " |
| May 20 | " " | W. Hinckley | 50 | No. 27 " " |
| May 22 | " " | E. Grimes | 50 | No. 140 " " |
| May 22 | " " | M. Feraandez | 50 | No. 195 " " |
| May 25 | " " | Hensley | 50 | No. 191 " " |
| May 28 | " " | Reading | 50 | No. 8 " " |
| May 29 | " " | W. Hinckley | 100 x 50 | No. |
| May 30 | " " | L. Galindo | 50 | No. 190 " " |
| June 3 | " " | S. Smith | 50 | No. 52 " " |
| June 6 | " " | J. M. S. Maria | 50 | No. 6 " " |
| June 18 | " " | M. E. McIntosh | | No. 196 " " |
| June 19 | " " | D. Garcia | | No. 273 " " |
| June 19 | " " | F. Hoen | | No. 62 " " |
| June 19 | " " | J. Allig | | No. 63 " " |
| June 20 | " " | J. Yuvain | | No. 60 " " |

Hart *v.* Burnett.

# NOTE 3.

*AN ACT concerning the City of San Francisco, and to ratify and confirm certain Ordinances of the Common Council of said city.*

[Approved March 11, 1858.]

*The People of the State of California, represented in Senate and Assembly, do enact as follows:*

SECTION 1. *Whereas*, The common council of the city of San Francisco passed an ordinance approved by the Mayor on the twentieth day of June, A. D. one thousand eight hundred and fifty-five, which ordinance is in the words and figures following, to wit:

Number eight hundred and twenty-two—Ordinance for the settlement and quieting of the land titles in the city of San Francisco.

*The People of the city of San Francisco do ordain as follows:*

SECTION 1. It shall be the duty of the Mayor to enter, at the proper land office of the United States, at the minimum price, all the lands above the natural high-water mark of the bay of San Francisco, at the time of the admission of California into the Union as a State, situated within the corporate limits of the city of San Francisco, as defined in the act to incorporate said city, passed April fifteenth, one thousand eight hundred and fifty-one, in trust for the several use, benefit, and behoof of the occupants or possessors thereof, according to their respective interests.

SEC. 2. The city of San Francisco hereby relinquishes and grants all the right and claim of the city to the lands within the corporate limits, to the parties in the actual possession thereof, by themselves or tenants, on or before the first day of January, A. D. one thousand eight hundred and fifty-five, and to their heirs and assigns forever; excepting the property known as the slip property, and bounded on the north by Clay street, on the west by Davis street, on the south by Sacramento street, and on the east by the water-lot front. And excepting, also, any piece or parcel of lan situated south, east, or north of the water-lot front of the city of San Francisco, as established by an act of the Legislature of March twenty-sixth, A. D. one thousand eight hundred and fifty-one; *Provided*, such possession has been continued up to the time of the introduction of this ordinance in the common council; or, if interrupted by an intruder, or trespasser, has been, or may be, recovered by legal process; and it is hereby declared to be the true intent and meaning of this ordinance, that when any of the said lands have been occupied and possessed under and by virtue of a lease or demise, they shall be deemed to have been in the possession of the landlord or lessor under whom they were so occupied or possessed; *Provided,* that all persons who hold title to lands within said limits by virtue of any grant made by any ayuntamiento, town council, alcalde, or justice of the peace of the former pueblo of San Francisco, before the seventh day of July, one thousand eight hundred and forty-six; or grants to lots of land lying east of Larkin street and northeast of Johnson street, made by any ayuntamiento, town council, or alcalde of said pueblo, since that date, and before the incorporation of the city of San Francisco by the State of California; and which grant, or the material portion thereof, was registered or recorded in a proper book of record deposited in the office, or custody, or control of the recorder of the county of San Francisco, on or before the third day of April, A. D. one thousand eight hundred and fifty; or by virtue of any conveyance duly made by the commissioners of the funded debt of the city of San Francisco, and recorded on or before the first day of January, one thousand eight hundred and fifty-five, shall, for all the purposes contemplated by this ordinance, be deemed to be the possessors of the land so granted, although the said lands may be in the actual occupancy of persons holding the same adverse to the said grantees.

SEC. 3. The patent issued, or any grant made by the United States to the city, shall inure to the several use, benefit and behoof of the said possessors, their heirs and assigns, mentioned in the preceding section, as fully and effectually, to all intents and purposes, as if it were issued or made directly to them individually and by name.

SEC. 4. The city, however, as a consideration annexed to the next two preceding sections, reserves to itself all the lots which it now occupies, or has already set apart for public squares, streets, and sites for school-houses, city hall, and other buildings belonging to the corporation; and also such lots and lands as may be selected and reserved for streets and other public purposes, under the provisions of the next succeeding sections.

SEC. 5. The city shall have the right to proceed to lay out and open streets, as soon as the corporation may deem it expedient, in that part of the city west of Larkin street and southwest of Johnson street, and reserves the right to take possession of such lands as it may be necessary to occupy for that purpose, without compensation; and to assess, in the manner provided by the pres-

ent or any existing charter of the city, upon the lands bounded on such streets, the whole expense of laying out, opening, grading, and constructing the same; and payment of the costs of said improvements shall be deemed a charge upon the lands mentioned in this section, to which the city of San Francisco relinquishes her right and title by the second and third sections of this ordinance.

Sec. 6.  The city shall also have the right to select and set apart, from the lands west of Larkin street and southwest of Johnson street, as many lots, not exceeding one hundred and thirty-seven and a half feet square each, as the Mayor and common council may, by ordinance, determine to be necessary for sites for school-houses, hospitals, fire-engine houses, and other public establishments necessary and proper for the use of the corporation; and may lay out and reserve upon the said lands, at convenient and suitable points and distances, public squares, which shall not embrace more than one block, corresponding in size to the adjoining blocks; *Provided,* that the selection shall be made within six months from the time of the passage of this ordinance; and that the city shall not, without due compensation, occupy, for the purposes mentioned in this section, after the laying out of the streets aforesaid, more than one-twentieth part of the land in possession of any one person; and that such possessor shall voluntarily assent thereto; or, refusing to do so, shall not be entitled to the benefit of any concession contained in the second and third sections of this ordinance.

Sec. 7.  The lots and lands reserved for the use of the corporation, under the provisions of the next preceding section, shall be selected in localities likely to be most convenient and suitable for their respective uses, and in such proportion to the quantity in the possession of the respective occupants as to make the apportionment as nearly equal as circumstances will admit.

Sec. 8.  The selection of said lands and lots shall be made by a commission, to consist of three persons, who shall be chosen by the common council, in joint convention, who shall report the same to the common council for its approval; and, upon such approval, deeds of release to the corporation for the lands thus selected shall be executed, acknowledged and recorded, in which deeds shall be specified the uses for which they are granted, reserved and set apart, respectively.

Sec. 9.  Although the city hereby renounces in favor of the actual possessors, in accordance with the provisions of section second, any right or claim of its own, nothing in this ordinance is intended to prejudice any other outstanding title to the said lands adverse to the said possessors.

Sec. 10.  Application shall be made to the Legislature to confirm and ratify this ordinance, and to Congress to relinquish all the right and title of the United States to the said lands, for the uses and purposes hereinbefore specified.

Sec. 11.  Nothing contained in this ordinance shall be construed to prevent the city from continuing to prosecute, to a final determination, her claim now pending before the United States Land Commission, for pueblo lands, for the several use, benefit and behoof of the said possessors mentioned in section two, as to the lands by them so possessed, and for the proper use, benefit and behoof of the corporation as to all other lands not hereinbefore released and confirmed to the said possessors.

Sec. 12.  That all ordinances, or parts of ordinances, conflicting with this ordinance, or any of its provisions, be and the same are hereby repealed.

[Approved, June twentieth, one thousand eight hundred and fifty-five.  S. P. WEBB, Mayor.]

*And whereas,* the said common council passed another ordinance, approved by the Mayor of said city, September twenty-seventh, A. D. one thousand eight hundred and fifty-five, which last mentioned ordinance is in the words and figures following, to wit:

Number eight hundred and forty-five.—Ordinance providing for selecting and designating public squares and reservations for hospitals, fire-engines and school purposes, and for adopting the plan of streets in the western and south-western portion of the city, according to the provisions of ordinance number eight hundred and twenty-two, and confirmatory of said ordinance number eight hundred and twenty-two.

*The People of the city of San Francisco do ordain as follows:*

Section 1.  Under and by virtue of the provisions of the ordinance of the common council, number eight hundred and twenty-two, entitled " an ordinance for the settlement and quieting of land titles in the city of San Francisco, approved June twentieth, one thousand eight hundred and fifty-five," the board of aldermen and board of assistant aldermen shall meet in joint convention, at their next regular meeting after the passage of this ordinance, and proceed to elect three commissioners, who shall have the powers, and proceed to discharge the duties specified in section eight of said ordinance number eight hundred and twenty-two.

Sec. 2.  It shall be the duty of the city surveyor, acting in conjunction with the said commissioners, and with their concurrence, to furnish, by way of recommendation to the common council, within one month from the date of their appointment, a plan for the location and dimensions of the streets to be laid out within the city limits, west of Larkin and south-west of Johnson streets, upon

Hart *v.* Burnett.

which plan shall also be designated the lots and grounds selected by the said commissioners for the use of the city under the provisions of the aforesaid ordinance number eight hundred and twenty-two; *Provided*, that the compensation of said commissioners shall not exceed the sum of one hundred dollars each, payable when the common council may legally make an appropriation therefor.

SEC. 3. The said ordinance number eight hundred and twenty-two, referred to in the preceding section one, is hereby re-ordained, ratified and confirmed in all its parts.

[Approved, September twenty-seventh, one thousand eight hundred and fifty-five.

JAMES VAN NESS, Mayor.]

*And whereas*, in pursuance of the aforesaid ordinances, commissioners were appointed by the common council, who, in conjunction with the city surveyor of said city, agreed upon and reported, for the approval of the common council, a plan for the location of streets, public squares, and lots for public uses, to be laid out west of Larkin and southwest of Johnson streets, in said city, accompanied by a map of the same, which said plan and map was, by the justices of the peace exercising the powers of a board of supervisors of the city and county of San Francisco, adopted, approved and ratified by an order bearing date the sixteenth day of October, A. D. one thousand eight hundred and fifty-six, which is in the words and figures following, to wit:

*The Board of Supervisors of the City and County of San Francisco do ordain as follows:*

SECTION 1. That the plan or map of the Western Addition, reported by the commission created under an ordinance of the last common council of the city of San Francisco, be adopted by this board, and be declared to be the plan of the city, in respect to the location and establishment of streets and avenues, and the reservation of squares and lots for public purposes in that portion of the then incorporated limits of said city, lying west of Larkin and southwest of Johnson streets.

*Be it therefore enacted*, That the within and before recited order and ordinances be and the same are hereby ratified and confirmed; and all the land entered, or to be entered, in the United States Land Office, in pursuance of section one of the first recited of said ordinances, in trust, shall pass and inure to, and be deemed to have immediately vested in the occupants thereof, for their several use and benefit, according to their respective interests, in execution of the trust designated in an Act of Congress, entitled an act for the relief of citizens of towns upon the public lands of the United States, under certain circumstances, approved May twenty-third, one thousand eight hundred and forty-four, as extended and applied by an Act of Congress, entitled an act to provide for the survey of the public lands in California, the granting of pre-emption rights therein, and for other purposes, approved March third, one thousand eight hundred and fifty-three; and it shall be the duty of all Courts and officers to take judicial notice of the said order and ordinances, as hereinbefore recited, without further proof, as fully and effectually, to all intents and purposes, as if they were public acts of the State Legislature.

SEC. 2. That the grant of relinquishment of title made by the said city in favor of the several possessors, by sections two and three of the ordinance first above recited, shall take effect as fully and completely, for the purpose of transferring the city's interest, and for all other purposes whatsoever, as if deeds of release and quit-claim had been duly executed and delivered to and in favor of them individually and by name; and no further conveyance or other act shall be necessary to invest the said possessors with all the interest, title, rights, benefits and advantages, which the said order and ordinances intend or purport to transfer or convey, according to the true intent and meaning thereof; *Provided*, that nothing in this act shall be so construed as to release the city of San Francisco, or city and county of San Francisco, from the payment of any claim or claims due or to become due this State against said city, or city and county, nor to effect or release to said city and county any title this State has or may have to any lands in said city and county of San Francisco.

---

# NOTE 4.

### ZAMORANO DOCUMENT.

The following is a translation of this document:

"POLITICAL GOVERNMENT OF ALTA CALIFORNIA.
*Head-Quarters General of Alta California.*

"The Government, satisfied with the zeal and activity which characterizes you, as well as the patriotism which animates you, sees in your official note of the twenty-fourth October last, a new proof of your vehement desire for the progress, and of your untiring efforts for the improvement and aggrandisement of your country, and of your fellow citizens.

Holladay *v.* Frisbie.

"In consequence, it affords me pleasure to inform you, in accordance with its request, that the E. D. T. has adopted, in its totality, the plan which you presented in your note, aforesaid, with regard to the pueblo of San Francisco, declaring the boundaries to be the same that you delineated in the said note; that is, commencing at the little cove at E. of the *Fortaleza*, following the line traced by you, as far as the shore, leaving to the north, *Casemata* and the *Fortaleza*; thence following the border of the said shore to Point of Lobos, on its southern side; thence following a straight line, as far as the peak of the *Devisedero (Lookout)* continuing the said line towards the E. as far as the Point of the Rincon, embracing the *Canutales* and the *Gentil.* Said line shall terminate within the bay of the Mission Dolores, whose estuary shall serve for a natural boundary between the municipal jurisdiction of that pueblo and the aforesaid Mission de Dolores.

"The Government, in proof of the confidence which your services inspired, has arranged that you shall be he who will have the honor of installing the first Ayuntamiento in that pueblo of San Francisco, for which you have already done so much.

"You will therefore proceed, at the time, and in the mode provided by law, to the election of the municipal authorities, in order that they be installed on the first day of January of the coming year 1835; setting apart for public buildings those edifices which to you may seem most appropriate.

"God and Liberty.

"*Monterey, November 4th*, 1834.                    (Signed)                    JOSE FIGUEROA.
"DON MARIANO G. VALLEJO,
    "Military Commandant of San Francisco.
"It is a true copy.                                                              ZAMORANO."